**EXHIBIT "G"**

RECEIVED IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
2005 JUN 13 P 10: 26          EASTERN DIVISION

| | | |
|---|---|---|
| MORRIS FOREST PRODUCTS, LLC;<br>STAN PITTMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Civil Action Number:** |
| v. | ) | |
| | ) | 2:05CV564-B |
| KEYSTONE EXTERIOR DESIGN, | ) | Removed from the Circuit Court |
| LLC; JERRY TURNER; DON | ) | of Tallapoosa County, Alabama |
| LUDWIG; UNIVERSAL FOREST | ) | CV-05-101, Alexander City |
| PRODUCTS; MATTHEW J. MISSAD; | ) | Division |
| DOUGLAS P. HONHOLT; DANA | ) | |
| RECTOR; KRAIG JANSEN, | ) | |
| | ) | |
| Defendants. | ) | |

---

## BRIEF IN SUPPORT OF DEFENDANTS' NOTICE OF REMOVAL

---

COME NOW Defendants, Universal Forest Products, Matthew Missad, Douglas

Honholt, Dana Rector, and Kraig Jansen and by and through its undersigned counsel files

this Brief in Support of its Notice of Removal. The Defendant respectfully removes this

action to the United States District Court for the Middle District of Alabama, Eastern

Division and in support thereof, states the following:

## STATEMENT OF FACTS

The Plaintiffs in this action are: (1) Morris Forest Products, LLC (hereinafter "MFP"),

an Alabama corporation located in Tallapoosa County, Alabama, on the west side of the

Tallapoosa River; and (2) Stan Pittman (hereinafter "Pittman"), an employee of MFP and

resident citizen of the State of Georgia. (Complaint[1], p.1). The Defendants are: (1) Keystone Exterior Design, LLC, a Tennessee corporation (hereinafter "Keystone") with its principal place of business in Tennessee[2]; (2) Jerry Turner (hereinafter "Turner"), a resident the State of Tennessee; (3) Don Ludwig (hereinafter "Ludwig"), a resident of the State of Ohio; (4) Universal Forest Products, is a Michigan corporation (hereinafter "Universal") with its principal place of business in the State of Michigan[3]; (5) Matthew Missad (hereinafter "Missad"), the Executive Vice-President of Universal and a resident of the state of Michigan; (6) Douglas Honholt (hereinafter "Honholt"), the Vice-President of Industrial Sales of Universal and a resident of the State of Michigan; Dana Rector (hereinafter "Rector"), a Director of Manufacturing for Universal and a resident of the State of Georgia; and Kraig Jansen (hereinafter "Jansen"), an Installment Products Operation Manager for Universal and a resident of the State of Georgia. (Complaint, p.2). On or about November 21, 2003, Keystone and MFP entered into a "Licensing Agreement." (Complaint, p.2; Licensing Agreement[4]). This agreement specifically provided that "the agreement is for the term from 11/1/2003 through 10/31/2004; thereafter, the parties will review and renew the agreement annually, making revisions that are mutually acceptable." (Licensing Agreement). The

---

[1] A copy of Plaintiffs' Complaint is attached to this Brief as Exhibit "A."

[2] See Affidavit of Donald Ludwig, attached to this Brief as Exhibit "B."

[3] See Affidavit of Eric Maxey, attached to this Brief as Exhibit "C."

[4] A copy of the Licensing Agreement is attached to this Brief as Exhibit "D."

agreement between the parties." (*Id.*). Nowhere in the entire agreement does the name Stan Pittman appear, nor does the agreement mention any commissions for MFP employees. (*Id.*).

On February 7, 2005, Missad, Honholt, Rector, and Jansen had a meeting with MFP. (Complaint, p.6). During this meeting, it is alleged that Universal, Missad, Honholt, Rector, and Jansen made some fraudulent misrepresentations. (Complaint, p.6).

## ARGUMENT

### This Honorable Court Should Exercise Subject Matter Jurisdiction Over This Matter Because There is Complete Diversity Between the Proper Parties.

A federal district court may exercise subject matter jurisdiction over a civil action in which only state law claims are alleged if the civil action arises under the federal court's diversity jurisdiction. *See* 28 U.S.C. § 1332(a)(1). The diversity statute confers jurisdiction on the federal courts in civil actions "between citizens of different states," in which the jurisdictional amount is met. Id. To satisfy diversity, not only must a plaintiff be a citizen of a state other than the state of which one defendant is a citizen, but also, under the rule of "complete diversity," no plaintiff may share the same state citizenship with any defendant. *See* Strawbridge v. Curtiss, 7 U.S. 267 (1806).

Because of the complete diversity requirement, a plaintiff may prevent removal simply by joining a defendant who shares the same state as the plaintiff. The filing of a frivolous or otherwise illegitimate claim against a non-diverse defendant solely to prevent removal is called "fraudulent joinder" and courts may disregard the citizenship of

fraudulently joined defendants when assessing the existence of complete diversity. <u>Wright v. American General Life and Accident Insurance Co.</u>, 136 F. Supp. 2d 1207 (M.D. Ala. 2001); *see also* <u>Tedder v. F.M.C. Corp.</u>, 590 F.2d 115, 117 (5th Cir. 1979)[5]

The Eleventh Circuit applies a three-fold test for determining whether a defendant has been fraudulently joined: the removing party must show (1) that there is no possibility the plaintiff could establish a cause of action against the resident defendant in state court, (2) that the plaintiff fraudulently pleaded jurisdictional facts, or (3) where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several or alternative liability and the claim has no real connection to the claim against the nondiverse defendant. <u>Wright</u>, at 1211; *see also* <u>Triggs v. John Crump Toyota</u>, 154 F.3d 1284, 1287 (11th Cir. 1998).

In the instant case, the proper plaintiff, MFP, has attempted to defeat diversity by fraudulently joining another plaintiff, Stan Pittman, and defendants Missad, Honholt, Rector, and Jansen.

## I.  Fraudulent Joinder of the Stan Pittman

Mr. Pittman is fraudulently joined in this action because he has cannot establish a cause of action against any resident defendant. The Complaint contains four claims, breach of contract, intentional interference, suppression, and fraud, however, the Complaint does not distinguish between the claims of Pittman and MFP, therefore all four claims will be

---

[5] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc) the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

addressed as to Mr. Pittman.

## A.    Breach of Contract

With regard to the breach of contract claim, the Plaintiff's allege that Mr. Pittman is a third-party beneficiary to the contract and as such, has standing to sue. This contention, however, is not supported by the law and the facts. "To recover under a third-party beneficiary theory, the complainant must show: (1) that the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon a third party; (2) that the complainant was *the intended beneficiary* of the contract; and (3) that the contract was breached." Collins Company, Inc. v. City of Decatur, 533 So. 2d 1127, 1132 (Ala. 1988)(emphasis added); *see also* Sheetz, Aiken & Aiken, Inc. c. Spann, Hall, Ritchie, Inc., 512 So. 2d 99, 101-02 (Ala. 1987). If the benefit to the third person is not intended to be a direct benefit, but rather to be merely an incidental benefit, the third person will not be entitled to damages based on a breach of that contract. Id., *citing* Mills v. Welk, 470 So. 2d 1226, 1228 (Ala. 1985).

It has also been held that the contract itself is the best evidence of the intention of the parties at the time of contracting, and that where it is plain upon the contract's face that no direct benefits were intended for the third person, then the third person is merely an incidental beneficiary and may not recover. *See* Sheetz, Aiken & Aiken, Inc. v. Spann, Hall, Ritchie, Inc., *supra.*; *see also* Collins, *supra.*(holding that courts must look to the surrounding circumstances of the transaction only when the contract is unclear as to whether the contracting parties intentionally conferred upon a third person a direct benefit;

consequently the court's inquiry may stop when it determines from the face of the contract

that the parties did not intend to confer upon the third person a direct benefit.

Clearly, in the instant case, Mr. Pittman is not a third party beneficiary because there

is no indication that at the time the contract was created that the contracting parties, MFP and

Keystone, intended to bestow a direct benefit upon him. Indeed the contract in this case is

not only the best evidence of the parties intention, but it is the only evidence this Honorable

Court should consider on that issue. The contract is clear that it is for the direct benefit of

both MFP and Keystone, however Mr. Pittman's name is never mentioned in the entire

three-page document. The agreement never addresses any personnel issues, much less

expresses a benefit on any one employee. Mr. Pittman is merely an MFP employee who was

selected by MFP to perform certain tasks for MFP which included the sale of Keystone

products. His position, and corresponding salary, was incidental to MFP and Keystone's

agreement.

