# FREEDOM COURT REPORTING

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2     OF THE MIDDLE DISTRICT COURT
3        EASTERN DIVISION
4
5  CIVIL ACTION NO: CV 05-00564
6
7  MORRIS FOREST PRODUCTS, LLC,
8        Plaintiff,
9  vs.
10 KEYSTONE EXTERIOR DESIGN,
11       Defendant.
12
13          DEPOSITION
14             OF
15          STAN PITTMAN
16
17 REPORTED BY: Kelly Jackson
18       Registered Professional
19       Reporter
20       and Notary Public
21
22
23

Page 2

1     STIPULATIONS
2
3     IT IS STIPULATED AND AGREED by
4  and between the parties through their
5  respective counsel that said deposition
6  may be taken before Kelly Jackson,
7  Certified Shorthand Reporter, Registered
8  Professional Reporter and Notary Public;
9     That the signature to and the
10 reading of the deposition by the witness
11 is waived, the deposition to have the
12 same force and effect as if full
13 compliance had been had with all laws
14 and rules of Court relating to the
15 taking of depositions:
16     That it shall not be necessary
17 for any objections to be made by counsel
18 to any questions, except as to form or
19 leading questions, and that counsel for
20 the parties may make objections and
21 assign grounds at the time of trial, or
22 at the time said deposition is offered
23 in evidence or prior thereto.

Page 3

1     A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4     MR. TRES CLEVELAND
5     Maynard, Cooper & Gale
6     2400 AmSouth/Harbert Plaza
7     Birmingham, Alabama  35203
8
9  FOR THE DEFENDANT:
10    MR. PATRICK DAVIDSON
11    Adams, Umbach, Davidson & White
12    205 South 9th Street
13    Opelika, Alabama  36801
14
15    MR. JOE STOTT
16    Scott, Sullivan, Streetman & Fox
17    2450 Valleydale Road
18    Birmingham, Alabama
19
20
21
22
23

Page 4

1        I N D E X
2
3  EXAMINATION BY MR. STOTT      5
4  EXAMINATION BY MR. DAVIDSON  209
5  RE-EXAMINATION BY MR. STOTT  236
6  DEFENDANT'S EXHIBIT 1        49
7  DEFENDANT'S EXHIBIT 2        71
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 5

1      I, Kelly B. Jackson, a
2   Registered Professional Reporter of
3   Birmingham, Alabama, and a Notary Public
4   for the State of Alabama, acting as
5   Commissioner, certify that on this date,
6   pursuant to the Federal Rules of Civil
7   Procedure and the foregoing stipulation
8   of counsel, there came before me at
9   Scott, Sullivan, Streetman & Fox, 2450
10  Valleydale Road, Birmingham, Alabama, on
11  the 24th day of October, 2005,
12  commencing at 11:30 a.m., STAN PITTMAN,
13  witness in the above cause, for oral
14  examination, whereupon the following
15  proceedings were had:
16
17      STAN PITTMAN,
18   being first duly sworn, was
19   examined and testified as follows:
20
21      MR. CLEVELAND:  For the record,
22  we are here pursuant to the judge's
23  order that this deposition is limited to

Page 6

1   jurisdictional issues only.  We intend
2   to keep that order.  And this isn't a
3   motion for summary judgment type issues
4   before us, and I wanted that to be made
5   part of the record before beginning.
6      MR. STOTT:  Of course, we
7   reserve the right to come back and
8   redepose Mr. Pittman down the road after
9   the jurisdictional issues are decided.
10  We of course intend to ask anything that
11  might be related to any of the legal
12  issues that are addressed in the
13  jurisdictional brief.
14
15  EXAMINATION BY MR. STOTT:
16      Q.  Can I get you to state your
17  name?
18      A.  Stan Pittman.
19      Q.  Is that your full name?
20      A.  Stanley C. Pittman.
21      Q.  What does the C stand for?
22      A.  Coleman.
23      Q.  Have you ever been known by any

Page 7

1   other names besides Stan Pittman?
2      A.  No, sir.
3      Q.  Have you ever given a
4   deposition before today?
5      A.  No.
6      Q.  Let me tell you a little bit
7   about what to expect, and I am sure your
8   attorney has talked to you about it some
9   and gotten you prepared.  I am going to
10  ask you some questions about the claims
11  that you have in this lawsuit.  And from
12  time to time, if I ask a question
13  poorly, you don't understand what I am
14  trying to ask or if I word it poorly, I
15  need you to let me know so I can
16  rephrase it or repeat it to make sure
17  that we understand each other.  If you
18  answer, I will assume that you
19  understood me; is that fair?
20      A.  Yes, sir.
21      Q.  And then, of course, the other
22  thing is I need to tell you you need to
23  answer everything out loud.  Head nods

Page 8

1   and huh-uhs and uh-huhs we can't get
2   transcribed.  She knows how to do it,
3   but I don't know how to read it after
4   she is done.  If you can make sure you
5   answer everything out loud.  The other
6   thing is we both can't be talking at the
7   same time.  If you will make sure you
8   let me finish my question before you
9   answer, I will try to make sure I let
10  you finish your answer before I start
11  asking the next one.
12      A.  Yes, sir.
13      Q.  Where do you live currently?
14      A.  473 Shade Murphy Road,
15  Moultrie, Georgia.
16      Q.  What do you do for a living?
17      A.  I sell lumber, anything made
18  out of lumber, particularly the southern
19  pine and hardwood.
20      Q.  Do you have an employer
21  currently?
22      A.  I am employed by Robbins
23  Manufacturing, Tampa, Florida.

2  (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

1    Q.  How long have you worked for
2  Robbins Manufacturing in Tampa?
3    A.  Five weeks today.
4    Q.  I understand that you had some
5  connection with Morris Forest Products
6  prior to working for Robbins
7  Manufacturing; is that correct?
8    A.  Yes.
9    Q.  When did your relationship with
10  Morris Forest Products begin?
11    A.  The relationship with Morris
12  Forest, approximately five years ago.
13    Q.  Describe that relationship to
14  me.
15    A.  I was a contract sales agent
16  with Morris Forest Products.
17    Q.  What does a contract sales
18  agent do?
19    A.  My expertise was in the mobile
20  home industry selling boards and wedges.
21    Q.  We are in October, 2005 now, so
22  five years ago would have been sometime
23  during the year 2000, is that roughly

Page 10

1  when you started working with Morris
2  Forest Products?
3    A.  Yes.  Roughly in that area.
4    Q.  During the time that you did
5  work with Morris Forest Products, did
6  your position with them change?
7    A.  Could you repeat that?
8    Q.  Let me ask it a different way.
9  Were you ever an employee of Morris
10  Forest Products?
11    A.  No, sir.
12    Q.  When you began selling boards
13  and wedges in the mobile home industry
14  in connection with Morris Forest
15  Products, how were you compensated?
16    A.  Commission.
17    Q.  Tell me what the basis of the
18  commission was, how did that work?
19    A.  The basis on the commission was
20  a percentage of -- based on a percentage
21  of the load minus treatment, minus
22  freight.
23    Q.  Have you ever had a different

Page 11

1  compensation arrangement with Morris
2  Forest Products?
3    A.  The only other compensation
4  difference for just lumber material
5  would be a thirty percent of profit on
6  another item sold to a different
7  customer.
8    Q.  What do you mean by that?
9    A.  You split the profit in lumber
10  sales.  Like the profit will be pulled
11  and then you have a 70/30 percent
12  split.  So a commissioned salesman gets
13  the thirty percent and the manufacturer,
14  whoever they may be, will get seventy
15  percent.
16    Q.  When you say on another item
17  sold to a different customer, what do
18  you mean by that, any item other than
19  this mobile home truck load stuff?
20    A.  No.  The other items -- that
21  was one item, which is a crating packing
22  material.  Then any other item would be
23  based on that -- a percentage that would

Page 12

1  be set ahead of time based on profits,
2  based on volume.
3    Q.  Did you have a written
4  contract?
5    A.  Yes.
6    Q.  Was there a specific term on
7  that written contract?
8    A.  Yes.
9    Q.  When did that term expire?
10    A.  That expired the day that I
11  left Morris Forest Products to go to
12  Robbins.
13    Q.  Did you wait until it expired
14  to leave or was that an agreement
15  between you and Morris that the contract
16  was over as of that time?
17    A.  That was an agreement with us
18  that it was over at that time.
19    Q.  Was there a specific term
20  written into the contract that you had,
21  a term of years?
22    A.  Time?
23    Q.  Term of time.

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 13

1    A.   Approximately another year was
2 left.
3    Q.   Had the contract been renewed
4 at different times, or was this all from
5 the very first contract?
6    A.   It was the first contract.
7    Q.   So the first contract was like
8 a five or six year term?
9    A.   Yes.
10    Q.   Is that yes?
11    A.   Yes.
12    Q.   When you first began working as
13 a contract sales agent for Morris Forest
14 Products, were you still doing any work
15 for any other entity, either as an
16 employee or as an independent
17 contractor?
18    A.   Anything that was done was
19 independent contractor.
20    Q.   What I am asking were you doing
21 anything else for anyone else, any other
22 entities?
23    A.   Yes.

Page 14

1    Q.   Who else did you work for
2 during that time period?  When I say
3 that time period, I mean during the same
4 time period that you were working for
5 Morris Forest Products.
6    A.   Pittman Forest Products.
7    Q.   Is that a company you owned or
8 is that owned --
9    A.   That was a division that I
10 owned.
11    Q.   What did you do for Pittman
12 Forest Products?
13    A.   Trade equipment.
14    Q.   I am sorry?
15    A.   Trade wood working equipment.
16    Q.   Who else did you work for
17 during that time period?
18    A.   I can't recall the names at
19 this time.
20    Q.   Did any of them compete with
21 Morris Forest Products in any way?
22    A.   No.
23    Q.   Was it a different industry or

Page 15

1 was it still in the lumber industry?
2    A.   That, I couldn't answer right
3 now.
4    Q.   We are not talking about a real
5 long time ago.  Let's say last year, did
6 you work for anybody other than Morris
7 Forest Products last year?
8    A.   That I would have to check my
9 records to see.
10    Q.   You can't remember as you sit
11 here today if you earned income from a
12 source other than Morris Forest Products
13 last year?
14        MR. CLEVELAND:  Object to the
15 form.  Asked and answered.
16    A.   I can't answer specifically the
17 names without looking at my records.
18    Q.   Do you remember any of the
19 names of any of the other companies that
20 you worked for in the last five years?
21    A.   Not without checking
22 my records.
23    Q.   Where would I find those

Page 16

1 records?
2    A.   In my office.
3    Q.   Is that something you have that
4 you can easily put your hands on?
5    A.   Fairly easily.
6    Q.   You remember what you did, you
7 just don't remember the names of the
8 companies you did it for?
9    A.   Basically.
10    Q.   Tell me what you did for other
11 companies.
12    A.   Sell them products.
13    Q.   What kind of products?
14    A.   It would be equipment.
15    Q.   Is that it, just equipment?
16    A.   Just equipment.
17    Q.   You didn't sell lumber to
18 anybody?
19    A.   No.
20    Q.   When you first began working
21 with Morris Forest Products and entered
22 into this contract around five to six
23 years ago, was there any relationship

4 (Pages 13 to 16)

**367 VALLEY AVENUE**
(877) 373-3660     **BIRMINGHAM, ALABAMA**     (205) 397-2397

## FREEDOM COURT REPORTING

Page 17

1  between Morris Forest Products and
2  Keystone?
3      A.  Not that I am aware of.
4      Q.  At what point during your work
5  with Morris Forest Products did you
6  begin doing anything that relates in any
7  way to Keystone?
8      A.  I made a trip to Blevins, which
9  is a mobile home supply sales center in
10 Mobile, Alabama, saw the Keystone deck
11 on their show floor, talked to Aaron
12 Lott, the manager, and he referred me to
13 Mr. Turner.  Our interest was to cut the
14 components.
15     Q.  And what happened from there?
16     A.  From there had a meeting with
17 Mr. Turner.  He was having problems with
18 his manufacturing, we discussed it, came
19 to an agreement to move their
20 manufacturing to our plant in Davidston.
21     Q.  To what?
22     A.  To our plant in Davidston,
23 Alabama.

Page 18

1      Q.  Who is our?
2      A.  The plant, Mr. and Ms. Morris'
3  plant where I was the sales rep.
4      Q.  Was there a written contract
5  that was entered into at that time,
6  between Keystone and Morris Forest
7  Products?
8      A.  There was just discussion and
9  documentation on that agreement.
10     Q.  Were you involved in that?
11     A.  I was not in the contract with
12 the manufacturing.  I was in the middle
13 of the sales side of it.
14     Q.  Was there more than one
15 contract or just one?
16     A.  That, I couldn't answer.
17     Q.  Maybe we are not on the same
18 page.  You confused me a little bit when
19 I asked you if you were involved in the
20 contract.  You said that you weren't
21 involved in the -- in the manufacturing
22 side, but you were on the sales side.
23 Was there a separate contract entered

Page 19

1  into on the sales side from the
2  manufacturing side?
3      A.  There was a contract drawn up
4  between Morris and Keystone.  My
5  involvement was guiding the
6  manufacturing, the sales, and those
7  components were put in the contract
8  between Keystone and Morris.
9      Q.  Did you have any say so over
10 the terms of the contract or was that
11 all left up to Mr. Morris?
12     A.  The terms of the contract were
13 done by the Morrises.
14     Q.  You gave your input, but it was
15 really their call as to what they wanted
16 to put in there and not put in there?
17     A.  Right.
18     Q.  From that point on, tell me
19 about your involvement with Keystone
20 product.
21     MR. CLEVELAND:  Object to the
22 form.
23     Q.  You can answer.