Allowing an employee such as Mr. Pittman to qualify as a third-party beneficiary

would open up a flood gate of third-party beneficiary claims. Every employee who ever

once received some compensation for work on any company's licensing contract would be

allowed to maintain a claim. Under the plaintiffs' theory, a cashier at a local Wal-Mart could

sue a supplier who breached a contract to supply goods for sale at the Wal-Mart store. This

is simply preposterous. In fact, it is so preposterous, that the Plaintiffs have not included any

other MFP employees who may have noticed an incidental benefit from the licensing

agreement in this lawsuit. Clearly, Mr. Pittman was selected only in a fraudulent attempt to

-6-

defeat diversity.

The Plaintiffs attempt to make some distinction that Mr. Pittman was paid on commission, however, that was merely his form of income. The commissions were not directly driven by the original licensing agreement, but rather only an incidental benefit. The agreement never contemplates employee compensation and it was MFP who decided to pay Mr. Pittman on commission. Pittman is an intended beneficiary of the agreement he personally reached with MFP, but he is merely an incidental, not intended, beneficiary of the contract between Keystone and MFP at issue in this case.

Additionally, allowing Mr. Pittman to recover under any of the claims of the Complaint would allow the plaintiffs double recovery against the defendants. Assuming arguendo that all the claims in the Complaint are valid, the defendants would be held liable twice for the same conduct. The court would be permitting both MFP and Mr. Pittman recovery. This is against Alabama law[6] and once again would open up a flood of potential claims. Essentially every employee who is affected by a contractual termination or corporate activities would be allowed a claim against any party involved in that termination or transaction. For these reasons, Mr. Pittman's claims are not viable.

**B.    Intentional Interference**

Mr. Pittman's claim for intentional interference is not viable because he does not have a contractual or business relationship with Keystone. Alabama law requires that Mr. Pittman first have a contractual or business relationship with Keystone prior to any alleged

_____

[6] *See* Keating v. Contractors Tire Service, Inc., 428 So. 2d 624 (Ala. 1983)

-7-

interference on Universal's part. *See* <u>Parsons v. Aaron</u>, 849 So. 2d 932 (Ala. 2002); <u>Serra Chevrolet, Inc. v. Edwards Chevrolet, Inc.</u>, 850 So. 2d 259 (Ala. 2002). Mr. Pittman's only relationship in this case was with MFP, his employer. He was not a direct party, nor a third-party beneficiary, of the agreement between MFP and Universal[7] Therefore, he had no relationship to interfere with and as such, his claim for intentional interference is not viable.

Additionally, assuming arguendo Mr. Pittman has standing and a relevant relationship, his claim for tortious interference is barred by the doctrine of competitor's privilege. Alabama has adopted the doctrine of competitor's privilege as an absolute defense to a claim for tortious interference. *See* <u>Soap Co. v. Ecolab, Inc.</u>, *supra*. The doctrine states that:

> "One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if: (a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint on trade and (d) his purpose is at least in part to advance his interest in competing with the other."

<u>Id.</u> at 1369; *see also* <u>Tom's Foods, Inc. v. Carn III</u>, 896 So. 2d 443 (Ala. 2004).

It is undisputable that MFP and Universal were competitors; the Plaintiffs' Complaint clearly indicates that the two companies were competing over Keystone's business at the time of the alleged interference. The second criterion for the privilege is satisfied because Universal did not engage in any unlawful activity when negotiating with Keystone. Mr.

---

[7] See Section I.A. of this Brief for a Discussion of Mr. Pittman's lack of standing.

Pittman has offered no evidence indicating that Universal negotiated unlawfully or lied to Keystone. It is undisputed that the contract in question contains a termination date of October 31, 2004. (See Exhibit "D"). Though the Plaintiffs now dispute the fact that the contract had expired, it is undisputed that Keystone represented to Universal Forest Products its understanding that the contract had already expired in October of 2004 when it began negotiating with Universal Forest Products in November of 2004. (See November 28, 2004 letter from Keystone to Matt Missad, attached hereto as Exhibit "E").

The only "tortuous conduct" alleged by Pittman in attempting to create a claim of tortuous interference is fraud. However, the statements complained of by Pittman in his Complaint were made to MFP after Keystone had already made the decision to take the position that the contract had expired. Thus, even if Pittman could make out a claim for fraud,[8] the alleged fraudulent statements do not amount to tortuous interference because those statements had no bearing on the relationship between Keystone and MFP. Because the statements were made to MFP, they did not in any way induce Keystone to breach the contract and therefore had no effect whatsoever on Keystone's position. Further, as will be shown more clearly in the "Fraud" section below, the alleged statements of Universal employee to MFP did not have any effect on MFP's handling of this situation. According to the Plaintiff's Complaint, a meeting occurred on February 7, 2005 in which the alleged fraudulent statements were made. By that time, MFP had already been made aware of

---

[8] Pittman cannot state a claim for fraud. This issue is addressed more specifically in Section 1(d) below.

Keystone's desire to end its relationship with MFP. In fact, on February 3, 2005, MFP authored a letter to Keystone giving Keystone three options to settle its differences with MFP. (See February 3, 2005 letter, attached hereto as Exhibit "F"). More than two weeks later, and two weeks after the February 7, 2005 meeting which supposedly provides a basis for a fraud claim, MFP again wrote to Keystone and to UFP. (See February 21, 2005 letter, attached hereto as Exhibit "G"). At that time, MFP reiterated its settlement demands, which were unchanged from MFP's position prior to the February 7th meeting. Thus, it is clear that the February 7, 2005 meeting upon which Pittman bases his fraud claim did nothing to change the position of Morris Forest Products with regard to its differences with Keystone.

Finally, the fourth criteria is met because any actions on Universal's part in dealing with Keystone were done for the purpose of advancing the company's interest.[9] This interest would of course increase Universal's business and in turn improve its position in the competition for Keystone's business.

For the stated reasons, the doctrine of competitor's privilege bars any claim by Mr. Pittman for intentional interference.

**C.    Suppression**

In order to establish a prima facie claim of fraudulent suppression, a plaintiff must produce substantial evidence establishing the following elements: (1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the defendant's

---

[9] The third criterion of the privilege is not at issue in this case, and is therefore satisfied.

suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result. Johnson v. Sorensen, 2005 WL 1253829 (Ala. 2005), *quoting* State Farm Fire & Cas. Co. v. Slade, 747 So. 2d 293, 323-24 (Ala. 1999).

Mr. Pittman cannot establish a prima facie claim of fraudulent suppression because none of the defendants owed him a duty to disclose material facts. The Complaint states that the Defendants had a duty to disclose certain material facts, however, even if a duty existed, it most certainly was not to Mr. Pittman. The defendants never dealt with Mr. Pittman in a capacity that would require disclosure of the material facts alleged in the Complaint. He was merely an employee of MFP and as such he was not owed a duty of disclosure.

Additionally, Mr. Pittman must also prove that he suffered actual damages. According to the Complaint, Mr. Pittman's losses consist of future lost commissions. These figures are speculative and are not actual damages. For these reasons, Mr. Pittman's intentional interference claim fails.

### D.    Fraud

The elements of fraud are: (1) a false representation; (2) of a material existing fact; (3) reasonably relied upon by the plaintiff; (4) who suffered damage as a proximate consequence of the misrepresentation. Saia Food Distributors and Club, Inc. v. SecurityLink From Ameritech, Inc., 2004 WL 2757417 (Ala. 2004), *quoting* Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So. 2d 1143, 1160 (Ala. 2003).

In the instant case, Mr. Pittman has no viable claim for fraud because the alleged fraudulent statements did not concern him, he did not rely on the statements and he did not suffer damages as a proximate consequence of the misrepresentation. The alleged statements were stated at a meeting between MFP and Universal. The statements address issues between Keystone, MFP, and Universal, not Mr. Pittman. Mr. Pittman may very well have been present at the meeting, however his hearing the statements does not give rise to fraud. The facts represented were not material to his relationship with MFP. He had no other relationship at the meeting. Thus, he was not defrauded individually.

Additionally, there is no evidence that Mr. Pittman relied on the statements, nor is there any evidence that he was harmed as a proximate consequence of the misrepresentations. Mr. Pittman's harm was caused when MFP and Keystone could not reach an agreement and MFP subsequently eliminated his commissions. There is absolutely no evidence that he relied on anything stated in the meeting and furthermore, any such reliance would be unreasonable at best. He would be relying on statements made by a competitor in a meeting discussing the very business his company and the competitor were negotiating for.