Page 20

1      A.  It was sales, guiding the
2  manufacturing, designing the technical
3  data that needed to be as far as tech
4  support help, sales was what I was there
5  for.
6      Q.  Did your contract with Morris
7  Forest Products change at all after
8  Keystone and Morris entered into their
9  contract?
10     A.  No.
11     Q.  In fact, when you entered into
12 the contract with -- your contract with
13 Morris Forest Products, Keystone wasn't
14 even contemplated at that point?
15     MR. CLEVELAND:  Object to the
16 form.
17     A.  My sales of anything was not
18 dictated Keystone or anything.  It was
19 whatever I brought to the table.
20     Q.  What I am saying is you had
21 never even heard of Keystone at the
22 point you entered into your contract
23 with Morris Forest Products; right?

**367 VALLEY AVENUE**
**(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397**

# FREEDOM COURT REPORTING

Page 21

1     MR. CLEVELAND: Object to the
2  form.
3     A.  Would you repeat that?
4     Q.  Your first introduction to the
5  Keystone product was this trip to Mobile
6  that you just told me about?
7     A.  Yes.
8     Q.  You didn't know what Keystone
9  was when you entered into your contract
10  with Morris Forest Products?
11     MR. CLEVELAND: Object to the
12  form.
13     A.  I don't see where you are going
14  with that because the items that were
15  brought to the table as they come have a
16  different basis as far as commission,
17  like I was saying on the board and
18  wedge, on the packaging products, on the
19  deck, so that was a later date than the
20  original time --
21     Q.  I understand that.  That's what
22  I am trying to ask you.  You didn't even
23  know what Keystone was, who they were,

Page 22

1  what they made and what they
2  manufactured at the time you entered
3  into your contract with Morris Forest
4  Products?
5     MR. CLEVELAND: Same
6  objection.
7     MR. STOTT: Tell me what your
8  objection is.  If it is a form
9  objection, I want to know so I can fix
10  it.
11     MR. CLEVELAND: The form
12  objection is you are trying to lead him
13  into -- like you have never heard of
14  them and all of that.
15     MR. STOTT: I can ask leading
16  questions.  It is my deposition.
17     MR. CLEVELAND: I can object to
18  them, too.
19     Q.  You can answer the question.
20     A.  That, I don't know.
21     Q.  Do you know that the first time
22  you heard of Keystone was when you were
23  at this Mobile thing that you told me

Page 23

1  about when you first saw them?
2     A.  Yes.
3     Q.  So before that, you were not
4  familiar in any way with Keystone,
5  correct?
6     A.  Yes.
7     Q.  It was before that that you
8  entered into your contract with Morris
9  Forest Products?
10     A.  Before that?
11     Q.  Before your trip to Mobile, you
12  had already entered into a contract with
13  Morris Forest Products?
14     A.  The --
15     Q.  That's a yes or no.  You told
16  me about a trip you made to Mobile when
17  you first saw the Morris -- when you
18  first saw the Keystone deck.  Was that
19  before or after you entered into a
20  contract with Morris Forest Products?
21     A.  That is not -- the contract --
22  what contract are you talking about?
23     Q.  Your contract where you agreed

Page 24

1  to be a contract sales agent with Morris
2  Forest Products.
3     A.  Right.  I entered the contract
4  with Morris prior to seeing the
5  Keystone.
6     Q.  You weren't planning, you
7  hadn't already decided in your head that
8  the Keystone items were something you
9  were going to sell, something you were
10  going to be involved in at the time you
11  entered into the contract with Morris
12  Forest Products?
13     A.  We had prior to that had been
14  hunting a deck system.
15     Q.  Prior to what?
16     A.  Prior to the joining with the
17  Morris contract.
18     Q.  To whose joining with the
19  Morris contract?
20     A.  For me joining as a sales agent
21  for Morris Forest Products.
22     Q.  Did you work with Morris Forest
23  Products before you signed a contract

## 367 VALLEY AVENUE
(877) 373-3660     BIRMINGHAM, ALABAMA     (205) 397-2397

# FREEDOM COURT REPORTING

Page 25

1  with them?
2      A.  No.  In my own business in
3  Moultrie, I had looked for a --
4      Q.  But you are not saying Morris
5  Forest Products, because you hadn't
6  worked with them, you didn't know
7  anything about that?
8      A.  Repeat that.
9      Q.  You are saying that you
10  personally have looked for a deck
11  system, but you are not trying to speak
12  for Morris Forest Products when you say
13  that?
14      A.  Anybody that deals with the
15  mobile home industry had looked for a
16  deck system.
17      Q.  Do you know what Morris did or
18  did not look for before you started
19  working for them?
20      A.  No.
21      Q.  Let me try my question again.
22  I will try to make it as simple and
23  straightforward as possible.  The actual

Page 26

1  Keystone deck system, not just a general
2  deck system, but Keystone itself is not
3  something that you contemplated and
4  intended to sell at the time you entered
5  into your contract with Morris Forest
6  Products?
7      A.  It was something that I hoped
8  for.
9      Q.  You didn't know what Keystone
10  was, you were hoping you would find
11  something out there?
12      A.  Yes.
13      Q.  But did you not contemplate
14  Keystone when you entered into your
15  contract with Morris Forest Products; is
16  that correct?
17      A.  I did not contemplate Keystone.
18      Q.  About when was it that you
19  first became involved with Keystone?
20      A.  Roughly two years ago.  I would
21  have to go back on my records to see an
22  exact date.
23      Q.  You had roughly three years of

Page 27

1  a relationship with Morris Forest
2  Products before any involvement with
3  Keystone came along?
4      A.  Roughly.
5      Q.  Can you tell me what your
6  income was, again, roughly, during that
7  time period, those three years before
8  Keystone?  And when I ask the question,
9  I only want to know about income derived
10  from your relationship with Morris
11  Forest Products, not something you were
12  doing on the side.
13      A.  Income was based on the sales,
14  based on commission.
15      Q.  I want to know what the number
16  was roughly.
17      A.  Without going back to my
18  records, I couldn't tell you.
19      Q.  You can't even give me a
20  ballpark estimate of how much you were
21  making?
22      A.  Not without going to my
23  accountant and going back to my records.

Page 28

1      Q.  How close can you get?
2      MR. CLEVELAND:  Objection.  It
3  calls for speculation.
4      A.  Without going back, I wouldn't
5  even begin to speculate.
6      Q.  You don't know if it was a
7  dollar or a hundred thousand dollars,
8  you can't narrow it down anymore than
9  that?
10      MR. CLEVELAND:  Objection.  It
11  calls for speculation.
12      A.  I would have to go to my
13  accountant and get those.
14      Q.  Can you tell me roughly what
15  percentage of your income was derived
16  from Morris Forest Products business
17  versus non Morris Forest Products
18  business during that three-year period?
19      A.  I would say a good ninety
20  percent.
21      Q.  Was from Morris?
22      A.  Uh-huh.
23      Q.  Is that yes?

## 367 VALLEY AVENUE
### (877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397

# FREEDOM COURT REPORTING

Page 29

1    A.  Yes.
2    Q.  Tell me, if any, how did your
3  income change after the contract was
4  entered into between Morris and
5  Keystone?
6    A.  Repeat that.
7    Q.  Tell me, if any, how did your
8  income change after the contract was
9  entered into between Morris and
10  Keystone.
11    A.  It was to increase.
12    Q.  Did you say it was to increase
13  or it did?
14    A.  Was to increase.
15    Q.  Did it in fact increase during
16  that two year period?
17    A.  It did.
18    Q.  How much did it increase?
19    A.  The increase in income would be
20  based upon a percentage of the sales.
21    Q.  I understand what it is based
22  on.  What I want to know is how much
23  extra money did you earn because of the

Page 30

1  contract between Morris and Keystone?
2    A.  That, I would have to check
3  records.
4    Q.  Can you give me any kind of
5  estimate?
6    A.  Not without going back and
7  checking records.
8    Q.  Was it more than ten thousand
9  dollars a year?
10    MR. CLEVELAND:  Object to the
11  form.
12    A.  I would have to go back and
13  check records.
14    Q.  Was it more than a million
15  dollars a year?
16    A.  I would have to go back and
17  check records.
18    Q.  You don't know whether you made
19  more than a million dollars a year off
20  of this without checking records?
21    A.  I would have to go back and
22  check records.
23    MR. CLEVELAND:  Objection. The

Page 31

1  witness has stated he wants to be sure
2  and doesn't want to guess or speculate.
3    Q.  How about fifty million, can
4  you tell me if it was more than fifty
5  million?
6    A.  Check the records.
7    Q.  Who is your accountant?
8    A.  Vines and Ladson.
9    Q.  L-A-D-S-O-N?
10    A.  Yes.
11    Q.  Where are they located?
12    A.  Moultrie, Georgia.
13    Q.  Do they do your personal and
14  business income taxes?
15    A.  Yes, they do.
16    Q.  Do you file income taxes both
17  personally and for your business?
18    A.  Yes, I do.
19    Q.  Your contract with Morris
20  Forest Products, I understand that
21  Morris Forest Products is who you
22  contracted with as a subcontractor,
23  independent contractor; is that correct?

Page 32

1    A.  Repeat that.
2    Q.  What I am trying to get at, is
3  I want to know if you contracted with
4  Morris individually or if you had a
5  partnership or an L.L.C. or a
6  corporation that contracted with Morris
7  Forest Products that you were working
8  through?
9    A.  It was individually.
10    Q.  Stan Pittman, not Stan Pittman,
11  Inc. or Stan Pittman, L.L.C.?
12    A.  Yes.
13    Q.  The 1099 that you would receive
14  from Morris Forest Products would be to
15  you individually and not to a company?
16    A.  Right, Stan Pittman.
17    Q.  How long were you involved with
18  sales for Keystone?
19    A.  From the time they came there.
20    Q.  When the original contract
21  started up until the time that Morris
22  and Keystone no longer did business
23  together?

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 33

1    A.  I was involved in it from the
2  time we met with Mr. Turner on.
3    Q.  Back two years ago?
4    A.  Yes.  Yes, from the first
5  meeting.
6    Q.  Do you know if Morris and
7  Keystone are currently doing anything
8  together?  Let me ask you this.  Were
9  Morris and Keystone still doing anything
10  together at the time you left Morris
11  Forest Products?
12    A.  No.
13    Q.  That time period was somewhere
14  between a year and a half and two years
15  that their relationship between Morris
16  and Keystone?
17    A.  The best of my recollection.
18    Q.  Tell me during that period,
19  whatever it is, one and a half to two
20  year period, if any, how your
21  relationship with Keystone -- what you
22  were doing for the Keystone product, how
23  that changed.

Page 34

1    A.  I carried the Keystone product
2  as far as sales, technology,
3  manufacturing, quality, I was in that --
4  that was what I did as my contract job,
5  was that I carried that product, was
6  moved forward to be moved into the
7  market.
8    Q.  Did you ever see -- let me
9  strike that.  Did that ever change at
10  any time or was that what your job was
11  for the Keystone product the whole way
12  through?
13    A.  The whole way through.
14    Q.  Did you ever actually see the
15  contract that was entered into between
16  Morris and Keystone?
17    A.  Yes.
18    Q.  Did you know that that contract
19  had an expiration date?
20    MR. CLEVELAND:  Object.  The
21  contract speaks for itself.  You can
22  answer it if you know.
23    A.  That, I could not -- I don't

Page 35

1  know what the date would be.
2    Q.  But did you know there was one
3  in there is all I am asking?  Did you
4  know there was a date on the contract
5  that says this contract will terminate
6  on such and such date?
7    MR. CLEVELAND:  Objection as
8  far as it calls for a legal conclusion.
9  The contract speaks for itself.
10    Q.  I am not asking you to tell me
11  whether it is enforceable, whether it is
12  good, whether it is bad, what it means.
13  I want to know if you knew that there
14  were words in the contract that
15  indicated there was a certain date that
16  the contract was to expire?
17    A.  That, I don't know.
18    Q.  You don't remember if you saw
19  that or not?
20    A.  I couldn't for definitely say
21  that.
22    Q.  In or around October of 2004,
23  were you involved in any discussions

Page 36

1  with Mr. and Mrs. Morris or with anyone
2  at Keystone about the fact that the
3  contract was to expire?
4    MR. CLEVELAND:  Same objection.
5    A.  That, I can't recall
6  specifically.
7    Q.  Do you recall any conversations
8  that you had around October of 2004,
9  somewhere between September and November
10  of 2004 where there was discussion that
11  that date on the contract was coming up
12  or had passed?
13    A.  I can't recall that
14  specifically.
15    Q.  You can't recall the substance
16  of the conversations or you can't recall
17  whether or not you were involved in it?
18    A.  I can't recall whether I was
19  involved in it or not.
20    Q.  Tell me at what point you
21  became aware that there was a
22  possibility of Keystone and Morris no
23  longer doing business together.