Finally, the alleged statements concern the business of Keystone and Universal is not responsible for that business. Interrogating Universal regarding Keystone's conduct is merely asking for Universal's speculations and opinions, which is not actionable as fraud. ". . . One cannot commit fraud by expressing opinions . . . ." Shuttershop, Inc. v. Amersham Corp., 114 F.Supp.2d 1218 (M.D. Ala. 2000). See also, Crown Investments, Inc. v. Bryant,

638 So.2d 873 (Ala. 1994)(holding that statements of opinion are not statements of material fact and therefore will not support fraud claims). At most, with regard to any issue which actually affected MFP or, indirectly, affected Pittman, the Universal employees could merely offer their opinions as to what Keystone's position might be or as to what Keystone would do in the future. For these reasons, Mr. Pittman's fraud claim is not viable.

Finally, as stated above, even if Pittman could somehow claim reliance on any statements made by Universal employees, that reliance would be limited to his position as employee of MFP. It is clear that Mr. Pittman did not individually make corporate decisions for MFP. However, even if he had been involved in those decisions, the evidence is undisputable that MFP did not change its position with regard to its relationship with Keystone as a result of the February 7, 2005 meeting which is the only alleged basis for the claim of fraud. As shown above, MFP made a settlement demand to Keystone prior to the February 7, 2005 meeting at which time it stated its position as to the relationship with Keystone and its alleged damages for what it felt to be a breach of contract. Two weeks after the February 7th meeting, MFP restated the exact same settlement demand. Thus, after the February 7, 2005 meeting, MFP did not in any way change its position with regard to its relationship with Keystone or the money that it sought to remedy what it felt to be a breach of contract. Clearly, MFP already felt that a breach had occurred before the February 7, 2005 meeting and had already made its decision as to the proper response to the alleged breach. The February 7, 2005 meeting with Universal employees did not factor in to this decision, or the post meeting demands would have been different. They were not, and thus

-13-

a fraud claim clearly does not exist.

## II.    Fraudulent Joinder of the Georgia Defendants

The Georgia defendants of Mr. Jansen and Mr. Rector are fraudulently joined because no plaintiff has a viable claim against them. The original contract entered into between MFP and Keystone did not involve these individuals because they are employees of Universal. Additionally, the claims for suppression are not viable because these individuals owed no duty to either of the plaintiffs. They simply worked for Universal and that is who their obligations were to.

The intentional interference also fails for the reasons previously stated, namely competitive privilege. As employees of the company engaged in competition, the privilege naturally extends to them. Finally, the claim of fraud also fails for reasons stated above. These individuals could not speak for Keystone. They merely provided their opinion and as such, cannot be sued for fraud. For these reasons, there are no viable claims against these defendants, and as such, they are fraudulently joined.

## III.    No Claims Between the Non-Diverse Parties

Assuming arguendo that Mr. Pittman is not a fraudulently joined plaintiff and Mr. Jensen and Mr. Rector are not fraudulently joined defendants, federal jurisdiction is appropriate because there are no claims between the non-diverse parties and as such complete diversity exists. Diversity of citizenship exists, in part, where the civil action is between citizens of different states. *See* 28 U.S.C. § 1332. Additionally, in <u>Strawbridge v. Curtiss</u>, 7 U.S. 267 (1806), Chief Justice Marshall noted that diversity is appropriate when

-14-

the suit is between a citizen of a state where the suit is brought, and a citizen of another state. This is precisely what we have in the instant case. For the previously stated reasons, there are no viable claims between the non-diverse parties. Assuming arguendo that Mr. Pittman, a Georgia citizen, is not fraudulently joined, he has no claims against a non-diverse Georgia defendant. His claims, assuming arguendo that he has any, would be against the defendants who are diverse from him.

In this case, it is clear that Plaintiff's counsel has stretched to the absolute limits to try to find some way to defeat diversity jurisdiction. In so doing, he has strained the limits of the law and still cannot destroy diversity where diversity in fact exists. When Plaintiff's counsel could not find an Alabama Defendant to go along with his Alabama Plaintiff, he attempted to create claims by manufacturing a Georgia Plaintiff and Georgia Defendants. This is a case involving three companies, MFP, Universal, and Keystone. Clearly diversity exists when looking at those corporate entities. When Plaintiff's counsel could not locate a Plaintiff to destroy diversity with regard to those two Defendants, or find a Defendant who would destroy diversity with respect to the only proper Plaintiff, he had no choice but to try to be more creative. In so doing, he obviously learned that there was a Georgia resident who he could claim (though improperly) as a Plaintiff, and therefore manufacture some claims against some Georgia Defendants to try to defeat diversity jurisdiction. However, his attempts have failed because there is no overlap between the Georgia Plaintiff and Georgia Defendant. Even if Stan Pittman could somehow state a claim against Keystone or Universal, he cannot individually state a claim against any of the Georgia Defendants, who

-15-

were merely individual employees of Universal. In order to destroy diversity jurisdiction, the Plaintiff should not be allowed to simply find a Georgia Plaintiff, all of whose claims are against diverse parties, and find some Georgia Defendants, against whom all pending claims are also filed by diverse parties. Because there are no claims which come anywhere close to viability where Pittman, the Georgia Plaintiff, has sued the individual Georgia Defendants, this Court must exercise its jurisdiction over this case. This is as blatant an attempt to circumvent the diversity rules as can be imagined, and it should not be rewarded. Diversity jurisdiction is created to avoid a situation where out of state Defendants are forced to trial by the Court local to the Plaintiff. That should not be allowed to happen in this case.

Furthermore, MFP has brought this action in Alabama state court. MFP is clearly an Alabama plaintiff, however, there are no Alabama defendants in this action. All the fears behind the grant of federal jurisdiction in a diversity action are present. The defendants in this action, none of whom are Alabama citizens, certainly fear potential prejudice in the state forum, which is the reason diversity jurisdiction exists in the first place, to eliminate that potential prejudice. *See* <u>Burgess v. Seligman</u>, 107 U.S. 20, 34 (1883). The plaintiffs are trying to hold the defendants in a circuit court of a State in which none of the defendants have citizenship. Chief Justice Marshall's statement is clear, "diversity is appropriate when the suit is between a citizen of a state where the suit is brought, and a citizen of another state." <u>Strawbridge</u>, *supra.* In this case diversity is appropriate because the suit is between MFP, a citizen of Alabama, the state where the suit was brought, and citizens, all of the defendants, of other states. Therefore, assuming arguendo that Mr. Pittman is not

-16-

fraudulently joined as a plaintiff and Mr. Jansen and Mr. Rector are not fraudulently joined as defendants, federal jurisdiction pursuant to diversity of citizenship is still appropriate because there are no defendants who are non-diverse from the forum and the forum plaintiff.

## CONCLUSION

Federal subject matter jurisdiction pursuant to 28 U.S.C. § 1332, diversity of citizenship, is appropriate in this case because the proper parties are diverse. The only non-diverse parties are the fraudulently joined plaintiff, Mr. Pittman, and the fraudulently joined defendants, Mr. Jansen and Mr. Rector. Mr. Pittman is fraudulently joined because he lacks any standing to assert any of the claims set forth in the Complaint. He was not a direct party to the contract, nor was he an intended, third-party beneficiary. He was merely an employee of MFP who was never intended to directly benefit from the Keystone contract. Any benefit he received was merely incidental and therefore, he has no standing to assert the claims of the Complaint. Additionally, Mr. Pittman has no viable claim for tortious interference because he never had a business or contractual relationship with Keystone. His only relationship was with his employer, MFP, and that relationship was never interfered with. Universal also was a direct competitor of MFP for the Keystone business and as such is entitled to the competitor's privilege against tortious interference. Thirdly, Mr. Pittman has no viable suppression claim because he was never owed any duty by any of the defendants. He never had a relationship with any of the defendants that would have required the defendants to disclose material facts to him. Fourthly, Mr. Pittman has no viable fraud claim because the alleged fraudulently representation had nothing to do with Mr. Pittman and

-17-

therefore he could not have reasonably relied on them.    The alleged fraudulent representations concern the relationship between Keystone, MFP, and Universal, not Mr. Pittman. Finally, allowing Mr. Pittman to recover would open the proverbial "flood gates" for liability and essentially allow double recovery. Mr. Pittman was an employee who was indirectly affected when the employer's contract with the supplier was terminated. Permitting him recovery would open up every business transaction to suits from disgruntled employees.  Additionally, assuming that all of the claims in the Complaint are viable, they would properly belong to MFP.  If Mr. Pittman is allowed to also maintain an action for the same claims, the defendants would potentially be penalized twice for the same conduct and the plaintiffs would be permitted double recovery.