9 (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1    A. After the days after the
2 meeting where Universal and Keystone
3 came to Morris Forest Products.
4    Q. I want you to assume -- I think
5 we can all agree that was February 7,
6 2005. That is what you indicated in
7 your affidavit. I think that has been
8 indicated by other people that there was
9 a meeting on February 7, 2005. Assuming
10 for me that that's the correct date, are
11 you saying you weren't aware of a
12 possibility that Keystone and Morris
13 would no longer do business together
14 until after that February 7, 2005
15 meeting?
16    A. After that, that's correct.
17    Q. Were you aware that on February
18 3rd, 2005, before that meeting, that
19 Mr. Morris sent a letter to Keystone
20 asking about a buyout of the leftover
21 equipment and product?
22    A. Repeat that.
23    Q. Were you aware that on or about

Page 38

1 February 3rd, 2005, four days before
2 that meeting, that Mr. Morris sent a
3 letter to Keystone asking for payment
4 for the equipment and the supplies and
5 the leftover product?
6    MR. CLEVELAND: Object to the
7 characterization of counsel's statement
8 of the letter.
9    A. I knew there was some
10 communication, but I didn't know what
11 the content was.
12    Q. What did you understand the
13 communication to relate to?
14    A. I knew there had been some
15 communication. I did not know what the
16 content was.
17    Q. They have been doing business
18 for two years, there is going to be
19 communication all the time. Were you
20 aware that the communication had to do
21 with the termination of the agreement
22 between Morris and Keystone?
23    A. I don't know the specific

Page 39

1 details of that communication.
2    Q. I take it you weren't consulted
3 prior to the February 7, 2005 meeting
4 about Morris negotiating a buyout of
5 that contract?
6    A. Repeat that.
7    Q. I take it you weren't consulted
8 by Mr. Morris or anyone else with Morris
9 Forest Products about Morris' attempt to
10 buy out that contract -- to get bought
11 out of that contract?
12    A. That, I can't recall.
13    Q. Did Mr. Morris or anyone else
14 at Morris Forest Products prior to
15 February 7th indicate to you that there
16 was an intent of Morris to pay you some
17 money if Keystone would pay Morris some
18 money to get out of the contract?
19    A. Repeat that.
20    Q. Prior to the February 7th
21 meeting, did anyone with Morris tell you
22 that you would be paid some money if
23 Keystone agreed to pay Morris Forest

Page 40

1 Products some money to buy out of the
2 contract?
3    A. At this moment, I don't recall
4 that conversation.
5    Q. What did you understand the
6 purpose of the February 7, 2005 meeting
7 was to be?
8    A. The February 7, 2005 --
9    Q. I called it February 5th. Go
10 ahead.
11    A. That meeting was between
12 Keystone and Morris and for us to carry
13 this product on forward.
14    Q. How did you learn there was
15 going to be a meeting on February 7,
16 2005?
17    A. Mr. Turner.
18    Q. Tell me specifically what
19 Mr. Turner told you was going to happen
20 at that meeting. I want to know as
21 close to word for word as you can get.
22    A. I will do my best. That the
23 Universal -- that he had talked to

10 (Pages 37 to 40)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 41

1 Universal and that Morris Forest
2 Products would be involved and we would
3 be manufacturing and things would be
4 carrying on and everything would be good
5 for everybody.
6     Q.  When did this conversation take
7 place between you and Mr. Turner?
8     A.  This was sometime prior to
9 February 7. I would have to go back and
10 look and see an exact time. I couldn't
11 recall an exact time right now. Can I
12 go to the bathroom?
13         (Short recess.)
14     Q.  When we went off the record, I
15 was asking you about when the
16 conversation you had with Jerry Turner
17 took place and you said it was prior to
18 February 7. About how long prior, are
19 we talking about a few days, a month?
20     A.  Sometime within a few weeks
21 prior.
22     Q.  And you said Mr. Turner told
23 you he had talked to Universal and

Page 42

1 Morris would be involved, tell me
2 what -- is that exactly what he said?
3     A.  I can't recall it exactly to
4 the detail. But that was what he said.
5     Q.  Did he say what he meant by he
6 had talked to Universal?
7     A.  Could you clear that up?
8     Q.  That is what I am asking you to
9 do. Did Mr. Turner tell you what he
10 meant by the fact that he had talked to
11 Universal?
12     A.  As I took it, that things would
13 be just like they were.
14     Q.  What does that have to do with
15 Mr. Turner talking to Universal? Did he
16 say what he talked to them about?
17     A.  He was in conversation with
18 Universal and they were coming to meet
19 and everything would stay just like it
20 was. We would keep -- business would
21 stay just like it was.
22     Q.  He didn't tell you what it was
23 that he had talked to Universal about?

Page 43

1     A.  Not specifically to the detail.
2     Q.  Did you understand there had
3 been some discussions between Keystone
4 and Universal that there was going to be
5 some sort of business arrangement
6 between those two entities?
7     A.  I knew there had been
8 conversation, but I didn't know the
9 details.
10     Q.  What did you understand that
11 conversation was about?
12     A.  That there would be --
13 something would happen with Keystone and
14 Universal.
15     Q.  Did you have any other source
16 of information about the relationship
17 between Keystone and Universal other
18 than Jerry Turner?
19     A.  That, I can't recall specifics.
20     Q.  Did you have other
21 conversations besides the one you just
22 told me about with Jerry Turner where he
23 discussed some relationship between

Page 44

1 Universal and Keystone?
2     A.  Repeat that question, again.
3     Q.  You told me about one
4 conversation you had with Jerry Turner
5 that took place sometime in the couple
6 of weeks before the February 7th meeting
7 where he told you that he had talked to
8 Universal and Morris would be involved
9 and everybody was going to be happy.
10 Other than that conversation, did you
11 have any other conversations with Jerry
12 Turner that involved the relationship
13 between Keystone and Universal?
14     MR. CLEVELAND:  Are you talking
15 about before or after?
16     Q.  Right now I am talking about
17 before the February 7th, 2005 meeting.
18     A.  There was a conversation prior
19 to the February 7th meeting.
20     Q.  A different one than the one
21 you have already told me about?
22     A.  There was a conversation where
23 he mentioned it prior to the February

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 45

1  7th meeting.
2      Q.  Is that a different
3  conversation than the one you just told
4  me about --
5      A.  That's the conversation prior.
6      Q.  You told me about one
7  conversation already.  And you told me
8  the only thing Jerry Turner told you
9  then was that he had talked to
10 Universal, that Morris Forest Products
11 would be involved and that everybody was
12 going to be happy.  Was that the one
13 that happened prior to the February 7th
14 meeting?
15     A.  That is the best of my
16 recollection.
17     Q.  Were there any other
18 conversations that you had with Jerry
19 Turner prior to the February 7th meeting
20 where there was some discussion about
21 the relationship between Universal and
22 Keystone?
23     A.  Right now I can't recall.

Page 46

1      Q.  When is the first time you ever
2  heard the name Universal associated in
3  any way with Keystone or Morris Forest
4  Products?
5      A.  Give me just a second.  The
6  first time -- I can't recall the very
7  first time.
8      Q.  Was it before that conversation
9  with Jerry Turner that you just told me
10 about?
11     A.  I can't recall.  It all
12 happened right in such close --
13     Q.  That conversation with Jerry
14 Turner may have been the first time you
15 heard Universal or it may have been some
16 other time?
17     A.  I would have to go back to my
18 notes and all.
19     Q.  What notes do you have?
20     A.  Different notes through the
21 life of Keystone.
22     Q.  Did you review those notes at
23 all before this deposition?

Page 47

1      A.  I looked over them.  But not in
2  specific detail for every detail.
3      Q.  Where are they right now?
4      A.  They are at my home.
5      Q.  You didn't bring them with you?
6      A.  No.
7      Q.  You didn't bring them with you
8  to meet with your attorneys this
9  morning?
10     A.  No.
11     Q.  Did you give a copy to your
12 attorneys before today?  Do your
13 attorneys have a copy is what I am
14 asking?
15     A.  They have a copy of part of my
16 notes.  I can't specifically say they
17 have everything that I have got.
18     Q.  There ought to be a set
19 somewhere here in Birmingham?
20     A.  I would have no idea.
21     MR. STOTT:  I want to get a
22 copy of that.  We are not going to be
23 able to go forward if he is going to say

Page 48

1  I don't remember, it is all in my notes.
2      MR. CLEVELAND:  As you know,
3  discovery hasn't started in this case.
4  As I previously stated, we don't have
5  any order here making us compel any
6  documents.  You are asking him questions
7  and he is answering to the best of his
8  recollection.
9      MR. STOTT:  We are going to end
10 up back here again and doing this over
11 again if you are not going to
12 voluntarily give it to me because I have
13 somebody sitting across from me saying
14 they can't remember if they made a
15 dollar or fifty million dollars.  That
16 is kind of ridiculous.
17     MR. CLEVELAND:  I think it is
18 ridiculous you asking questions like
19 that.  He said he doesn't know and you
20 don't like his answer so you try to
21 change the topic on him.
22     MR. STOTT:  I guess we will ask
23 Judge Albright.  If we have to come back

12  (Pages 45 to 48)

## FREEDOM COURT REPORTING

Page 49

1  again, we will come back again.
2      Q.  Let's go on.  Mr. Pittman, let
3  me show you what I am going to mark as
4  Defendant's Exhibit 1.
5
6          (Whereupon, Defendant's Exhibit
7          1 was marked for
8          identification.)
9
10     Q.  Tell me if you have ever seen
11 this February 3rd, 2005 letter before
12 today.
13     A.  Before today?
14     Q.  Yes, sir.
15     A.  More than likely I have.  It is
16 in some of the paperwork that I have
17 seen, yes, sir.
18     Q.  Did you see it before this
19 lawsuit was initiated?
20     A.  Probably, but I can't give a
21 specific date.
22     Q.  As of the February 7th, 2005
23 meeting, were you aware that Mr. Morris

Page 50

1  had made these various offers to
2  Keystone regarding a buyout of the
3  contract between Morris and Keystone?
4      MR. CLEVELAND:  Object to
5  counsel's statement.  The letter speaks
6  for itself.
7      Q.  I am not asking you to tell me
8  what they are.  I am asking you if you
9  were aware.
10     A.  This was between Mr. Morris and
11 Mr. Turner.
12     Q.  That is something you wouldn't
13 have been involved in?
14     A.  Not on Morris Forest Products.
15 That is Morris Forest Products and
16 Keystone business.
17     Q.  If there is going to be a
18 decision about whether or not there is a
19 relationship between Morris and
20 Keystone, that's something that is going
21 to be completely up to Mr. Morris and
22 you are out of that, that is something
23 you are not going to be involved in?

Page 51

1      MR. CLEVELAND:  Object to the
2  form.
3      A.  I don't understand what you are
4  asking.
5      Q.  If there is going to be a
6  decision back in February of 2005, if
7  there was going to be a decision as to
8  whether or not there was going to be an
9  ongoing business relationship between
10 Morris and Keystone, that was something
11 between Mr. Morris and the folks at
12 Keystone and nothing that you had a say
13 so in, correct?
14     A.  I don't understand the
15 question.
16     Q.  Tell me what you meant when I
17 asked you if you were aware about these
18 offers, you said that is Morris and
19 Keystone's business and not my business,
20 what do you mean by that?
21     MR. CLEVELAND:  Objection.  I
22 don't think that's what he stated.
23     A.  My position is sales,

Page 52

1  technology, that sort of thing.  As far
2  as the Morris Forest Products' financial
3  business with any other company, I am
4  not an owner or part of Morris Forest
5  Products.  Mine is just sales.
6      Q.  You had no right to make
7  decisions to that regard?
8      A.  As far as buying and selling of
9  anything that is owned by Rod and Wanda
10 Morris, no, sir, I don't.
11     Q.  Your contract with Morris
12 Forest Products did not give you the
13 right to make financial decisions on
14 behalf of Morris Forest Products,
15 correct?
16     A.  You would have to specify that.
17     Q.  Tell me then what financial
18 decisions did your contract give you the
19 right to make on behalf of Morris Forest
20 Products.
21     MR. CLEVELAND:  Objection.
22 That's assuming he had any.
23     Q.  He told me to be more

13  (Pages 49 to 52)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 53

1  specific.
2      MR. CLEVELAND:  What is your
3  definition of financial decisions?
4      Q.  Since I don't have his contract
5  in front of me since you brought no
6  documents --
7      MR. CLEVELAND:  I wasn't aware
8  there was an order requiring us to bring
9  documents.
10     Q.  My question is tell me what
11  financial decisions your contract
12  allowed you to make on behalf of Morris
13  Forest Products.
14     MR. CLEVELAND:  I object to
15  that unless you give him a definition of
16  financial decisions.  That is a very
17  broad question. You can answer if you
18  know what he is talking about.
19     A.  I don't know what specific area
20  you are going to.
21     Q.  Any.  You tell me any financial
22  decisions that you were allowed to make
23  on behalf of Morris Forest Products by

Page 54

1  the terms of your contract with Morris
2  Forest Products.
3      A.  The financial decisions that I
4  could make under the terms of my
5  contract with Morris Forest Products
6  would be as far as negotiating, selling
7  of a product, establishing a profit
8  margin and then bringing it back to
9  Morris Forest Products and having it
10  okayed that that would be --
11     Q.  You couldn't make a decision
12  without Mr. Morris' okay no matter what?
13     A.  That is the way it goes with
14  contract sales.
15     Q.  Specifically with your contract
16  that you had?
17     A.  Specifically with any contract
18  with anyone.
19     Q.  That would include your
20  contract with Morris Forest Products,
21  correct?
22     A.  I think you could say that.
23     Q.  Do you agree with that?  Do you

Page 55

1  agree that's what your contract allowed,
2  that any decision you made as to a price
3  or profit or anything like that had to
4  be approved by Morris Forest Products
5  before it would go into effect?
6      A.  Probably in most situations.
7      Q.  Give me an example of a
8  situation where you could do it on your
9  own without approval of Morris Forest
10  Products.
11     A.  If there was a whole lot of
12  profit in it and I knew it was real
13  good, then I could probably make a
14  decision.
15     Q.  Did you have the authority to
16  enter into contracts on behalf of Morris
17  Forest Products?
18     A.  Huh-uh.
19     Q.  Is that a no?
20     A.  That is a no.
21     Q.  I take it that you couldn't
22  direct Mr. Morris as to who he could or
23  could not enter into contracts with?