Federal jurisdiction is also appropriate because Mr. Jansen and Mr. Rector are fraudulently joined as defendants. They were employees of Universal acting in their official capacity and did not engage in any unlawful conduct.  The claims against them fail for the same reasons Mr. Pittman's claims fail, thereby making their joinder fraudulent.

Assuming arguendo that neither Mr. Pittman, Mr. Jansen or Mr. Rector are fraudulently joined, federal jurisdiction is appropriate because there are no claims between the non-diverse parties and all of the defendants are diverse from the state forum.  Mr. Pittman, the only plaintiff from Georgia has no claims against the non-diverse Georgia defendants, Mr. Jansen and Mr. Rector. Additionally, the case was brought in Alabama state court by an Alabama plaintiff, however not a single other party is a citizen of Alabama. The fear of state forum bias is alive and well in this situation because there is not one single

defendant who is an Alabama citizen.

WHEREFORE, this Honorable Court has proper subject matter jurisdiction pursuant to diversity of citizenship.  This Honorable Court also has authority under Rule 21 of the Federal Rules of Civil Procedure to dismiss Mr. Pittman as a Plaintiff and/or dismiss and Mr. Jansen and Mr. Rector as defendants, and the Defendant prays that this be done.[10]

Respectfully submitted,

**WILLIAM A. SCOTT, JR. - ASB-1539-O73W**
**JOSEPH E. STOTT - ASB-4163-T71J**
Attorney for Defendant Universal Forest
Products, Matthew Missad, Douglas
Honholt, Dana Rector, and Kraig Jansen

**OF COUNSEL:**

**SCOTT, SULLIVAN, STREETMAN & FOX, P.C.**
2450 Valleydale Road
Birmingham, AL 35244
(205) 967-9675

---

[10] *See* Newman-Green, Inc. v. Alfonzo-Larin, 490 U.S. 826 (1989)

-19-

## CERTIFICATE OF SERVICE

This is to certify that on this 13 day of _____ June _____, 2005, a copy of the foregoing has been served on counsel for all parties by placing same in the U.S. Mail, first class postage prepaid, and properly addressed to:

Randall S. Haynes, Esq.
MORRIS, HAYNES & HORNSBY
131 Main Street
Alexander City, AL 35010
(256) 329-2000

W. Percy Badham, III, Esq.
MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
Suite 2400 AmSouth/Harbert Plaza
(205) 254-1000

**OF COUNSEL**

# EXHIBIT "A"

## IN THE CIRCUIT COURT OF TALLAPOOSA COUNTY
## ALEXANDER CITY DIVISION

MORRIS FOREST PRODUCTS, LLC;   )
STAN PITTMAN,   )
   )
     Plaintiffs,   )
   )
   )     CIVIL ACTION NO.
v.   )
   )     *CV-05-101*
KEYSTONE EXTERIOR DESIGN,   )
LLC; JERRY TURNER; DON   )
LUDWIG; UNIVERSAL FOREST   )
PRODUCTS; MATTHEW J. MISSAD;   )
DOUGLAS P. HONHOLT; DANA   )
RECTOR; KRAIG JANSEN,   )
   )
     Defendants.   )
   )



## COMPLAINT

Come now Morris Forest Products, LLC ("MFP") and Stan Pittman, Plaintiffs in the above-styled case, and for their complaint against Keystone Exterior Design LLC ("Keystone"), Jerry Turner, Don Ludwig, Universal Forest Products ("UFP"), Matthew Missad, Douglas Honholt, Dana Rector and Kraig Jansen, say as follows:

## PARTIES

1.    Plaintiff Morris Forest Products, LLC is an Alabama corporation located in Tallapoosa County, Alabama, on the west side of the Tallapoosa River.

2.    Plaintiff Stan Pittman is an employee of MFP and a resident citizen of the State of Georgia.

3.    Defendant Keystone Exterior Design LLC is a corporation located in Canton, Ohio.

4.    Defendant Jerry Turner is upon information and belief a resident citizen of the State of Tennessee.

5.    Defendant Don Ludwig is upon information and belief a resident citizen of the State of Ohio.

6.    Universal Forest Products is a corporation headquartered in Grand Rapids, Michigan with manufacturing plants in various states, including the State of Georgia.

7.    Defendant Matthew Missad is Executive Vice-President of Universal and upon information and belief is a resident citizen of the State of Michigan.

8.    Defendant Douglas Honholt is Vice-President of Industrial Sales of Universal and upon information and belief is a resident citizen of the State of Michigan.

9.    Defendant Dana Rector is a Director of Manufacturing for Universal and upon information and belief is a resident citizen of the State of Georgia.

10.    Defendant Kraig Jansen is an Installment Products Operation Manager for Universal and upon information and belief is a resident citizen of the State of Georgia.

## FACTS

11.    On or about November 21, 2003, Keystone and MFP entered into a Licensing Agreement.

12.    The Licensing Agreement grants MFP the right to manufacture and market in the United States several products, including but not limited to, a Residential Deck System. The Licensing Agreement also grants MFP the right of first refusal in the event that the licensor (Keystone) receives an offer to purchase its stock from a third party: "If licensor receives from a third party, an offer to purchase its stock, AL [MFP] will have the first right of refusal in licensed markets and territories."

01175540.1                                         2

13.   In accordance with the Licensing Agreement, MFP made a substantial investment of money and resources to purchase the necessary equipment and inventory in order to be able to manufacture and distribute the products identified in the Licensing Agreement.

14.   In addition to the substantial investment in equipment and inventory, MFP devoted resources and staff to marketing said products.

15.   As a result of its marketing efforts, MFP developed a strong customer base for the licensed products, including a substantial account with Menards.

16.   With the equipment and inventory in place and the customers lined up, including the large account with Menards, MFP was set to receive the promised and expected economic benefit from its investment under the License Agreement.

17.   However, unbeknownst to MFP, Universal entered into discussions and negotiations with Keystone to purchase Keystone.  In fact, Universal and Keystone ultimately reached an agreement for the sale of Keystone to Universal.

18.   In violation of the License Agreement, MFP was never given the right of first refusal regarding the sale of Keystone.

19.   Universal and Keystone then terminated the License Agreement with MFP and Universal took over the manufacturing and distributing of the products once licensed to MFP, including the Menards account.

20.   MFP is now left with a substantial investment in equipment and inventory it cannot use and the loss of a substantial part of its business.

21.   Plaintiff Stan Pittman is an employee of MFP who was put in charge of manufacturing and distributing the products under the License Agreement with Keystone, including distribution of the Residential Deck System and the Menards program.  Mr. Pittman

01175540.1                                    3

Case 3:05-cv-00564-WHA-DRB    Document 3    Filed 08/15/05    Page 5 of 9

was going to be paid an extra commission in addition to his salary based upon the volume of sales to Menards. As a result of the wrongful acts of the Defendants and the resulting loss of the product and the Menards' account, Mr. Pittman suffered damages through loss of commission.

## COUNT ONE

## (BREACH OF CONTRACT)

22.  Plaintiffs repeat and reaver the allegations set forth in paragraphs 1 through 21 above as if fully set forth herein.

23.  The License Agreement provided that in the event of an offer to purchase Keystone's stock by a third party that MFP would be given right of first refusal.

24.  Universal offered to and in fact ultimately purchased Keystone's stock.

25.  Defendants breached the Licensing Agreement by failing to give MFP the right of first refusal on the Universal offer.

26.  Plaintiffs were injured as a result of Defendants' breach.

WHEREFORE, premises considered, Plaintiffs seek compensatory damages

## COUNT TWO

## (INTENTIONAL INTERFERENCE)

27.  Plaintiffs repeat and reaver the allegations set forth in paragraphs 1 through 21 above as if fully set forth herein.

28.  There was a Licensing Agreement in place between Keystone and MFP.

29.  Defendants Universal, Missad, Honholt, Rector and Jansen knew of the Licensing Agreement and of the contractual and business relationship between Keystone and MFP.

30.    Defendants Universal, Missad, Honholt, Rector and Jansen intentionally interfered with the contractual and business relationship between MFP and Keystone.

31.    Plaintiffs were damaged as a result of these Defendants' interference.

WHEREFORE, premises considered, Plaintiffs seek compensatory and punitive damages.

## COUNT THREE
### (SUPPRESSION)

32.    Plaintiffs repeat and reaver the allegations set forth in paragraphs 1 through 21 above as if fully set forth herein.