Page 56

1      A.  No.  I couldn't direct.  Rod
2  Morris is a man of his own.
3      Q.  You could express your opinion,
4  but he didn't have to listen to you is
5  basically how it works?
6      A.  You can express your opinion.
7      Q.  He didn't have to listen to it,
8  it is his company; right?
9      A.  More than likely.
10     Q.  That is a yes or no question.
11     MR. CLEVELAND:  I don't know if
12  he can speak for Mr. Morris himself.  If
13  he knows what Mr. Morris does with his
14  business in his opinion, he can answer.
15     Q.  I didn't ask your opinion as to
16  what he might or might not do.  I asked
17  you this.  Does he have to listen to
18  your opinion if he doesn't want to?
19     MR. CLEVELAND:  Objection.  It
20  calls for speculation of Mr. Morris.  If
21  you know, you can answer.
22     A.  I am speculating what the
23  situation -- I don't know.

## 367 VALLEY AVENUE
## (877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397

# FREEDOM COURT REPORTING

Page 57

1    Q.  Do the terms of your contract
2  with Morris Forest Products give you
3  right to force Mr. Morris to make any
4  particular contractual agreements?
5    A.  By force, you mean what?
6    Q.  Where you get the say so
7  instead of him.
8    A.  I don't understand what
9  direction you are going.
10    Q.  Let me make it as simple as I
11  can.  If you wanted to enter a deal with
12  somebody on behalf of Morris Forest
13  Products and not something on your own
14  company somewhere else, but something
15  you were doing for Morris Forest
16  Products -- under your contract sales
17  agent agreement with Morris Forest
18  Products, if you wanted to enter into a
19  contract or deal with somebody and
20  Mr. Morris didn't want to, who is going
21  to win that argument?
22    A.  It is Mr. Morris' company.  He
23  makes the decisions for his company.

Page 58

1    Q.  You couldn't require him to
2  enter into a contract that he didn't
3  want, could you?
4    A.  I don't think I could require
5  him or anyone else to enter into one if
6  they didn't want to.
7    Q.  You didn't have a provision in
8  your contract that would allow you to
9  make those decisions unilaterally, did
10  you?
11    A.  Could you clear that up?
12    Q.  You didn't have a provision in
13  your contract with Morris Forest
14  Products that would allow you to enter
15  into deals without the approval of Rod
16  Morris?
17    A.  Rod Morris runs his business
18  and he --
19    Q.  I understand that.  I am asking
20  about the terms of your contract right
21  now.  That is all I want to know.  Did
22  you have anything in your contract as a
23  sales agent for Morris Forest Products

Page 59

1  that would allow you to enter into deals
2  that you wanted that Morris Forest
3  Products did not want?
4    A.  I am kind of confused by that
5  question.
6    Q.  Tell me what is confusing about
7  it, and I will clear it up.
8    A.  Ask it one more time.
9    Q.  Did you have a provision of any
10  sort in your contract with Morris Forest
11  Products that would allow you on your
12  own to enter into deals on behalf of
13  Morris Forest Products that you wanted
14  to enter into that Rod Morris did not?
15    A.  My contract provides that I
16  sell for Morris Forest at a commission.
17    Q.  As part of that contract, was
18  there any provision that would allow you
19  to enter into a deal that you wanted
20  that Morris Forest Products did not
21  want?
22    A.  I really don't know how to
23  answer that.

Page 60

1    Q.  What part of it are you having
2  difficulty with?  I will see if I can
3  clear it up.
4    A.  The force issues, is it a
5  physical force or legal force or mental
6  force?  Our agreement was that I would
7  sell for Morris Forest Products and sell
8  products at a profit and I would receive
9  a commission.
10    Q.  Tell me any circumstance that
11  you can think of where your contract
12  would allow you to say, Mr. Morris, I
13  think we should do this and he says, no,
14  do not do it, but you can do it anyway?
15    A.  I don't think using Rod Morris'
16  money, I would have the right to do
17  that.
18    Q.  Let's flip it around the other
19  way.  What if he did want to do a deal
20  and you didn't think it was the right
21  thing to do, could you override him in
22  any way per the terms of your agreement?
23    A.  I don't think I could override

15 (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 61

1  Mr. Morris and his money.
2      Q.  Prior to the February 7th, 2005
3  meeting, were you aware that Mr. Morris
4  had made any offers that would result in
5  Mr. Morris no longer being involved with
6  Keystone?
7      A.  I can't recall anything.
8      Q.  Did Mr. Morris ever say to you,
9  now that you have had an opportunity to
10  look at these different options that are
11  shown on Defendant's Exhibit 1, that you
12  would receive anything if he got the
13  money that he asked for in Defendant's
14  Exhibit Number 1?
15      A.  I don't recall anything like
16  that.
17      Q.  That is something you would
18  recall if he told you you were going to
19  get a payment, isn't it?
20          MR. CLEVELAND:  Let's clarify.
21  This is all before the February 7
22  meeting, these questions?
23      Q.  Correct.

Page 62

1      A.  Prior to February --
2      Q.  Right.
3      A.  No.  There was nothing said
4  prior to February 7.
5      Q.  Tell me every conversation you
6  can remember prior to February 7, 2005
7  that you had with Mr. Morris or with any
8  of his family members about the
9  possibility of the contract with
10  Keystone no longer being present.
11      A.  There was conversations prior,
12  I am talking about much, much prior that
13  there -- in the conversations between
14  Mr. Turner and Mr. Morris and Mr. Don
15  Ludwig that the contract would be
16  renewed on --
17      Q.  Tell me about those
18  conversations.
19      A.  The contract, it is like any
20  other contract, it goes to a certain
21  point and they would renew it and that
22  we had such a good relationship, that
23  there was no problem, everything would

Page 63

1  keep rolling with a renewal.
2      Q.  Who did you have that
3  conversation with?
4      A.  It was in conversations that
5  were had at the plant of Morris Forest
6  Products.  Mr. Turner was there and
7  Mr. Ludwig was there and there were
8  times that Mr. Turner would be there
9  alone.
10      Q.  So you are saying that Jerry at
11  some point said to you that the contract
12  would be renewed?
13      A.  We all -- it was -- you go into
14  a project like this, with a business
15  that we are doing, you pretty well
16  figure if we are going to put this much
17  time in it, that the contract is going
18  to be renewed.
19      Q.  Did you ever hear Jerry Turner
20  say that the contract was going to be
21  renewed?
22      A.  The statement was made that
23  everything was good, everything would

Page 64

1  progress as it was.
2      Q.  When was that statement made?
3      A.  Sometime in the -- prior to
4  February 7, somewhere in those days
5  prior to that.
6      Q.  In the few days or weeks
7  before, or are you talking about months
8  before?
9      A.  I would say in months before.
10      Q.  Let's back up to months
11  before.  I asked you previously -- let
12  me ask this.  When is the first time you
13  can ever recall having any discussions
14  with anyone at all about the renewal of
15  the contract?
16      A.  The first time as far as the
17  renewal, that's a tough one.
18      Q.  Or expiration of the contract.
19      A.  I can't recall specific dates.
20  I can't recall specific conversations.
21  I just know that from the time and
22  investment of time that I was doing in
23  that twenty some odd month investment of

16 (Pages 61 to 64)

## 367 VALLEY AVENUE
## (877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397

# FREEDOM COURT REPORTING

Page 65

1  my time into that Keystone deck, that
2  Mr. Turner had made the fact that
3  everything was good, that the
4  manufacturing was going well, sales were
5  going well and we were progressing on.
6  I could go back on my records and
7  check. But we had pitched the deck to
8  Home Depot. There was a good response
9  there. Robbins Manufacturing had a big
10 show in Tampa that we had done, had
11 pitched. A lot of money had been
12 invested into the pitch to go to Menards
13 for the 2005 season. And this was all
14 December, January, in that area, all
15 that had been arranged.
16    Q.  Do you know if Morris Forest
17 Products was up to date in its owed
18 payments to Keystone at that time
19 period?
20    A.  That is Morris Forest Products'
21 business.
22    Q.  I understand it is their
23 business. What I want to know is do you

Page 66

1  know?
2     A.  That's Morris Forest Products'
3  business.
4     Q.  Yes or no, either you don't
5  know or you do know. Do you know
6  whether they were up to date?
7     A.  I have no idea.
8     Q.  Had you heard any discussions
9  about the fact that Morris Forest
10 Products was behind in payments?
11    A.  That is Morris Forest Products'
12 business.
13    Q.  I understand it is their
14 business. I want to know if you had
15 heard any discussions about it.
16    A.  That's Morris Forest Products'
17 business.
18    Q.  You have got to answer my
19 question as to whether or not you heard
20 any discussions about that.
21    A.  I cannot recall any discussion.
22    Q.  You can't recall ever --
23    A.  At this time I cannot recall

Page 67

1  any discussion.
2     Q.  Did Mr. Turner or Mr. Ludwig
3  ever contact you about the fact that
4  Morris Forest Products was behind in
5  their payments?
6     A.  I did not handle the Keystone
7  Morris Forest Products money.
8     Q.  I understand you didn't handle
9  it. What I want to know is if
10 Mr. Turner or Mr. Ludwig, despite the
11 fact that you are not the right person
12 to call, ever called you any way and
13 said, hey, you guys are behind in your
14 payments, you need to get caught up?
15    A.  I do not recall any
16 conversation like that.
17    Q.  Did any of the Morrises ever
18 discuss with you the fact that there was
19 a concern about the renewal of the
20 contract in or around October of 2004?
21    A.  I can't recall that.
22    Q.  I think you told me earlier the
23 first time you were aware of a meeting

Page 68

1  taking place on February 7th, 2005 was
2  when Jerry Turner told you about it; is
3  that right?
4     A.  The best I can recall.
5     Q.  You told me about that
6  conversation, everything you can
7  remember about it?
8     A.  The best I recollect.
9     Q.  Did you ask Mr. Turner, why are
10 people from Universal coming to our
11 facility, what do they have to do with
12 us, what do they have to do with this
13 whole thing?
14    A.  No.
15    Q.  You said, fine, bring them on?
16    A.  That was between him and
17 Mr. Morris.
18    Q.  Did you understand that he and
19 Mr. Morris had had discussions about
20 that meeting before you were involved?
21    A.  That, I don't know. I don't
22 recall --
23    Q.  Did you say, hey, does

17 (Pages 65 to 68)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 69

1  Mr. Morris know about this or anything
2  to that effect?
3     A.  I am sure that I -- I reckon
4  I was speculating then that him and
5  Mr. Morris had talked seeing how it was
6  the two of them's business.
7     Q.  What, if anything, did
8  Mr. Turner say that needed to be done to
9  be prepared for that meeting on February
10  7?
11     A.  Whatever he talked to
12  Mr. Morris --
13     Q.  Did he mention anyone else by
14  name during that conversation that you
15  had with him?
16     A.  The director of manufacturing,
17  Mr. Dana Rector, that he was going to
18  meet with him at the Universal plant
19  over in Georgia and they were going to
20  get some things coordinated and they
21  were going to come look at the plant at
22  Morris Forest Products.
23     Q.  I take it Dana Rector was not

Page 70

1  involved in that telephone conversation
2  that you had with Mr. Turner, he wasn't
3  on the phone with y'all?
4     A.  I don't know if he was there
5  with Mr. Turner.
6     Q.  You didn't hear him talk or
7  hear anybody say anything to him during
8  that conversation?
9     A.  Not that I recall.
10     Q.  Did he call him the director of
11  manufacturing or did he call him by name
12  Dana Rector?
13     A.  Both.
14     Q.  Do you know if that meeting
15  ever took place?
16     A.  As far as --
17     Q.  You said that Mr. Turner said
18  that he was going to meet --
19     A.  Dana Rector came to the meeting
20  when Universal came to Morris Forest
21  Products.
22     Q.  Just a minute ago you told me
23  they were going to meet ahead of time.