33.    Defendants had a duty to disclose to Plaintiffs the following material facts: (a) Keystone was negotiating a sale to Universal (b) that Universal wanted to enter the market for the licensed products and, in particular, wanted to gain access to Menards (c) that Keystone and Universal wanted to cut MFP out of the deal and take over the distribution of the licensed products (d) that Universal had been establishing a process and a facility to manufacture and distribute the licensed products even before a final deal was agreed upon (e) the actual terms and price that Universal paid to buy Keystone and (f) the true nature and extent of the relationship between Universal and Keystone.

34.    Defendants failed to disclose these material facts to Plaintiffs.

35.    Plaintiffs relied upon these omissions and non-disclosures to their detriment and suffered damages as a result thereof.

WHEREFORE, premises considered, Plaintiffs seek compensatory and punitive damages.

01175540.1                                5

## COUNT FOUR

### (FRAUD)

36.    Plaintiffs repeat and reaver the allegations set forth in paragraphs 1 through 21 above as if fully set forth herein.

37.    Defendants misrepresented to Plaintiffs the true nature and extent of the relationship and the deal between Keystone and Universal.

38.    In addition, Defendants Universal, Missad, Honholt, Rector and Jansen in a face-to-face meeting held at MFP on February 7, 2005 made the following material representations to the Plaintiffs: (a) that Universal had nothing to do with the relationship between Keystone and MFP (b) that no deal or agreement had been reached between Keystone and Universal and (c) that Universal was not trying to replace MFP or cut MFP out of the business.

39.    These representations were false.

40.    Plaintiffs relied upon these misrepresentations to their detriment and suffered damages as a result thereof.

WHEREFORE, premises considered, Plaintiffs seek compensatory and punitive damages.

Randall S. Haynes

OF COUNSEL:

MORRIS, HAYNES & HORNSBY
131 Main Street
Alexander City, AL 35010
(256) 329-2000

W. Percy Badham III

OF COUNSEL:

MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
Suite 2400 AmSouth/Harbert Plaza
Birmingham, AL 35203
(205) 254-1000

Attorneys for Plaintiffs

01175540.1                               7

**PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL:**

Keystone Exterior Design, LLC
5655 Linder Circle NE
Canton, OH 44721

Jerry Turner
P.O. Box 1613
Mt. Juliet, TN 37121

Don Ludwig
5655 Linder Circle NE
Canton, OH 44721

Universal Forest Products
2801 East Beltline NE
Grand Rapids, MI 49525

Matthew J. Missad, Executive Vice President
Universal Forest Products
2801 East Beltline NE
Grand Rapids, MI 49525

Douglas P. Honholt, Vice President of Industrial Sales
Universal Forest Products
2801 E. Beltline NE
Grand Rapids, MI 49525

Dana Rector, Director of Manufacturing
Universal Forest Products
5200 Highway 138
Union City, GA 30291-0329

Kraig Jansen
c/o Universal Forest Products
2801 East Beltline NE
Grand Rapids, MI 49525

8

# EXHIBIT "B"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA,
### EASTERN DIVISION

| | | |
|---|---|---|
| MORRIS FOREST PRODUCTS, LLC; | ) | |
| STAN PITTMAN, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action Number:** |
| v. | ) | |
| | ) | _____ |
| KEYSTONE EXTERIOR DESIGN, | ) | Removed from the Circuit |
| Court | | |
| LLC; JERRY TURNER; DON | ) | of Tallapoosa County, Alabama |
| LUDWIG; UNIVERSAL FOREST | ) | CV-05-101, Alexander City |
| PRODUCTS; MATTHEW J. MISSAD; | ) | Division |
| DOUGLAS P. HONHOLT; DANA | ) | |
| RECTOR; KRAIG JANSEN, | ) | |
| | ) | |
| **Defendants.** | ) | |

## AFFIDAVIT OF DONALD LUDWIG

My name is DONALD LUDWIG, I am member of Keystone Exterior Design, L.L.C. I am over the age of nineteen (19) years and have personal knowledge of the facts asserted herein.

I affirm that Keystone Exterior Design, L.L.C., is a Tennessee corporation and its principle place of business is in the state of Tennessee. I affirm that the documents attached to this affidavit are true and correct copies of the correspondence and documents they purport to be and they were created, transmitted, and received in the normal course of business. These documents are: (1) Licensing Agreement Entered Into Between Keystone and Morris Forest Products, dated 11/21/2003; (2) Letter from Keystone to Matt Missad, dated 11/28/2004; (3) Letter Dated February 3, 2005; and (4) Letter Dated February 21, 2005.

FURTHER AFFIANT SAITH NOT

DONALD LUDWIG

STATE OF OHIO          )
COUNTY OF STARK        )

On this the 13TH day of JUNE, 2005, before me a Notary Public, within and for said County and State, personally appeared DONALD LUDWIG, to me known to be the identical person described in and who executed the foregoing instrument and acknowledged that the same is true, and that after reading the same or having the same read to him and with a full understanding of the terms and the effect thereof, executed the same.

NOTARY PUBLIC
My Commission Expires: _____

THOMAS W. CONNORS, Attorney at Law
Notary Public, State of Ohio
My commission has no expiration date
sec. 147.03 R.C.

# EXHIBIT "C"

### AFFIDAVIT OF ERIC S. MAXEY

STATE OF MICHIGAN      )
                                   )SS
COUNTY OF KENT         )

#### Summary of Affidavit

**Eric S. Maxey, Vice President of Administration, affirms that Universal Forest Products, Inc. is a corporation incorporated in the State of Michigan and has its principal office in the State of Michigan.**

I, Eric S. Maxey, being first duly sworn, on my oath depose and say as follows:

1.     I am the Vice President of Administration for Universal Forest Products, Inc. ("UFP").

2.     As Vice President of Administration, I can attest to the fact that UFP is a Michigan Corporation and has its principal place of business in Michigan.

_____
Eric S. Maxey

Subscribed and Sworn to before me
this 10th day of June, 2005.

_____
Notary Public

           CHRISTINA A. HOLDERMAN
           NOTARY PUBLIC IONIA CO., MI
           MY COMMISSION EXPIRES J# 17, 2006
           ACTING IN KENT COUNTY, MI

**EXHIBIT "D"**

FROM :Don Ludwig Cell # 330-704-6666   FAX NO. :                    Nov. 06 2003 11:37PM P2



**6655 Linder Circle NE**
**Canton, OH 44721**
Phone: (330) 492-8184
Fax: (330) 499-1563
Email: gemini@netvitro.net

## _LICENSING AGREEMENT_

Authorized Licensee (name and address of record)
  Name: Morris Forest Products
  Address:  22608 Hwy 22 East
        Daviston, AL 36256

Phone: 256-395-9511
Fax: 256-395-9633
Email: wandamorris@direcway.com

1.  **TERM**
    This agreement is for the term from 11/1/2003 through 10/31/2004; thereafter, the parties will review and renew the agreement annually, making revisions that are mutually acceptable.

2.  **PREMISES**
    Jerry Turner has invented a connector referred to as a Keystone Connector

    Mr. Turner has a patent pending on this device and several structures produced using this device.

    Mr. Turner has assigned all rights to these patents to Keystone Exterior Designs, LLC(KED), a corporation in which Mr. Turner is a majority owner.

    Keystone desires to expand the marketing, distribution, and sales of these products and believes the Authorized Licensee (AL) can substantially assist in these efforts and will vigorously pursue such expansion.

    AL desires to manufacture, market, and distribute KED products in specific markets and territories.

    _In consideration of these premises, the following items are agreed:_

3.  **PRODUCTS**
    Only those products checked below are covered by this agreement.

    (✓) Residential Deck System    (✓) Quiknik Tables        (✓) Workbenches

    (✓) Garden/Hobby Table    (✓) Swimming Pool Deck

    From time-to-time new products using the Keystone Connectors may be developed by the licensor and/or licensee; these products will become part of the Keystone product portfolio owned by KED; nevertheless, the inclusion of such products in this agreement will be negotiated in good faith.  Additional products will be added by written agreement signed by both parties.

4.  **LICENSING AGREEMENT**
    This agreement grants AL the right to manufacture and market the indicated products in the territories and/or markets indicated below.  Where necessary an appendix may be added to clarify these territories and markets.