Page 71

1     A.  I don't know.  With Mr. Turner
2  and then --
3     Q.  Let me finish my question.  You
4  told me a minute ago that according to
5  the conversation, Mr. Turner was going
6  to meet with Dana Rector, the head of
7  manufacturing sometime prior to the
8  February 7th meeting.  Do you know if
9  that meeting between Mr. Turner and
10  Mr. Rector ever took place?
11     A.  I wasn't there.
12     Q.  Do you know if it ever took
13  place?  I am not asking if you
14  attended.  I want to know if you know
15  whether the meeting ever took place.
16     A.  Not for certain.
17     Q.  Have you ever heard from any
18  source that it did take place?
19     A.  Not that I can recall.
20
21     (Whereupon, Defendant's Exhibit
22     2 was marked for
23     identification.)

Page 72

1
2     Q.  I am going to show you what I
3  am going to mark as Defendant's Exhibit
4  Number 2.  Can you identify that for me,
5  please?
6     A.  That was my notes from a
7  conversation with Mr. Turner.
8     Q.  That is dated February 1st,
9  2004?
10     A.  Yes.
11     Q.  I understand this meeting took
12  place on February 7, 2005.  Are those
13  notes from 2004 or 2005?
14     A.  2005.
15     Q.  When did you make that note?
16     A.  That February 1st, 2005.
17     Q.  That was something you made at
18  the time that the conversation took
19  place?
20     A.  Right.
21     Q.  You have mentioned Matt Missad
22  in that note by name?
23     A.  Uh-huh (nodding head

18 (Pages 69 to 72)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 73

1 affirmatively).
2    Q.  Is there a particular reason
3 you mentioned him by name?
4    A.  No.  It was just whatever the
5 conversation was at the time.
6    Q.  Did you know Mr. Missad prior
7 to February 1st, 2005?
8    A.  No.
9    Q.  Can you explain to me why you
10 didn't mention Dana Rector's name in
11 that note?
12    A.  No, I couldn't.
13    Q.  Is it possible that it is
14 because his name was not mentioned and
15 Mr. Turner simply referred to the
16 director of manufacturing is why you
17 wrote that name?
18    MR. CLEVELAND:  Object to the
19 form.  Asked and answered.  He has
20 already testified to that.
21    A.  No.  It is the way Stan Pittman
22 does things.
23    Q.  Can you say for absolute

Page 74

1 certainty whether Mr. Turner mentioned
2 Dana Rector by name in that February 1st
3 conversation?
4    MR. CLEVELAND:  Object to the
5 form.  Asked and answered twice.
6    Q.  I have never asked the
7 question.
8    MR. CLEVELAND:  I am going to
9 object to it anyway.  You have asked it
10 twice and he has answered it twice.
11    MR. STOTT:  Object to the form
12 then instead of trying to tell him what
13 to say.
14    A.  That is -- the head of
15 manufacturing, Dana Rector was mentioned
16 in that conversation.
17    Q.  You have told me a couple of
18 times about a conversation that you had
19 with Mr. Turner that occurred before the
20 February 7th meeting.  Is that
21 conversation what is reflected in
22 Defendant's Exhibit 2?
23    A.  As best I can recall.

Page 75

1    Q.  Where on your notes does it
2 describe the fact that everything was
3 going to -- that Morris Forest Products
4 was going to be involved and everything
5 was going to go forward as before and
6 everybody was going to be happy?
7    A.  I didn't write them statements
8 down.
9    Q.  Your notes mention something
10 about a buyout, don't they?
11    A.  Yes.
12    Q.  Tell me what buyout you were
13 referring to in those notes, who was
14 buying who or what.
15    A.  That was Mr. Turner and
16 Mr. Morris.  That was something they had
17 between them.
18    Q.  Does that mean you don't know?
19    A.  Specific details, no.
20 Universal -- you would -- I am not going
21 to speculate.  You would take it that
22 Universal with Mr. Turner, Keystone,
23 there was to be something between

Page 76

1 Keystone and Universal.  Because
2 Universal hadn't approached Morris that
3 I had any recollection of of buying that
4 company out that I was aware of.
5    Q.  You thought Universal was going
6 to buy Keystone, is that how you
7 understood that, the term buyout?
8    A.  That is the way I would take
9 it.
10    Q.  Who owned the finished parts,
11 who owned the finished parts that were
12 at the Morris Forest Products facility?
13    A.  Morris Forest Products.
14    Q.  Who owned the goods in progress
15 that were at the Morris Forest Products
16 facility?
17    A.  Morris Forest Products.
18    Q.  Who owned the jigs that were at
19 Morris Forest Products?
20    A.  Morris Forest Products.
21    Q.  My understanding from reading
22 this is that Mr. Turner indicated to you
23 that people were going to meet with you

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 77

1  on Monday or Tuesday to see the value of
2  the finished parts, the goods in
3  progress and the jigs, et cetera for the
4  buyout?
5      MR. CLEVELAND: Objection. It
6  will speak for itself.
7      Q. Is that right?
8      A. You have to take it the way it
9  reads.
10     Q. Did I read it correctly?
11     A. You have to take it the way it
12 reads.
13     Q. Did I read it correctly?
14     A. I don't know that is stated
15 correctly.
16     Q. You read it for me. Read the
17 end of the first paragraph starting with
18 they would drive over.
19     A. Where it says Turner to drive
20 down?
21     Q. Read the whole thing.
22     A. Head of manufacturing to be in
23 Union City on Monday, Turner to drive

Page 78

1  down and meet him and said if
2  conversation went good with Matt Missad,
3  they would drive over and meet with us
4  on Monday or Tuesday to see value of
5  finished parts, goods in progress, jigs,
6  et cetera for buyout.
7      Q. You understood that was going
8  to be the buyout referred to Universal
9  potentially buying Keystone?
10     A. Right.
11     Q. Can you explain to me why
12 someone would have to assess the value
13 of something owned by Morris Forest
14 Products for a buyout of a completely
15 different company?
16     MR. CLEVELAND: Objection. It
17 calls for speculation. If you know.
18     Q. Did you ask Mr. Turner why do
19 you have to look at our stuff if
20 Universal is buying Keystone?
21     A. That was between him and
22 Mr. Morris.
23     Q. I want to know if you asked

Page 79

1  that question or if y'all had that
2  discussion.
3      A. I can't recall that I asked
4  that question.
5      Q. So the issue about Universal
6  potentially buying Keystone, that was
7  your assumption, your speculation?
8      A. More than likely.
9      Q. You never inquired as to why
10 anybody would have to come to your plant
11 to look at things so that Universal
12 could buy Keystone?
13     MR. CLEVELAND: Objection.
14 Asked and answered.
15     A. That is between Turner and
16 Morris.
17     Q. You never asked the question as
18 to why people would have to come to your
19 plant to look at things to make that
20 determination?
21     A. That is their business.
22     Q. I understand that's their
23 business. I need to know if you

Page 80

1  participated in any conversations.
2      A. Not that I recall.
3      MR. CLEVELAND: To make things
4  move on, he may understand it is your
5  business. But you have to answer yes or
6  no. You can always explain it, but go
7  ahead and answer yes or no.
8      Q. Between February 1st, 2004 when
9  you spoke to Jerry Turner and February
10 7th when the meeting occurred, did you
11 have any other conversations affiliated
12 in any way with Universal or Keystone
13 about the meeting?
14     A. You mean February 1st, 2005?
15     Q. Yes. I am reading off your
16 paper. Between February 1st, 2005 and
17 February 7, 2005, did you have any other
18 discussions with anyone in any way
19 affiliated with Keystone or Universal
20 about the upcoming meeting?
21     A. I can't recall a conversation
22 at that time as far as the meeting. I
23 am sure there was some mention of a

20 (Pages 77 to 80)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 81

1  meeting, but as far as specifics, a
2  specific time or specific
3  conversation --
4      Q.  Do you know whose idea it was
5  to have the meeting in the first place?
6      A.  The first mention of a meeting
7  was from Mr. Turner.
8      Q.  I understand he is the first
9  one who mentioned it to you.  Do you
10  know whose idea it was to have a
11  meeting?
12      A.  Keystone's.
13      Q.  You told me earlier that you
14  assumed when you had this conversation
15  with Mr. Turner, that he and Mr. Morris
16  had already had some discussions; is
17  that right?
18      A.  I do not know for certain.
19      Q.  That was your assumption when
20  you had the conversation?
21      A.  Yes.
22      Q.  But you didn't know if it was
23  Mr. Morris' idea to have a meeting or

Page 82

1  Keystone's idea to have a meeting?
2          MR. CLEVELAND:  Objection to
3  the form.  Asked and answered.
4      Q.  Or anyone else's for that
5  matter?
6          MR. CLEVELAND:  Objection.
7  Asked and answered.
8      A.  The first conversation that I
9  heard of a meeting was Mr. Turner's
10  statement about Universal.
11      Q.  What, if anything, did you do
12  between February 1st, 2005 and February
13  7th, 2005 to prepare for the meeting?
14      A.  Between February 1st and
15  February 5th, 2005?
16      Q.  February 1st and February 7th.
17      A.  February 7th to prepare for the
18  meeting of -- I was involved in that
19  time in answering the tech questions for
20  Menards, preparation for a Robbins
21  meeting, preparation for a Menards
22  meeting through that period.  That's the
23  best recollection of what my time was

Page 83

1  concentrated in.
2      Q.  Does that mean you didn't do
3  anything to prepare for the meeting?
4      A.  Not that I can recall right
5  now.
6      Q.  Tell me when and where did the
7  meeting take place.
8      A.  Conference room at Morris
9  Forest Products.
10      Q.  Do you remember what time of
11  day?
12      A.  Sometime in the morning.  I
13  couldn't tell you an exact to the
14  minute, but it was in the morning.
15      Q.  Tell me everyone who attended
16  that meeting from the Morris Forest
17  Products side.
18      A.  From the Morris Forest
19  Products, Rod Morris, Brandon Morris,
20  and Stan Pittman.
21      Q.  I understand Rod Morris is the
22  owner of the company and Brandon is his
23  son?

Page 84

1      A.  Yes.
2      Q.  Do you know if Brandon has any
3  ownership interest in the company?
4      A.  That is none of my business.
5      Q.  Is it something you know?
6      A.  No.
7      Q.  I take it that Rod Morris,
8  Brandon Morris and yourself were already
9  there before the meeting started,
10  already at Morris Forest Products?
11      A.  Yes.
12      Q.  Did y'all have any meetings
13  that morning amongst yourselves to
14  discuss what was going to happen that
15  day?
16      A.  Not that I recall.
17      Q.  Who was the first person
18  outside of the three you already told me
19  about to arrive?
20          MR. CLEVELAND:  From Morris
21  Forest Products?
22      Q.  Outside of those three people,
23  from anywhere else who attended the

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 85

1  meeting, who was the next person outside
2  of the folks that were already there
3  that morning because they worked there,
4  who was the next person to arrive?
5      A.  As far as from Universal?
6      Q.  Any attendees at the meeting
7  other than yourself, Rod Morris and
8  Brandon Morris.
9      A.  I don't recall what the
10 progression of Matthew -- Mr. Missad,
11 Mr. Honholt were the ones that flew in.
12 Mr. Dana Rector, and the other gentleman
13 that I would have to go back and look
14 for his name to recall it right now, I
15 have a blank there, all drove in from
16 Atlanta and Mr. Turner drove in.
17     Q.  Did those three different
18 groups of people arrive at three
19 different times?
20     A.  They come in three different
21 ways, yes.  Exactly how they walked in
22 the door, I couldn't tell you.
23     Q.  You know they were there at

Page 86

1  different times, you just don't remember
2  which order?
3      A.  Right.
4      Q.  You couldn't tell me whether
5  Mr. Turner got there first or whether
6  Mr. Rector --
7      A.  I couldn't tell you the
8  progression they walked through the
9  door.
10     Q.  You do know they got in at
11 different times?
12     A.  Yes.
13     Q.  Were there any discussions that
14 occurred during that meeting that
15 related to the relationship among
16 Universal, Keystone and Morris that took
17 place before everyone arrived?
18     A.  That, I can't recall.
19     Q.  Tell me what happened after
20 everybody got there and the meeting
21 started.  I want you to take me through
22 it in as much detail as possible,
23 telling me what statements were made and

Page 87

1  who they were made by.
2      A.  The meeting progressed with
3  everybody more or less introduced
4  themselves, blah, blah, blah.  The
5  meeting went with Keystone and Universal
6  were having the -- whatever business
7  they were having together.  Morris
8  Forest Products was involved as far as a
9  manufacturing side.
10     As I said before, it was --
11 this meeting was a meeting that Morris
12 Forest Products would continue on doing
13 just like they were doing.  In the
14 prior -- in the beginning of this
15 meeting, it was my opinion that I would
16 not let Universal go through the plant.
17 This is my personal opinion.  To go and
18 see.  By the end of the morning
19 conversations that we had with
20 Universal, we were to believe -- led to
21 believe that we would be involved, that
22 we would be a manufacturing facility for
23 whatever this Universal/Keystone, ever

Page 88

1  how this was going, and we would carry
2  on just like we were.  So at the end of
3  that meeting, we felt that everything
4  was okay, and Mr. Morris said that it is
5  okay to go ahead and take Universal
6  through the plant so they can see how
7  the operation is going so they can
8  better understand so we could better
9  function together.
10     Q.  You told me generally what the
11 discussion was.  What I want to do is
12 break that down into specific statements
13 made by specific people.  I think you
14 told me everybody that attended the
15 meeting.  Jerry Turner was there?
16     A.  Yes.
17     Q.  Tell me everything that Jerry
18 Turner stated at that meeting that you
19 can recall.
20     A.  I can't repeat what Mr. Turner
21 said verbatim.  I could say that the
22 gist of all the conversations that were
23 in that meeting that Morris Forest

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397

# FREEDOM COURT REPORTING

Page 89

1  Products was involved and everything
2  would progress just like it was.
3      Q.  Did anybody participate in the
4  discussions at the same level or were
5  there more people who were more
6  talkative than others?
7      A.  It was just like at any
8  meeting.  There would be people that
9  talked more than others.
10     Q.  Were there people who didn't
11 talk at all other than shooting the
12 breeze?
13     A.  No.  Everybody had a part of
14 the conversation.
15     Q.  Tell me everything that Matt
16 Missad said to you that was untrue.
17     A.  The conversation that was had
18 there was that everything would progress
19 normally, that Morris Forest Products
20 would be involved, we would progress on,
21 and that is the reason they got the tour
22 of the plant.  Is that -- in
23 manufacturing, you just don't take

Page 90

1  anybody through your plant unless you
2  are sure they are going to be involved
3  with you and you have that warm fuzzy
4  feeling.
5      Q.  Do you know for a fact that
6  Mr. Missad made any statements to that
7  effect?
8          MR. CLEVELAND:  Object to the
9  form.  Asked and answered.
10     A.  I told you everything -- the
11 statements that were in that
12 conversation was that everything would
13 move on.
14     Q.  I understand.  You also told me
15 that some people talked more than
16 others.  I know that everybody doesn't
17 repeat the exact same phrases at a
18 meeting.  What I want to know is do you
19 know for sure that Matt Missad made
20 those statements?
21         MR. CLEVELAND:  Object to the
22 form.
23     A.  The same as I stated before.