        Territories: United States of America
        Markets: DIY/retail, (aka homecenters)

    _"Exterior wood structures erected in minutes with no tools required!"_

FROM : Don Ludwig Cell H 330-704-6666   FAX NO. :                    Nov. 06 2003 11:37PM P3

AL agrees to achieve certain sales targets and report on progress periodically as indicated in the appendix

KED is likely to develop and exploit markets that are not covered by this agreement. AL agrees to manufacture any product (for which it holds a manufacturing license) for KED market consumption. AL will ship these products as directed and invoice KED at agreed prices. The initial pricing is shown in the appendix. While KED has agreed to pay a 15% labor surcharge, this premium will removed by mutual agreement when low production volumes no longer constrain production efficiencies. KED will administer these sales and service these accounts, paying AL invoices within terms.

5.    MANUFACTURING SUB CONTRACTING
AL may sub-contract manufacture of some components or operations if necessary due to capacity or capability constraints; however, AL retains accountability for product quality and royalty payments are unaffected. AL agrees to use diligence in protecting KED intellectual properties and confidential manufacturing techniques.

6.    ASSEMBLY JIGS
KED has transferred ownership of the assembly jigs to AL; AL is assigned the right to use these jigs to manufacture KED products covered by this agreement.

7.    MARKETING ASSISTANCE
Recognizing the size of the markets licensed, and the potential financial requirements to support them. AL may need to seek assistance to serve those markets. To the extent that AL contracts other parties to penetrate and serve licensed markets, KED agrees to help defray the cost of such participation by reducing the agreed royalty by 33%. In these cases, special attention will be necessary to assure accurate royalty accounting and AL will arrange such accounting. If AL finds it necessary to sub-contract both the manufacture and marketing of these products, it will be considered an assignment of the license and requires the written consent of KED. This consent will not be unreasonably withheld

8.    CONNECTOR PURCHASES
AL agrees to purchase Keystone Connectors from KED at the prices indicated in the appendix.

AL will provide written Purchase Orders for Keystone Connectors and KED will fill and deliver such orders within normal product leadtimes. KED will not be held liable for conditions outside its control that could limit ability to deliver connectors promptly.

AL will pay for connectors within invoice terms

9.    MARKETING AND ADVERTISING
For the term of this agreement, KED authorizes AL to use all trademark, product literature, and other advertising or marketing tools which may become available. AL will cover production costs of such material.

10.    ROYALTY PAYMENTS
AL agrees to pay a royalty to KED based on the product and market as indicated in the appendix.
AL will make quarterly payments of agreed royalties based on net revenues after freight and trade discounts. AL will provide complete reconciliation of gross to net revenue calculations
KED will annually reconcile royalty payments with connector shipments to identify and minimize systemic errors in the royalty system.

2

FROM :Don Ludwig Cell # 336-784-6666  FAX NO. :          Nov. 06 2003 11:38PM  P4

11.  TECHNICAL SUPPORT
KED will provide necessary technical support and will provide formal programs for sales training.
Such programs will be at time and place agreed by the parties. Expenses for training beyond the
actual staff of the AL will be paid by the AL.

12.  KED INTELLECTUAL PROPERTY
AL recognizes that the connectors and structures are currently in the patent approval process. In
the event that patents issue as planned, KED on its own discretion and at its own expense will
prosecute infringement of those patents. AL agrees to notify KED of such infringements as they
are encountered.

13.  WARRANTY
KED warrants its connectors for a period of one year against defects in material and workmanship.
AL warrants its material and workmanship to be free from defects. Each party will act promptly at
its own expense to correct warranty issues. These warranties do not cover normal wear, neglect,
abuse, accident or improper assembly.

14.  INSURANCE
KED will carry general liability insurance during the term of this agreement with limits of not less
than $1,000,000. AL will carry similar coverage and KED will be named as an additional insured.
As new markets are developed, additional coverage limits may be required. Both parties agree to
carry those limits.

15.  TERMINATION
Either party may terminate this agreement immediately if the other party is in breach of any item
and, after written notification, fails to return to compliance.

16.  PRODUCT DEVELOPMENT AND QUALITY
Parties agree to share manufacturing methods and component supply sources that tend to improve
the efficiency, profitability, and quality of the product. This includes the free use of any
information regardless of its patentability; including drawings and/or photographs of tooling and
products. The purpose of this clause is to maximize returns of all parties by sharing information
and technology. AL agrees to produce KED products specifically to KED standards and
specifications. KED personnel will be granted reasonable access to AL and its sub-contractor
facilities.

17.  OWNERSHIP CHANGES
If ownership of either party changes during the term of this agreement, then transfer of this license
will be negotiated in good faith by both parties. This agreement may only be assigned with the
written consent of the parties that shall not be unreasonably withheld. If licensor receives from a
third party, an offer to purchase its stock, AL will have the first right of refusal in licensed markets
and territories.

18.  MISCELLANEOUS
This agreement together with appendices, is the sole agreement between the parties

The laws of the state of Tennessee govern this agreement

Authorized Licensee

_11-21-03_
Date

Rodney Morris

Keystone Exterior Design, LLC

Date:

H-21-03

3

# Appendices

A. TERRITORIES AND MARKETS (ref item 4):  USA, DIY/retail (aka homecenters)

B. SALES TARGETS (ref item 4)  None for 2004

C. PRICE LISTS FOR KED MARKETING EFFORTS (ref item 4)

Appendix C1  RDS components

| | | | KED Price | | | 15% labor adjust | | adjusted total price |
|---|---|---|---|---|---|---|---|---|
| CP1 | | | 13.01 | | | 0.39 | | 13.40 |
| CP2 | | | 13.11 | | | 0.40 | | 13.51 |
| CP3 | | | 13.21 | | | 0.41 | | 13.63 |
| CP4 | | | 13.31 | | | 0.42 | | 13.74 |
| CP5 | | | 13.42 | | | 0.43 | | 13.85 |
| CP6 | | | 16.34 | | | 0.46 | | 16.80 |
| CP7 | | | 16.44 | | | 0.47 | | 16.91 |
| FS28 | | | 34.87 | | | 0.91 | | 35.78 |
| FS44 | | | 32.62 | | | 0.96 | | 33.58 |
| HJ8 | | | 10.16 | | | 0.26 | | 10.42 |
| HPL/R1 | | | 8.24 | | | 0.22 | | 8.46 |
| HPL/R2 | | | 8.24 | | | 0.22 | | 8.46 |
| HPL/R3 | | | 8.24 | | | 0.22 | | 8.46 |
| HPL/R4 | | | 8.24 | | | 0.22 | | 8.46 |
| HPL/R5 | | | 12.27 | | | 0.34 | | 12.61 |
| HPL/R6 | | | 15.20 | | | 0.36 | | 15.56 |
| HPL/R7 | | | 15.30 | | | 0.37 | | 15.67 |
| LP1 | | | 10.67 | | | 0.32 | | 10.99 |
| LP2 | | | 10.67 | | | 0.32 | | 10.99 |
| LP3 | | | 10.67 | | | 0.32 | | 10.99 |
| LP4 | | | 10.67 | | | 0.32 | | 10.99 |
| LP5 | | | 14.70 | | | 0.43 | | 15.13 |
| LP6 | | | 18.26 | | | 0.46 | | 18.72 |
| LP7 | | | 18.36 | | | 0.47 | | 18.83 |
| RS4 | | | 23.23 | | | 0.68 | | 23.90 |
| RS8 | | | 37.66 | | | 0.91 | | 38.57 |
| RS8C | | | 32.88 | | | 0.99 | | 33.87 |
| SJ4 | | | 4.96 | | | 0.18 | | 5.14 |
| SJ8 | | | 10.95 | | | 0.29 | | 11.25 |
| SP31 | | | 4.37 | | | 0.02 | | 4.39 |
| SP32 | | | 5.22 | | | 0.09 | | 5.30 |
| SP33 | | | 5.52 | | | 0.09 | | 5.60 |
| SP34 | | | 5.66 | | | 0.09 | | 5.75 |
| SP35 | | | 5.90 | | | 0.09 | | 5.99 |
| SP36 | | | 6.11 | | | 0.09 | | 6.20 |
| SP37 | | | 6.41 | | | 0.09 | | 6.50 |
| SP41 | | | 4.89 | | | 0.02 | | 4.91 |
| SP42 | | | 5.74 | | | 0.09 | | 5.82 |
| SP43 | | | 6.04 | | | 0.09 | | 6.12 |
| SP44 | | | 6.18 | | | 0.09 | | 6.27 |
| SP45 | | | 6.42 | | | 0.09 | | 6.51 |
| SP46 | | | 6.63 | | | 0.09 | | 6.72 |