Page 91

1  The gist of the conversation was
2  everything was going to move on.
3      Q.  I understand that's the gist of
4  the conversation.  What I want to know
5  is was Matt Missad one of the people who
6  said that?
7      A.  The gist of the conversation by
8  everybody in there was that everything
9  would progress on just like it was.
10     Q.  I take it you don't know
11 whether Matt Missad made those
12 statements or not?
13     A.  I am telling you the gist of
14 the conversation, that everything would
15 progress on just like it was.
16     Q.  Yes or no, you do or do not
17 remember Mr. Missad making those
18 statements?
19     A.  Making what statements?
20     Q.  The statements that you
21 described as the gist of the
22 conversation.
23     A.  I do remember with the gist of

Page 92

1  the conversation through Mr. Missad that
2  the things would progress just like they
3  were.
4      Q.  Tell me everything you heard
5  Dana Rector say at the meeting that
6  specifically came out of his mouth, not
7  the gist of the conversation.
8      A.  Dana Rector made the statement
9  that everything would be wonderful if it
10 stayed at Morris Forest Products, not
11 verbatim as far as -- the gist of what
12 he said that everything would be
13 wonderful if it stayed manufactured at
14 Morris Forest Products.
15     Q.  Is there anything else that you
16 can recall that he said?
17     A.  The conversations I had with
18 Dana Rector as we left that --
19     Q.  Let's leave it in the meeting
20 first.  If there is conversations that
21 were outside of the meeting
22 afterwards -- I think that is where you
23 are going, isn't it?

23  (Pages 89 to 92)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 93

1    A.  Yes.
2    Q.  Stick with the conference room
3  right now.  Is there anything else he
4  said in the conference room?
5    A.  Specifically that I can
6  remember right now, no.
7    Q.  Was he one of the people that
8  talked a lot less in the conference room
9  than others?
10    A.  I didn't count his words.
11    Q.  You know who dominates a
12  meeting when there is a group of people,
13  it is pretty quick to see who is going
14  to talk a lot and who is not.  I am
15  always one of the ones that talks a lot
16  and you probably have figured that out
17  by now.  You can see there is people
18  that kind of sit back and listen.  How
19  would you describe Mr. Rector in that
20  conversation in the conference room?
21    A.  He wasn't the top speaker in
22  the room.
23    Q.  When you indicated that he said

Page 94

1  everything would be wonderful if the
2  manufacturing stayed at Morris, was that
3  in the conference room?
4    A.  That was right there at the
5  conference room.
6    Q.  That's the only statement you
7  specifically remember him saying in the
8  conference room?
9    MR. CLEVELAND:  Object to the
10  form.
11    A.  That statement that was made --
12  I know that statement was made.
13    Q.  Is there anything else
14  specifically that you can recall him
15  saying still in the conference room?
16    A.  In the conference room or out?
17    Q.  In the conference room.
18    A.  Not at this moment.
19    Q.  What about Mr. Honholt, tell me
20  everything that Mr. Honholt said during
21  the meeting in the conference room.
22    A.  A lot of questions about
23  product, a lot of questions about how

Page 95

1  things were done.
2    Q.  Did he make any statements or
3  just ask questions?
4    A.  He asked questions and made
5  statements.  The whole gist of that
6  conversation was headed in the direction
7  of Morris Forest Products doing the
8  manufacturing, keeping things there.
9    Q.  Tell me the best you can recall
10  anything that Mr. Honholt said during
11  that meeting in the conference room that
12  was not true.
13    MR. CLEVELAND:  Object to the
14  term not true.  If you know any
15  statements that he said for sure that
16  weren't true, answer.
17    A.  The things that I know today
18  that are not true in that, that that
19  meeting was carried to lead us to
20  believe that everything would progress,
21  that I would continue doing just what I
22  was doing, promoting and pushing the
23  Keystone deck, sales, and that

Page 96

1  everything would go according to normal
2  was what we were led to believe.
3    Q.  Right now I want to know what
4  Mr. Honholt said that was untrue.
5    A.  We were not carried on in the
6  production of the Keystone deck or the
7  sales of the Keystone deck.
8    Q.  What did Mr. Honholt say that
9  was contrary to that?
10    A.  The gist of that conversation
11  that we would carry on, everybody in
12  there.  The conversation was led to
13  believe by the questions and the
14  statements that were made through that
15  conversation.  I can't recall specific
16  words right this minute of what was
17  said, but their gist was to lead on to
18  we would be involved.
19    Q.  But you can't remember any
20  specific words Mr. Honholt used?
21    A.  Not right at this moment.
22    Q.  What about Mr. Rector, anything
23  that he said that was untrue, specific

24  (Pages 93 to 96)

## 367 VALLEY AVENUE
## (877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397

# FREEDOM COURT REPORTING

Page 97

1 words that he used?
2     A.   The gist of that conversation
3 that we would be continuing
4 manufacturing.
5     Q.   Can you remember specific
6 statements that Mr. Rector made that
7 were untrue, specific words that he
8 used?
9     A.   The specifics that was untrue
10 that we would stay involved and we would
11 be manufacturing after that date, which
12 we didn't.
13     Q.   Is that something you
14 specifically remember Dana Rector saying
15 or was that the gist of the conversation
16 among everybody?
17     A.   That was the gist of the
18 conversation of everybody there.
19     Q.   I am trying to separate those
20 two things. I want to know if you
21 recall specific statements. At this
22 time I am asking about very specific
23 statements. Let me go back to

Page 98

1 Mr. Honholt. I think you said you can't
2 remember the specific words he said.
3 What about Mr. Missad, can you remember
4 specific words that he said?
5     A.   Matthew stated that he did not
6 want a confrontational relationship with
7 Morris Forest Products and thought that
8 we could work it out where we could
9 progress on and everything would be okay
10 as far as manufacturing.
11     Q.   What about Mr. Rector, do you
12 remember any specific words that he
13 said?
14     A.   The statement that I made
15 before, that he stated at the end that
16 it would be wonderful if it stayed
17 there. The rest of the conversations
18 would lead us to believe that he was --
19 as far as right now this second, I
20 cannot quote him in specific detail on
21 his statements.
22     Q.   What about Craig Jansen; is
23 there anything you can think of with

Page 99

1 detail something you remember him
2 saying?
3     A.   The details; right now I
4 can't. Right now I can't recall.
5     Q.   Do you know if Craig Jansen
6 even spoke at all during that meeting?
7     A.   It is to the best of my
8 recollection that everybody talked in
9 that meeting.
10     Q.   But you can't remember any
11 specific words that Craig Jansen used?
12     A.   Not at this moment.
13     Q.   What about Jerry Turner?
14     A.   Not right at this moment.
15     Q.   Do you recall Mr. Morris, Rod
16 Morris at one time saying something
17 about a potential lawsuit during that
18 meeting?
19     A.   A lawsuit?
20     Q.   That there may be litigation
21 over the relationship between Keystone
22 and Morris Forest Products?
23     A.   That, I don't recall.

Page 100

1     Q.   When Mr. Missad said he didn't
2 want a confrontational relationship, was
3 that in response to something that was
4 said by someone else?
5     A.   The best I can recall in that
6 statement that he was making was he
7 wanted us to have that warm fuzzy
8 feeling so we would know that we would
9 be progressing on with the manufacturing
10 and everything would stay like it was.
11     Q.   Didn't Mr. Morris actually say
12 this was probably going to end up in
13 litigation and Matt Missad responded
14 that he wasn't going to buy a lawsuit,
15 that is when he said he thought that
16 everybody could work everything out?
17     A.   That, I don't recall.
18     Q.   Can you say for certain one way
19 or the other whether that statement was
20 made?
21     A.   Not right at this moment.
22     Q.   At some point the group in the
23 conference room breaks up and you leave

25 (Pages 97 to 100)

## 367 VALLEY AVENUE
## (877) 373-3660     BIRMINGHAM, ALABAMA     (205) 397-2397

# FREEDOM COURT REPORTING

1  the conference room; right?
2     A.  Yes.
3     Q.  Have you told me all the
4  statements you can remember that
5  happened in the conference room at this
6  point?
7     A.  Yes.
8     Q.  Tell me any statements you can
9  think of that happened -- let me ask
10  this a different way.  Were there
11  different groups of people, did y'all
12  separate out?
13     A.  Yes.
14     Q.  Tell me who you spent any time
15  with that day at the facility at Morris
16  after that meeting in the conference
17  room.
18     A.  After that I went with Honholt
19  and Matthew Missad and we went to the
20  far end of the building.  Jansen and
21  Rector came out later taking a bathroom
22  break, that sort of thing.  We split
23  up.  I went down to the front and stayed

1  with Missad and Honholt showing them the
2  raw material coming in, walking them
3  through the process and then they came
4  up into the gym and was in the molding
5  area.  Somewhere in that area right
6  there I left those and went over with
7  Rector and Jansen, and Brandon Morris
8  was with those two.
9     Q.  After you went and joined
10  Mr. Brandon Morris, Mr. Jansen and
11  Mr. Rector, did you ever have anymore
12  conversations with Mr. Honholt and
13  Mr. Missad?
14     A.  As they came back -- as our
15  plant is situated, the front office is
16  here, the manufacturing area was here
17  for the deck area and then you would go
18  into the raw material cut area, then the
19  molding area in the back.  So as we came
20  through, we accumulated back up at the
21  front.
22     Q.  And how long did that last?
23  Was everybody back together at that

1  point, the whole group that was in the
2  conference room?
3     A.  Yes.  They gathered back up
4  after we came out of the plant into the
5  front.
6     Q.  Where was Mr. Turner during all
7  of this?
8     A.  Mr. Turner, I couldn't tell
9  you.
10     Q.  Tell me any other statements
11  that were made by any of these
12  individuals that we have talked about to
13  you that were untrue outside -- after
14  you left the conference room.
15     A.  The conversations that we had
16  in that plant was bragging on the
17  quality, and on the manufacturing by
18  everybody that was there.  There was a
19  lot of excitement in the product.
20     Q.  Is that it?
21     A.  That is it.
22     Q.  Tell me what was untrue about
23  that.

1     A.  Because we were kicked to the
2  curb and left with nothing to do as far
3  as manufacturing the Keystone deck.
4     Q.  I understand you took everybody
5  on a tour of the facility and everybody
6  gave it good reviews, said this is
7  great, y'all are doing a good job,
8  things of that nature; is that what
9  you're trying to tell me?
10     A.  Right.
11     Q.  You believe it turned out that
12  they didn't think it was great?
13     A.  I didn't say that.
14     Q.  Tell me what they said that
15  wasn't true.
16     A.  What they said that wasn't true
17  is they were leading us to believe that
18  everything was fine, what we were doing
19  and how we were doing it was good and
20  that we would continue to do what we
21  were doing.
22     Q.  Tell me who used the words that
23  you will continue to do what you are

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 105

1  doing.
2      A.  That was in the gist of the
3  conversation with everybody there.
4      Q.  Was it one of these deals
5  everything they said made you feel good
6  so you assumed that everything was going
7  to be fine?
8          MR. CLEVELAND:  Object to the
9  form.
10     A.  I quit assuming a long time
11  ago.
12     Q.  I need to know who used those
13  specific words, that you will --
14     A.  All the Universal people that
15  was in that was -- the statements that
16  they used was to lead us to believe that
17  everything would progress as normal,
18  that it would be best to manufacture
19  there in Davidston, Alabama.
20     Q.  I understand that you believe
21  that everything that was said was to
22  make you think that everything was
23  fine.  That is basically what you are

Page 106

1  telling me, isn't it?
2      A.  That's right.
3      Q.  I want to know if anybody used
4  specific words that said we will
5  continue to contract with you beyond the
6  date of the current contract or beyond
7  today's date?
8          MR. CLEVELAND:  Object to the
9  form.  Asked and answered.
10     A.  The gist of the statements by
11  everybody there was that we would carry
12  on just as we were.
13     Q.  What specific words were used
14  by anybody that led you to that
15  conclusion?
16         MR. CLEVELAND:  Object to the
17  form.  Asked and answered.
18     A.  I have told you the statements
19  that were made that I can remember
20  specifically verbatim.
21     Q.  Other than the statements you
22  have told me about, are there any other
23  statements that were made by anybody

Page 107

1  from Universal or Keystone that led you
2  to the conclusion that Morris Forest
3  Products was going to continue to
4  contract with Keystone or Universal or
5  anyone else?
6      A.  When they walked out of the
7  conference room, we felt like everything
8  would go on just as normal.
9      Q.  I understand that.  I think we
10  have got to that point.  What I want to
11  know is if there are any other specific
12  statements that you can recall that were
13  made by any of these individuals or have
14  you told me every statement that you can
15  recall?
16     A.  That I can recall right now.
17     Q.  Just to make sure we don't
18  leave any out.  Matt Missad said that he
19  didn't want a confrontational
20  relationship, that he thought y'all
21  could work out everything out where you
22  could continue to do the work?
23     A.  Yes.