4

| | | | | | | |
|---|---|---|---|---|---|---|
| SP47 | | | 6.93 | | 0.09 | 7.02 |
| SR1L/R | | | 13.22 | | 0.48 | 13.70 |
| SR2L/R | | | 19.87 | | 0.57 | 20.23 |
| SR3L/R | | | 23.66 | | 0.69 | 24.35 |
| SR4L/R | | | 28.32 | | 0.81 | 29.14 |
| SR5L/R | | | 37.13 | | 0.93 | 38.07 |
| SR6L/R | | | 40.42 | | 1.06 | 41.47 |
| SR7L/R | | | 44.39 | | 1.18 | 45.57 |
| SS1L/R | | | 4.87 | | 0.19 | 5.06 |
| SS2L/R | | | 8.01 | | 0.25 | 8.26 |
| SS3L/R | | | 9.42 | | 0.32 | 9.74 |
| SS4L/R | | | 11.53 | | 0.38 | 11.91 |
| SS5L/R | | | 15.70 | | 0.44 | 16.14 |
| SS6L/R | | | 17.12 | | 0.50 | 17.62 |
| SS7L/R | | | 19.22 | | 0.57 | 19.79 |
| ST1 | | | 10.87 | | 0.30 | 11.17 |

Appendix C2 RDS swimming pool dock specific components

| | |
|---|---|
| PP1L/R | 22.07 |
| PP2L/R | 19.62 |
| PJ8 | 10.42 |
| PFS38 | 52.99 |
| PGA | 36.50 |

Appendix C3 ..picnic tables TBD

Appendix C4  utility tables TBD

Appendix C5 hobby/garden tables TBD

Appendix C6  RDS kits (ref Menards specification)

| | |
|---|---|
| CP7 | 13.62 |
| FS26 | 34.87 |
| FS44 | 32.82 |
| HJ8 | 10.16 |
| HPL7 | 8.24 |
| HPR7 | 8.24 |
| LP7 | 10.67 |
| RS4 | 23.23 |
| RS8 | 37.66 |
| RS8C | 32.88 |
| SJ4 | 4.96 |
| SJ8 | 10.95 |
| SP37 | 6.41 |
| SP47 | 6.93 |
| SR2L | 19.67 |
| SR3L | 23.66 |
| SR4L | 28.32 |
| SR2R | 19.67 |
| SR3R | 23.66 |
| SR4R | 28.32 |
| ST1 | 10.67 |

5

| KIT A | 322.44 |
| KIT B | 198.57 |
| KIT C | 153.46 |
| KIT D | 97.58 |
| KIT E | 61.07 |
| KIT F | 79.92 |
| KIT G | 100.11 |
| KItGBK | 129.55 |

**D.  CONNECTOR PRICING** (ref item 8)

| M1 | 0.580 |
| M2 | 0.780 |
| M3 | 0.460 |
| M4 | 0.840 |
| M5 | 0.840 |
| F1 | 0.580 |
| F2 | 0.780 |
| F3 | 0.890 |
| F4 | 0.840 |
| F5 | 0.840 |
| M23L | 1.760 |
| M23R | 1.760 |
| M232 | 2.730 |
| SP3 | 4.230 |
| SP4 | 4.750 |

**E.  ROYALTY SCHEDULES** (ref item 10)

The agreed royalty for DIY/retail sales by AL is 7.5%.

If third party participation is necessary due to the size of the market, KED will reduce its royalty requirement to 5%.

KED has agreed to reduce the royalty for sales to Menards 5% to achieve pricing requirements of that customer.  MFP agreed to reinstate the 7.5% royalty at a future date after the initial startup expenses associated with the Menards introduction.

6

Feb          Mon          AM
                              on schedule at
                              end of 1st order.

Time of Payment is same (Monthly)

Payments is off of Revenue until
1 April  Then off Invoice for agreement.

These Are Notes agreed on at Signing
of Licence agreement, To give some
initial relief of Financial Pressure to
Dallistan.

# EXHIBIT "E"



**KEYSTNE**
**EXTERIOR DESIGNS**

5655 Linder Circle NE
Canton, OH 44721
Phone: (330) 492-8198
Fax: (330) 499-1863
Email: gemini@wilkshire.net

11/28/2004

Attn: Mr. Matt Missad

FAX: 616-364-6919 (3 pages including this cover)

Pursuant to our meeting last Monday, I forwarded a matrix of actual/forecast revenue and margin for our product line.

This was in anticipation of a meeting scheduled for Monday, 11/29. It's come to my attention that I sent these documents to Bob Coleman's fax. I hope he forwarded them to you; if not, this is a duplicate transmission.

I trust you'll contact me if any clarification is required before your meeting.

FYI, our contract with our current manufacturing licensee expired on 10/31/04. We must begin negotiations in earnest to extend that contract for next season. It would be most helpful to know the initial reactions and intentions of Universal Forest Products regarding our product. Kindly contact Jerry or me at your earliest convenience.

Thanks again for your hospitality.

Don Ludwig
◇<

*"Exterior wood structures erected in minutes with no tools required!"*

EXHIBIT "F"



February 3, 2005

To Whom It May Concern:

    Morris Forest Products, L.L.C. (MFP) offers the following options to Universal Forest Products (UFP) to help expedite the transfer of Keystone Structures by Keystone Exterior Designs for an orderly transition out of MFP.

    Option #1.
        Complete buy out of all assets and liabilities of MFP.
            What you would receive:

1. All buildings, equipment and inventories.
2. Experienced people exceeding over 200 yrs. combined total in trading and manufacturing.
3. All accounts present and future.

Value $ 5,000,000

    Option #2
        Complete buy of all assets and liabilities of MFP involved with Keystone Exterior Design.
            What UFP would receive:

1. All equipment and inventory involved with manufacturing Keystone decks.
2. We will assist in the removal and loading of all equipment and inventory involved with the manufacture of decks.
3. All accounts currently being sold (Menards, Splash Pools).

Value $1,500,000



If UFP should exercise option #2 but wants MFP to remain for a period of not less than one year, we would offer the following:

Building, approximately 40,000 sq. ft. @ $2.00 per sq. ft. lease on an annual basis $80,000.

1. Trained personnel:
   A. Hired by UFP
   B. Retained by MFP but MFP paid a manufacturing value to be negotiated on each deck part.
2. MFP sales staff will sell & service current and future accounts for UFP for a negotiated per invoice commission.

We would like to exit the Keystone program in a clean and orderly manner. We have invested a lot of time, energy, money and talent to progress Keystone to its current status. It is our feelings we are offering the minimum acceptable offer for the investment MFP has incurred.

If UFP should accept our offer we will work with them to expand our relationship further in all product lines we manufacture and sell.

Thank you,

Rod Morris

# EXHIBIT "G"

FEB-21-2005 ... MUNKIRN VALLEY ... 2583958633 ... P. 02
Case 3:05-cv-00564-DRB    Document 3    Filed 06/13/2005    Page 2 of 4
Case 3:05-cv-00564-WHA-DRB    Document 27-2    Filed 09/02/2005    Page 50 of 53

**M.F.P.**

2/21/2005
Morris Forest Product
Attn: Jerry Turner, Don Lugwig (KED)
Matthew Missad (UFP)
Douglas Honholt (UFP)

Gentlemen,

As you know, we have been working diligently to try to resolve this matter and to come to some resolution as to our future relationship. In that regard, the following is our response to your latest correspondence.

Morris Forest Products received the new contract proposal offered by Keystone Exterior Design (KED) and Universal Forest Products (UFP). After review of this contract it is Morris Forest Products position that this contract, as written is unacceptable. As Morris Forest Products has stated we lost the contract with Robbins that was to furnish MFP with KDAT lumber for the 2005 season. This was lost because of the purchase of KED by UFP, and subsequently the fact we were told not to go to the Tampa show. We do not feel at this point that we will be able to procure enough lumber to cover the needs for 2005. With this said Morris Forest Products stands by its original proposal (attached).

In the event we are unable to resolve this matter, we want to make our position and intentions clear. It is our position that the contract between Morris Forest Products (MFP) and Keystone is still in place and that MFP still has the right of first refusal as set forth in that contract. The sale of Keystone Exterior Design to Universal Forest Products is in violation of the contract between MFPs and KED as MFP was not offered the right of first refusal. We intend to take any and all legal action necessary to protect our interest and also intend to hold both Keystone(KED) and Universal Forest Products responsible for any and all damages to MFP that occur as a result of any breaches of the contract and/or improper actions taken by either KED or UFP.