Page 108

1      Q.  Doug Honholt -- the only
2  specific statements he made were
3  questions about the product, you can't
4  remember any other specifics that he
5  said?
6      A.  At this moment.
7      Q.  Mr. Rector said it would be
8  wonderful if you could keep doing the
9  work?
10     A.  Yes.
11     Q.  And as far as Mr. Jansen and
12  Mr. Turner, you can't recall any
13  specific statements that they made?
14     A.  No.
15     Q.  All those conversations
16  together, that and everybody talking
17  about how good the manufacturing process
18  was led you to a feeling that everything
19  was going to continue to go fine?
20         MR. CLEVELAND:  Object to the
21  form.  He has testified --
22         MR. STOTT:  Object to the form.
23         MR. CLEVELAND:  I will say my

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

**FREEDOM COURT REPORTING**

Page 109

1 objection as --
2        MR. STOTT:  You will not
3 instruct your client.  Let's get on the
4 phone with Judge Albright.
5        MR. CLEVELAND:  Call the judge.
6        MR. STOTT:  Let's go.  You are
7 not going to make statements in front of
8 your client and tell him what to say.
9        MR. CLEVELAND:  I am not doing
10 that.  You are sitting here saying
11 specifically, generally.  He has stated
12 over and over times about general and
13 specifics.
14        MR. STOTT:  I have told him if
15 he doesn't understand the question, feel
16 free to tell me.  But I am not going to
17 let you instruct him how to answer it.
18        MR. CLEVELAND:  I am not
19 instructing him how to answer.
20        MR. STOTT:  Keep your
21 objections to object to the form.
22        MR. CLEVELAND:  Read back the
23 first question if you have that before

Page 110

1 we got to an argument.
2        MR. DAVIDSON:  Please.
3        (Record read.)
4        MR. CLEVELAND:  He has
5 testified -- you have mischaracterized
6 his testimony.
7    Q.  You can answer.
8    A.  The gist of all the
9 conversations that were stated in
10 that -- by what was stated that we would
11 carry on just like we were.
12    Q.  You have told me every specific
13 statement made by any individual that
14 was present in that room that you
15 heard?
16    A.  That I can recall at this
17 moment.
18    Q.  During that meeting, did anyone
19 including -- did any employee that you
20 understand to be employed by Universal
21 Forest Products state to you that
22 Universal in fact had nothing to do with
23 the relationship between Keystone and

Page 111

1 Morris Forest Products?
2    A.  State to me?
3    Q.  Correct.
4    A.  Not that I recall.
5    Q.  Did anyone tell you there was
6 no agreement or deal of any kind between
7 Keystone and Universal?
8    A.  That, I don't remember.
9    Q.  How long did these meetings
10 last on February 7?
11    A.  The morning meeting started
12 nineish or somewhere in there and ended
13 somewhere in the lunch hour,
14 somewhere -- I couldn't tell you exactly
15 as far as time.  It was somewhere on
16 up -- it was afternoon, but I couldn't
17 tell you exactly what time.
18    Q.  Afternoon, the time you were
19 just telling me about when the meeting
20 ended, have you ever again spoken with
21 Matt Missad?
22    A.  Afterwards?
23    Q.  Correct.

Page 112

1    A.  After the meeting after I left
2 the plant?
3    Q.  I am sorry.  Let me back up.
4 You said that meeting lasted roughly
5 nine o'clock to lunchtime?
6    A.  It was after lunchtime.
7    Q.  I am not trying to hold you to
8 a time.  Just to make it better, just to
9 make it easier for me to answer the
10 questions, I am going to refer to the
11 end of that meeting as, quote, lunchtime
12 just for the purposes of being able to
13 ask these questions.  At lunchtime those
14 folks left?
15    A.  I carried them back to the
16 airport.  Matthew Missad rode back with
17 me back to the airport.  Mr. Honholt
18 rode with Mr. Turner back to the
19 airport.
20    Q.  Did you have conversations in
21 the car with Matt Missad on the way back
22 to the airport about the relationship
23 between Morris Forest Products or

28 (Pages 109 to 112)

**367 VALLEY AVENUE**
**(877) 373-3660      BIRMINGHAM, ALABAMA      (205) 397-2397**

# FREEDOM COURT REPORTING

Page 113

1    Keystone/Universal or both?
2        A.  It was my interpretation from
3    the conversation with Mr. Missad that we
4    would carry on just like we were.
5        Q.  Tell me specifically what
6    Mr. Missad said in the car after the
7    meeting that led you to that
8    interpretation.
9        A.  The gist of that conversation
10   was that the manufacturing would stay in
11   Davidston, Alabama, we would continue to
12   manufacture.
13       Q.  Are those words that he
14   specifically used?
15       A.  I don't know if I am quoting
16   him verbatim.  The gist of what I took
17   from what he said that we would move on
18   in that direction.
19       Q.  After you dropped him off at
20   the airport, have you ever again spoken
21   to him?
22       A.  Yes.  We have had conversations
23   after.

Page 114

1        Q.  When?
2        A.  In the weeks after.
3        Q.  Tell me about -- we will get
4    back to that in just a minute.  After
5    Doug Honholt left that meeting around
6    lunchtime, have you ever since spoken to
7    him?
8        A.  Not that I recall.
9        Q.  After Dana Rector left that
10   meeting around lunchtime, have you ever
11   since spoken to him?
12       A.  Not since that time.
13       Q.  How about Craig Jansen?
14       A.  No.
15       Q.  The only person who you
16   understand to be employed with Universal
17   that you have spoken to since that
18   meeting is Matt Missad?
19       A.  Yes, the only person I have
20   spoken to since that meeting.
21       Q.  Tell me about any conversations
22   you have had with him after that time.
23       A.  After that time, after the

Page 115

1    initial meeting in the weeks prior, we
2    had conversations when it started coming
3    to light that Morris Forest Products
4    would not be manufacturing.
5        Q.  Tell me -- tell me how it came
6    to light that Morris Forest Products
7    would not be manufacturing.
8        A.  The -- I would have to go back
9    to my notes on that as far as specific
10   details how that time progressed.
11       Q.  Let me ask it this way.  Is
12   that something you learned through
13   Mr. Morris?
14       A.  No.  Part of this conversation
15   was with Matt Missad and I.
16       Q.  I need you to tell me the best
17   you can anything that Matt Missad told
18   you about that issue.
19       A.  I would have to go back to my
20   notes on that and see what specific
21   statements were made.
22       MR. CLEVELAND:  I will object
23   for the record that I believe this line

Page 116

1    of questioning is teetering on the edge
2    of jurisdictional issues since it is
3    passed February 7th.  I don't believe
4    any of --
5        Q.  Can we stipulate that the
6    February 7th that -- there were no
7    statements that comprise the fraud
8    allegation that occurred after the
9    February 7th meeting?
10       MR. CLEVELAND:  Ask some more
11   questions and --
12       Q.  Did Matt Missad say anything to
13   you that you believe was untrue after
14   that February 7th meeting?
15       A.  Any statement that he made?
16       Q.  Yes.
17       A.  There was -- led to believe
18   that there would be some compensation
19   for Morris Forest Products in that days
20   after that meeting.
21       Q.  Do you know if there were in
22   fact offers made to Mr. Morris?
23       A.  I don't know exact details on

29 (Pages 113 to 116)

# FREEDOM COURT REPORTING

Page 117

1  what was offered to Mr. Morris.
2      Q.  Do you know whether or not
3  there were any offers made?
4      A.  I can't tell you.  I don't know
5  the details.
6      Q.  No information one way or the
7  other?
8      A.  No.
9      Q.  Had you ever met any of those
10  individuals from Universal, Mr. Honholt,
11  Mr. Missad, Mr. Jansen or Mr. Rector
12  before .February 7th, 2005?
13      A.  Not that I recall.
14      Q.  Did any of those individuals
15  appear to you to act in a way that they
16  had some sort of animosity towards you
17  during that meeting?
18      MR. CLEVELAND:  It calls for
19  speculation.  If you know the --
20      A.  The animosity came after the
21  meeting to the point that Morris Forest
22  Products would not be manufacturing for
23  Keystone.

Page 118

1      Q.  So there was no animosity in
2  any of the direction on that day, it all
3  came after?
4      A.  That, I don't recall.
5      Q.  What did you mean when you said
6  the animosity came after it came to
7  light that Morris would not be
8  manufacturing for Keystone?
9      A.  I think -- I was offered to go
10  with the product and I think when that
11  didn't happen, that is where the
12  animosity came from.
13      Q.  During the time at the plant
14  and including from Matt Missad's
15  involvement, the time you were in the
16  car, did anybody with Universal or
17  Keystone make any statements at that
18  meeting about the relationship between
19  Universal and Keystone?
20      A.  Not that I recall at this
21  moment.
22      Q.  Did you have an understanding
23  of what you believed the relationship

Page 119

1  between Universal and Keystone was at
2  the time of that meeting?
3      A.  I felt like Universal and
4  Keystone had some sort of relationship.
5  Details I didn't know.
6      (Short recess.)
7      Q.  Mr. Pittman, I understand that
8  you had an additional meeting with
9  Mr. Turner later on in the afternoon or
10  evening of this February 7th meeting; is
11  that correct?
12      A.  Right.
13      Q.  Tell me how that came about.
14      A.  We carried the folks back to
15  the airport from Universal, and we went
16  over to the Burger King there.  It was
17  right next to the airport.
18      Q.  Who was present?
19      A.  He and I.
20      Q.  Tell me about the conversations
21  that occurred while y'all were at Burger
22  King.
23      A.  The conversation was just a

Page 120

1  casual conversation.  As far as back
2  into specific verbatim statements, I
3  wouldn't begin to try to recall it from
4  that far back.  But in the conversation,
5  it was carried to the point is there any
6  interest in following the product.
7      Q.  Did you ask him what he meant
8  by that?
9      A.  In that -- I knew what he meant
10  as far as following the product.  A
11  salesman knows that when you are talking
12  about following a product, you are -- in
13  that conversation is carried on doing
14  what you are doing and doing it with
15  somebody else.
16      Q.  What else happened?
17      A.  My conversation was that I
18  didn't want to pursue following the
19  product.  I didn't want to talk about
20  that subject until I was finished with
21  what we were doing with Morris Forest
22  Products, what I was doing with Morris
23  Forest Products.

30  (Pages 117 to 120)

# FREEDOM COURT REPORTING

Page 121

1    Q.  Did Mr. Turner make any
2  statements to you at dinner that night
3  that you believe were untrue?
4    A.  Well, the conversation starting
5  out that evening that we would continue
6  on with the manufacturing the way we
7  were doing is what proved to be untrue.
8  The way -- right now I believe is
9  untrue.
10    Q.  That is the conversation you
11  told me about that happened earlier on
12  during all the meetings and everything?
13    A.  The conversation that we had
14  that night as far as things would
15  continue on like they were proved to be
16  untrue.
17    Q.  Tell me what Mr. Turner said
18  that night about things carrying on.
19    A.  I can't quote him verbatim for
20  what the statements were, but in our
21  conversation, the conversation was
22  carrying onto the facts that we would
23  continue manufacturing, continue selling

Page 122

1  just like we were.
2    Q.  Did that statement come before
3  or after you were offered to --
4    A.  That was in the tail end of
5  that conversation.
6    Q.  I am sorry?
7    A.  That was in the tail end of the
8  conversation.
9    Q.  Which part was in the tail end?
10    A.  The tail end of the
11  conversation was the following the
12  product.  In the beginning was that we
13  would continue on.
14    Q.  If I understood your earlier
15  testimony, you believe that Mr. Turner
16  got upset with you for turning down what
17  you considered to be a job offer and
18  that is why he chose to stop doing
19  business with Morris Forest Products?
20    A.  I don't think I stated it that
21  way.
22    Q.  Tell me --
23    A.  I think that the animosity was

Page 123

1  brought on because I did not take a
2  position with the Keystone whoever,
3  whatever, to help carry the product on
4  through into the markets that it was in.
5    Q.  You believe it was that
6  animosity that led to Morris no longer
7  doing the work?
8    A.  I don't think I stated it that
9  way.  I think I said there was animosity
10  there.  I can't state that to be the
11  fact with the dealings with Turner and
12  Mr. Morris.
13    Q.  You believe that created some
14  animosity that had not previously been
15  present?
16    A.  Right.
17    Q.  Have you heard from any source
18  whatsoever that the conversations
19  between you and Mr. Turner about
20  following the product led to a decision
21  either by Universal or Keystone to not
22  do business with Morris Forest Products?
23    A.  Restate that.