Additionally, MFP intends to take any steps necessary to protect and maintain its relationship with Menards and Splash Pools. This should benefit KED and UFP as well because loss or damage to the Menards or Splash Pool account would hurt KED and UFP as much as it would hurt MFP and in fact, could result in potential liability for returned product. MFP does not want this to happen and, as a result, MFP intends to proceed on Wednesday, February 23, 2005 to attend and prepare for the Menard's show. There will be cost incurred by this show. MFP will be responsible for the cost of travel and lodging, but the cost of the show ($ 25,000 – 50,000) will be held by either KED or UFP.

As was stated we need to leave on Wednesday to go to Menards. A fast response is necessary for plans to be made for the trip. Thanks for your attention to this matter. We look forward to your response to the attached proposal.

Rod Morris



R.M.

February 21, 2005

To Whom It May Concern:

Morris Forest Products, L.L.C. (MFP) offers the following options to Keystone Exterior Designs(KED) to help expedite the transfer of Keystone Structures by Keystone Exterior Designs for an orderly transition out of MFP.

Option #1.
Complete buy out of all assets and liabilities of MFP.
What you would receive:
1. All buildings, equipment and inventories.
2. Experienced people exceeding over 200 yrs. combined total in trading and manufacturing.
3. All accounts present and future.

Value $ 5,000,000

Option #2
Complete buy of all assets and liabilities of MFP involved with Keystone Exterior Design.
What KED would receive:
1. All equipment and inventory involved with manufacturing Keystone decks.
2. We will assist in the removal and loading of all equipment and inventory involved with the manufacture of decks.
3. All accounts currently being sold (Menards, Splash Pools).

Value $1,500,000

22008 HWY. 22 EAST • DAVISTON, ALABAMA 36256 • 256-395-9911 • FAX 256-396-9633

FEB-21-2005 MON 03:29 PM MT. MOUNTAIN VALLEY IC    2563959633    P. 04
Case 3:05-cv-00564-WHA-DRB    Document 27-8    Filed 09/02/2005    Page 52 of 53
Case 3:05-cv-00564-DRB    Document 3    Filed 06/13/2005    Page 4 of 4



If KED should exercise option #2 but wants MFP to remain for a period of not less than one year, we would offer the following:

Building, approximately 40,000 sq. ft. @ $2.00 per sq. ft. lease on an annual basis $80,000.

1. Trained personnel:
   A. Hired by KED
   B. Retained by MFP but MFP paid a manufacturing value to be negotiated on each deck part.
2. MFP sales staff will sell & service current and future accounts for KED for a negotiated per invoice commission.

We would like to exit the Keystone program in a clean and orderly manner. We have invested a lot of time, energy, money and talent to progress Keystone to its current status. It is our feelings we are offering the minimum acceptable offer for the investment MFP has incurred.

If KED should accept our offer we will work with them to expand our relationship further in all product lines we manufacture and sell.

Thank you,

Rod Morris

&lt;p&gt;&lt;strong&gt;***NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.&lt;/strong&gt;&lt;/p&gt;
&lt;!-- rcsid='$Header: /ecf/district/server/HtmlHead,v 3.1 2003-04-25 07:52:35-04 loy Exp $' --&gt;
&lt;p align=center&gt;&lt;strong&gt;U.S. District Court&lt;/strong&gt;&lt;/p&gt;
&lt;p align=center&gt;&lt;strong&gt;Alabama Middle District&lt;/strong&gt;&lt;/p&gt;
Notice of Electronic Filing&lt;BR&gt;
&lt;div&gt;&lt;BR&gt;The following transaction was received from sl, entered on 6/17/2005 at 11:06 AM CDT and filed on 6/17/2005
&lt;BR&gt;
&lt;!-- rcsid='$Header: /ecf/district/server/HtmlBody_d,v 3.1 2003-04-25 07:52:35-04 loy Exp $' --&gt;
&lt;table border=0 cellspacing=0&gt;
&lt;tr&gt;&lt;td&gt;&lt;strong&gt;Case Name:&lt;/strong&gt;
&lt;/td&gt;&lt;td&gt;Morris Forest Products, LLC et al v. Keystone Exterior Design, LLC et al&lt;/td&gt;&lt;/tr&gt;
&lt;tr&gt;&lt;td&gt;&lt;strong&gt;Case Number:&lt;/strong&gt;&lt;/td&gt;&lt;td&gt;&lt;A HREF=https://ecf.almd.uscourts.gov/cgi-bin/DktRpt.pl?31036&gt;3:05-cv-564&lt;/A&gt;&lt;/td&gt;&lt;/tr&gt;
&lt;tr&gt;&lt;td&gt;&lt;strong&gt;Filer:&lt;/strong&gt;&lt;/td&gt;&lt;td&gt;Morris Forest Products, LLC&lt;/td&gt;&lt;/tr&gt;&lt;tr&gt;&lt;td&gt;&lt;/td&gt;&lt;td&gt;Stan Pittman&lt;/td&gt;&lt;/tr&gt;&lt;tr&gt;&lt;td&gt;&lt;/td&gt;&lt;td&gt;Keystone Exterior Design, LLC&lt;/td&gt;&lt;/tr&gt;&lt;tr&gt;&lt;td&gt;&lt;/td&gt;&lt;td&gt;Jerry Turner&lt;/td&gt;&lt;/tr&gt;&lt;tr&gt;&lt;td&gt;&lt;/td&gt;&lt;td&gt;Don Ludwig&lt;/td&gt;&lt;/tr&gt;&lt;tr&gt;&lt;td&gt;&lt;/td&gt;&lt;td&gt;Universal Forest Products&lt;/td&gt;&lt;/tr&gt;&lt;tr&gt;&lt;td&gt;&lt;/td&gt;&lt;td&gt;Matthew J. Missad&lt;/td&gt;&lt;/tr&gt;&lt;tr&gt;&lt;td&gt;&lt;/td&gt;&lt;td&gt;Douglas P. Honholt&lt;/td&gt;&lt;/tr&gt;&lt;tr&gt;&lt;td&gt;&lt;/td&gt;&lt;td&gt;Dana Rector&lt;/td&gt;&lt;/tr&gt;&lt;tr&gt;&lt;td&gt;&lt;/td&gt;&lt;td&gt;Kraig Jansen&lt;/td&gt;&lt;/tr&gt;

&lt;tr&gt;&lt;td&gt;&lt;strong&gt;Document Number:&lt;/strong&gt;&lt;/td&gt;
&lt;td&gt;

&lt;/td&gt;&lt;/tr&gt;
&lt;/table&gt;
&lt;!-- rcsid='$Header: /ecf/district/server/HtmlFoot,v 3.1 2003-04-25 07:52:35-04 loy Exp $' --&gt;
&lt;p&gt;&lt;strong&gt;Docket Text:&lt;/strong&gt;
&lt;BR&gt;
NOTICE of Assignment to Magistrate Judge mailed to counsel for Jerry Turner, Don Ludwig, Universal Forest Products, Matthew J. Missad, Douglas P. Honholt, Dana Rector, Kraig Jansen, Morris Forest Products, LLC, Stan Pittman, Keystone Exterior Design, LLC (sl, )
&lt;/p&gt;
&lt;p&gt;The following document(s) are associated with this transaction:&lt;/p&gt;
&lt;table&gt;

&lt;/table&gt;
&lt;/div&gt;
&lt;!-- rcsid='$Header: /ecf/district/server/HtmlAtyList,v 3.2 2003-06-02 17:33:50-04 bibeau Exp $' --&gt;
&lt;BR&gt;&lt;B&gt;
3:05-cv-564 Notice will be electronically mailed to:
&lt;/B&gt;
&lt;BR&gt;
&lt;BR&gt;Walter Percy Badham                  , III   pbadham@mcglaw.com,
&lt;BR&gt;&lt;BR&gt;Patrick Christopher Davidson                
rdavidson@audwlaw.com, kklingensmith@audwlaw.com &lt;BR&gt;&lt;BR&gt;Randall Stark Haynes    rhaynes@morrishaynesandhornsby.com, kfox@morrishaynesandhornsby.com
&lt;BR&gt;&lt;BR&gt;William A. Scott                 , Jr   wscott@sssandf.com,
jmcdade@sssandf.com &lt;BR&gt;&lt;BR&gt;Joseph E. Stott                   
jstott@sssandf.com, lyoungblood@sssandf.com &lt;BR&gt;
&lt;BR&gt;
&lt;B&gt;
3:05-cv-564 Notice will be delivered by other means to:
&lt;/B&gt;
&lt;BR&gt;
&lt;BR&gt;