Page 124

1    Q.  Has anybody told you that your
2  decision to not accept Mr. Turner's
3  offer --
4    A.  Not that I recall at this
5  moment.
6    Q.  Did you understand what my
7  question was?
8    A.  Yes.
9    Q.  Do you have an understanding
10  what the current relationship between
11  Keystone and Universal is?
12    A.  I have no clear knowledge of
13  the details of their relationship.
14    Q.  You realize that you filed a
15  lawsuit against Universal and against
16  some employees at Universal; is that
17  right?
18    A.  Uh-huh (nodding head
19  affirmatively.)
20    Q.  Is that a yes?
21    A.  Yes.
22    Q.  My understanding is that the
23  contract that Morris had to make these

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 125

1  deck parts was with Keystone?
2      A.  As far as I know.
3      Q.  How is it that you came to sue
4  Universal for Keystone no longer doing
5  business with Morris Forest Products?
6      A.  Universal/Keystone or ever how
7  that is stated or whatever that is came
8  in and the product that we had carried,
9  we Morris Forest Products manufactured,
10  Stan Pittman as being a sales rep
11  selling, they came in and took that
12  product out and so with that, for two
13  years, I had fought and built sales,
14  built customer relations, built
15  technical support, and was the driving
16  force behind this deck with the vision
17  of what would be produced as far as my
18  income building this, and then they came
19  in and the product was pulled out.  So
20  it hurt Stan Pittman.
21      Q.  What did Universal do that was
22  wrong or illegal or improper?
23      A.  The procedure of taking the

Page 126

1  deck away from Morris Forest Products.
2      Q.  What was the procedure that --
3  what was improper about the procedure?
4      A.  Just the way they did it.
5      Q.  What about it, how did they do
6  it?
7      A.  Details, legal details, I
8  couldn't give you legal details.  But
9  they came in a non proper manner of
10  coming in and taking it away.  For the
11  investment that Morris Forest Products
12  had put in this and the people had put
13  in it, they came in and pulled it out.
14  It hurt everybody involved as far as the
15  Morris Forest Products side.
16      Q.  Does Morris employ any other
17  contractors similar -- let me go back.
18  Back in the time period between 2000 and
19  2005, did Morris employ any other
20  contractors that were doing something
21  similar to what you were doing for them?
22      A.  I have no idea.
23      Q.  Do you know if anyone other

Page 127

1  than yourself ever did anything related
2  to the Keystone deck system as far as
3  sales?
4      A.  I have enough problems keeping
5  up with my own little red wagon.
6      Q.  Are you aware one way or the
7  other whether any other independent
8  contractors ever sold any Keystone
9  products --
10      A.  I wouldn't know that to state
11  it to be a fact.
12      Q.  Have you heard that?
13      A.  I don't know.  I don't know to
14  state that to be a fact.
15      Q.  I understand you can't state it
16  as a fact.  Have you heard from any
17  source --
18      A.  I don't know.
19      Q.  You don't know if you have
20  heard it?
21      A.  I don't know.
22      Q.  Isn't that something that would
23  stand out to you if you found out

Page 128

1  somebody else was doing your job?
2      A.  I have had several days that I
3  wished someone was doing my job.
4      Q.  Seriously --
5      A.  I am telling you I don't know.
6      Q.  Do you know if there was any
7  agreement made when the original
8  contract was signed between Morris and
9  Keystone as to sales reps that would be
10  used, the number of sales reps, what
11  their identity would be or anything like
12  that?
13      A.  There was some sales rep
14  agreements.  As far as specifying
15  product to be sold, details would have
16  to come from Mr. Turner and Mr. Morris.
17  That wasn't my responsibility.
18      Q.  There were some sales rep
19  agreements between Keystone and Morris?
20      A.  The sales agreements was
21  between Keystone and Morris.
22      Q.  Something you completely stayed
23  out of?

32 (Pages 125 to 128)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

## FREEDOM COURT REPORTING

Page 129

1    A.  Yes.
2    Q.  Do you know whether the folks
3  at Keystone knew that you would be
4  involved as a sales rep in the process
5  of selling?
6    A.  I am sure they did.
7    Q.  How did they know that?
8    A.  Because I was there.
9    Q.  What do you mean?
10   A.  There in the meetings, there
11 out driving building that business.
12   Q.  At what point did you alert
13 Mr. Turner or anyone else at Keystone
14 that you were an independent contractor
15 instead of an employee?
16   A.  It was pretty well stated from
17 the time Mr. Turner was around and
18 Mr. Ludwig both.
19   Q.  And --
20   A.  Mr. Don Ludwig.
21   Q.  Do you know if that was
22 before --
23   A.  I have never stated that I was

Page 130

1  an employee of Morris Forest Products.
2    Q.  Did you tell Mr. Ludwig and
3  Mr. Turner that before or after the
4  contract was signed?
5    A.  I couldn't tie it down to an
6  exact date.
7    Q.  You know at some point they
8  became aware that you were an
9  independent contractor?
10   A.  Right.  I was pretty verbal
11 about it.
12   Q.  You don't know if it was before
13 or after they signed a contract with
14 Mr. Morris?
15   A.  I couldn't tell you a specific
16 date.  I have never worked for anybody
17 but the contract sales is all I have
18 ever done.
19   Q.  Did you have any sort of deal
20 where you would get paid a minimum
21 amount even if you didn't do any sales
22 for a particular time period with
23 Morris?

Page 131

1    A.  Ask that again.
2    Q.  If you had a bad week and you
3  didn't sell anything, would you get
4  paid?
5    A.  My payment schedule was
6  stretched all out over the month, yes.
7  Some months it would be a lot greater
8  than one month, but I would keep it in
9  reserves so I would have it to fill in
10 those voids.  That's the common practice
11 in commission sales.
12   Q.  You drew a particular amount
13 each week or each two weeks regardless
14 of how much you had sold and at some
15 point later on you would decide to take
16 bigger draws if there was money in
17 reserve?
18   A.  You more or less monitor your
19 sales to see if you are staying within
20 that perimeter of your draw.
21   Q.  You indicated that you had some
22 recollection of some discussions that
23 occurred several months before this

Page 132

1  February, 2005 meeting, maybe back
2  October, November time period, maybe
3  even into December, January, 2004, 2005
4  where there were some renewal
5  discussions of renewing the contract.
6  And what I want to know about that is do
7  you recall during those conversations if
8  there were any discussions about making
9  any changes to the existing contract?
10   A.  Specific details, I do not
11 recall.
12   Q.  Do you remember having
13 conversations with Mr. Morris where you
14 and he discussed some changes that y'all
15 would like to see to the contract for
16 renewal?
17   A.  Specific details, I don't
18 recall.
19   Q.  I am not asking for the
20 specific details.  Do you remember
21 generally speaking with Mr. Morris that
22 there were some changes that y'all would
23 like to see?

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 133

1  A. I am sure we had conversations,
2  you're always wanting to make things
3  better. As far as a specific time,
4  whether it was in that period of time, I
5  don't have any idea.
6  Q. Is there anything that you can
7  think of in the contract that you wanted
8  to see changed?
9  A. Nothing that I can -- nothing
10 that I can recall.
11 Q. What, if anything, did you do
12 differently as a result of conversations
13 that you had with the Universal
14 employees and Jerry Turner on February
15 7th, 2005?
16 A. What -- clear that up.
17 Q. Did you change the way you were
18 going about doing things because of
19 those conversations?
20 A. After that -- after that period
21 of time -- specific date I couldn't tell
22 you, specific minute, I couldn't tell
23 you. After the fact that it came to

Page 134

1  light that we would not be
2  manufacturing, yes, I had to change
3  everything I was doing because Keystone
4  for twenty-four months had been my
5  life. That is what drove me, that
6  sales. I don't know if you have ever
7  been in sales, but when you take on a
8  project like that, that is your life,
9  that's your focus. Just like a receiver
10 running for the goal line, you take it.
11 Anticipating the rewards when you reach
12 that goal.
13 Q. I assume you don't know all the
14 specific terms of the contract between
15 Keystone and Morris that was in place
16 back in late 2004?
17 A. I could not. I do not.
18 Q. So if that contract did just
19 simply expire, that is not something you
20 would know?
21 MR. CLEVELAND: Objection. It
22 calls for speculation.
23 Q. Is that correct?

Page 135

1  A. I think that -- is that a yes
2  or a no?
3  Q. I want to know --
4  A. Or can I say something else?
5  Q. Let me ask the question a
6  little bit better. I have sort of
7  forgotten exactly what I said. If the
8  contract did simply expire because the
9  time of the contract, the term of the
10 contract ran out, that's not something
11 you would be able to speak to, you don't
12 know that one way or the other, do you?
13 A. Let me make this statement. I
14 don't think Rod Morris would have led
15 Robbins Manufacturing to spend eight
16 thousand dollars on a display site, that
17 would be sort of detrimental to anybody
18 in the wood business to lead them to
19 think that they were fixing to get a
20 chance to sell this thing, to spend
21 eight thousand dollars for nothing. I
22 think if the contract had came to an end
23 at whatever time you are talking about,

Page 136

1  I don't think as a productive business,
2  we would have carried on manufacturing
3  through for the hurricane, we would not
4  have approached Home Depot, we would not
5  have been setting meetings for Robbins,
6  we would not have spent all that money
7  preparing for the two week show at
8  Menards. I don't think we would have
9  done that.
10 Q. I will ask you to answer it in
11 the yes or no. As far as whether there
12 is a term that called for an expiration
13 and it just plain expired, that's not
14 something you know, you don't know that
15 one way or the other?
16 A. I don't know that specific date
17 and time for an expiration.
18 Q. Hypothetically, just assuming
19 for --
20 A. I don't do no assuming.
21 Q. I am going to ask you to do it
22 for the purpose of this question.
23 Assuming for me that that contract was

34 (Pages 133 to 136)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 137

1  going to expire one day, you were going
2  to have to make changes as far as what
3  you were doing from a daily buying and
4  selling basis anyway?
5      MR. CLEVELAND: Object to the
6  question. It calls for speculation. If
7  you can understand it, you can answer it
8  to the best of your knowledge.
9      A. Repeat it again.
10     Q. Assuming hypothetically that
11 the contract was going to expire one
12 day, whenever that expiration came up,
13 you were going to have to change what --
14 how you were spending your time working?
15     A. Right. I just said right to
16 that I understood what you said. My
17 answer to that question there would have
18 been prior notice there would have been
19 an expiration time, it would have been
20 visible to Stan Pittman because we would
21 have been downscaling manufacturing and
22 customers would have been notified that
23 somebody else will be getting their

Page 138

1  product from somewhere else.
2      Q. To the best of your
3  recollection, did Mr. Morris ever tell
4  you that the original contract had an
5  expiration date?
6      A. I am sure somewhere in
7  conversations there was an expiration
8  date.
9      Q. Did anyone ever tell you that
10 that expiration date according to
11 paragraph one of the contract was
12 October 31st, 2004?
13     A. Not that I recall.
14     Q. Had you known that there was a
15 expiration date of October 31st, 2004,
16 what, if anything, would you have done
17 differently back in October of 2004?
18     MR. CLEVELAND: I object. That
19 calls for speculation and also I am
20 going to object that we are teetering on
21 the lines of getting outside of any
22 issues that we have agreed or we have
23 discussed in the jurisdictional issue.

Page 139

1  It is getting more into the heart of the
2  case.
3      Q. You can answer.
4      A. I am not going to speculate.
5  Do you want to repeat it?
6      Q. If you had known that the
7  contract had an expiration date of
8  October 31st, 2004, what, if anything,
9  would you have done differently back
10 around the months of August, September,
11 October, 2004?
12     MR. CLEVELAND: Objection. It
13 calls for various speculations in that
14 question. If you have an answer --
15     A. I don't see an expiration date
16 of manufacturing in an October range or
17 area of somewhere in that time due to
18 the continuous conversations and the
19 continuous manufacture of multiple,
20 multiple, multiple loads through
21 October, November.
22     Q. I am not asking you if the
23 contract did or did not expire on

Page 140

1  October 2004. I am asking you what you
2  would have done differently --
3      A. I have not got a clue what I
4  would have done differently.
5      Q. So if you were given earlier
6  notice of the expiration of the
7  contract, do you know what you would do
8  differently?
9      MR. CLEVELAND: Object to the
10 question. It calls for speculation.
11     A. I don't know what I would do
12 differently.
13     Q. How much time passed between
14 the point of the February 7th, 2005
15 meeting and the point that it became
16 evident to you that Morris was not going
17 to continue to do Keystone work?
18     A. Within a few weeks right after
19 that meeting.
20     Q. So before the end of February?
21     A. Somewhere in that area. I
22 can't recall specific dates.
23     Q. Is there anything you can think

35 (Pages 137 to 140)