# FREEDOM COURT REPORTING

Page 141

1 of that occurred in February of 2005
2 that you would have done any differently
3 had the statements you told me about not
4 been made, the statements at the
5 February 7th meeting?
6      MR. CLEVELAND: Objection.
7 Calls for speculation.
8    A. I don't know how to answer that
9 question, what I would have done. I am
10 not going to play the lottery here. I
11 don't play the lottery. It is
12 speculation. You're assuming.
13    Q. You can't think of anything as
14 you sit here that you would have done
15 differently had those statements that
16 you told me about not taken place during
17 the month of February, 2005?
18      MR. CLEVELAND: Same objection.
19    A. I am not going to assume
20 anything.
21    Q. I am not asking you to assume
22 or speculate. Mr. Pittman, what I am
23 asking you is there anything you know of

Page 142

1 that you would have done differently?
2 If the answer is I don't know, that's
3 fine.
4    A. I don't know.
5    Q. Is there anything that you gave
6 up doing that you could have done during
7 that period immediately following
8 February 7, 2005 that you decided not to
9 do because of the conversations that
10 went on at that meeting?
11      MR. CLEVELAND: Can you repeat
12 that?
13    Q. Is there anything that you
14 could have done in February of 2005 or
15 in that few week period after February
16 7, 2005, anything you decided not to do
17 but you could have done and you decided
18 not to do it because of the statements
19 made at that February 7th, 2005
20 meeting? Again, I don't want you to
21 speculate.
22      MR. CLEVELAND: This is in the
23 context of could have done, this is with

Page 143

1 the contract and this whole situation?
2    Q. I want to know if there is
3 anything in your life that you reframed
4 from doing that you decided not to do
5 because of the statements made at that
6 February 7th, 2005 meeting in that three
7 or four week period before you found
8 out --
9    A. The statements being?
10    Q. The ones you told me about at
11 the meeting that you said were untrue.
12    A. The statements that we would
13 continue on the -- the gist of the
14 conversation was that we would continue
15 on.
16    Q. I am going to make it as
17 crystal clear as I can. Is there
18 anything that you could have done
19 between -- strike that. Is there
20 anything you could have done in the few
21 weeks after February 7th, 2005 before
22 you learned that Keystone in fact was
23 not going to continue to use Morris,

Page 144

1 whatever that time period is up to the
2 point you found out that Keystone was
3 not going to continue to use Morris to
4 manufacture their supplies, is there
5 anything you had an opportunity to do
6 that you decided not to do because of an
7 untrue statement made to you at the
8 February 7th, 2005 meeting?
9      MR. CLEVELAND: Object to the
10 form.
11    A. Could you clear that up? I
12 know I might seem like I am a little
13 dense.
14    Q. I don't know how else to ask
15 it. There is a time period between
16 February 7th, 2005 and a few weeks later
17 where you thought that Morris was going
18 to continue to do the Keystone business
19 and at some point you found out they
20 weren't.
21    A. Up until that point?
22    Q. Up until that point is there
23 something in your life that you decided

36 (Pages 141 to 144)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 145

1  not to do that you would have done
2  except for the untrue statements made to
3  you at that meeting?
4      A.  Up until that point my life and
5  soul was Keystone decks and selling and
6  maintaining the customers and keeping
7  the product alive and doing well.  Until
8  that point where it was plain that it
9  was over, that was what I was doing.
10  That was my heart and soul.
11      Q.  Is there some opportunity that
12  you passed up or something that you
13  would have done differently, something
14  you would have decided to do if it
15  wasn't for the feeling that you were
16  going to continue to do the Morris work?
17      A.  I ain't got a clue.
18      Q.  How are you paid currently?
19      A.  Currently?
20      Q.  With your job right now, how
21  are you paid?
22      MR. CLEVELAND:  Object.  That
23  has nothing to do with the

Page 146

1  jurisdictional issues that we are here.
2      Q.  I disagree strongly.  I think
3  it very clearly goes to one of the
4  elements of your claims, that being
5  damages.
6      MR. CLEVELAND:  If he is paid a
7  lot or not, I don't think that is
8  relevant.
9      Q.  You need to answer.
10      A.  It is none of your business.
11      Q.  Unfortunately you brought a
12  lawsuit and in your lawsuit you are
13  claiming that you lost wages.  You are
14  going to have to tell me.
15      A.  I don't have to tell you.  What
16  happened -- what is happening now after
17  I left Morris Forest Products, the judge
18  would have to tell me I have to.
19      MR. STOTT:  I am going to give
20  you an opportunity to instruct him to
21  answer.
22      MR. CLEVELAND:  I want you to
23  convince me of why you think that is

Page 147

1  relevant to jurisdictional issues.  We
2  are not here to talk about damages.
3      MR. STOTT:  I hate to tell you
4  that damages is an element of your
5  claims.
6      MR. CLEVELAND:  We have pled
7  that he has damages.
8      MR. STOTT:  I have a right to
9  find out if he did or not.
10      MR. CLEVELAND:  You are saying
11  that if he makes more money now, that he
12  didn't have any damages?  Is that what
13  you're -- is that what you are trying to
14  say?  If that's the case, then that is
15  definitely not true because maybe if he
16  won the lottery or got a better job,
17  circumstance has nothing to do with the
18  fact --
19      MR. STOTT:  We certainly have
20  the right to make that argument.
21      MR. CLEVELAND:  That's the
22  status of law.  It is not an argument.
23      MR. STOTT:  It is your decision

Page 148

1  if he answers or doesn't answer.  You
2  can either instruct --
3      MR. CLEVELAND:  I didn't
4  instruct him to answer or not to
5  answer.
6      MR. STOTT:  I am asking you to
7  do that.
8      MR. CLEVELAND:  I don't know if
9  I can make him answer if he doesn't want
10  to.  I don't think it has anything to do
11  with jurisdictional issues.
12      Q.  I am going to give you one more
13  chance to answer that question.  I need
14  to know if you are going to refuse to
15  answer a direct question under oath in a
16  deposition that is ordered by the court.
17      A.  Restate the question.
18      Q.  Tell me how you are currently
19  compensated in your current job and the
20  amount of that compensation.
21      A.  The statement -- I will make
22  one and only statement, and you can take
23  this as what you want or you can throw

**367 VALLEY AVENUE**
**(877) 373-3660     BIRMINGHAM, ALABAMA     (205) 397-2397**

# FREEDOM COURT REPORTING

Page 149

1  it away. I am a commissioned salesman
2  at where I am at with perks. Take it or
3  leave it.
4      Q.  Are you making more money or
5  less money than you were making working
6  for Morris Forest Products? If you
7  refuse to answer, you need to tell me
8  you refuse to answer.
9          MR. CLEVELAND:  If you know,
10  you can answer. It certainly doesn't
11  effect your claim either way. If you
12  know.
13      A.  That, I don't know.
14      Q.  You don't know if you are
15  making more money or less money today
16  than you were making when you worked for
17  Morris Forest Products?
18      A.  If Universal hadn't came in and
19  snatched out the decks out from under
20  us, I would have been making a whole lot
21  more money than what I am making right
22  now.
23      Q.  What do you mean by Universal

Page 150

1  snatched the decks out from under you?
2      A.  When they came in, we had an
3  agreement and a sales agreement and
4  customers, and the deck left, so there
5  was nothing for me to sell.
6      Q.  What do you mean the deck left?
7      A.  It wasn't manufactured by
8  Morris Forest Products.
9      Q.  Do you know if Universal was a
10  competitor of Morris?
11          MR. CLEVELAND:  Object to the
12  question. It calls for a legal
13  conclusion.
14      A.  To my knowledge, I don't know.
15      Q.  What did you know about
16  Universal Forest Products back in late
17  2004, early 2005?
18      A.  A big company.
19      Q.  Did you know what kind of work
20  they did?
21      A.  Yes.
22      Q.  What did you know, what kind of
23  things --

Page 151

1      A.  I knew they were in the wood
2  business.
3      Q.  Were they doing some of the
4  same things that Morris Forest Products
5  did?
6      A.  I had never been in their
7  plant.
8      Q.  Was it your understanding that
9  they were in that same line of work?
10      A.  That would put me to
11  speculation.
12      Q.  Had you heard --
13      A.  The thing that I knew that they
14  built was mobile home trusses.
15      Q.  Did Morris Forest Products
16  build mobile home trusses?
17      A.  No.
18      Q.  Was there anything else that
19  Universal did that you are aware of?
20      A.  I ain't got an idea.
21      Q.  Did you think they were a
22  competitor of Morris Forest Products?
23      A.  I personally had no run-in as

Page 152

1  far as a competition with Universal.
2      Q.  I am not asking if you ever
3  personally competed. I am asking if you
4  knew if they did some of the similar
5  work and maybe were competing for some
6  of the same customers as Morris Forest
7  Products?
8          MR. CLEVELAND:  Objection.
9  Asked and answered.
10      A.  I was not stated to that to be
11  a fact that I recall.
12      Q.  How do you think you've been
13  affected by the fact that Morris Forest
14  Products no longer does the work with
15  Keystone?
16      A.  It was detrimental to the
17  company.
18      Q.  Detrimental to Morris Forest
19  Products?
20      A.  To me and Morris Forest
21  Products. There was a great deal of
22  money invested on the Morris Forest
23  Products putting that product up to the

38 (Pages 149 to 152)

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 153

1  point it was at.  There was a great deal
2  of time and money invested by Stan
3  Pittman in getting to that point.
4      Q.  You didn't personally invest
5  anything?
6      A.  Not in Morris Forest Products.
7      Q.  Or in anything having to do
8  with the sale of the Keystone product?
9      A.  As far as -- clear that up.
10      Q.  Did you ever invest any money
11  into anything that went into the sale of
12  the Keystone product?
13      A.  You are calling hotel rooms,
14  you are calling drinks, you are calling
15  phone calls, are you calling that an
16  investment?
17      Q.  Did you get reimbursed for
18  that?
19      A.  Hours.
20      Q.  Did you get reimbursed for
21  that?
22      A.  No.
23      Q.  Did you ever purchase any

Page 154

1  manufacturing equipment, purchase any
2  lumber that went into the --
3      A.  Morris Forest Products did all
4  the purchasing of that.
5      Q.  Do you know for a fact that you
6  would have sold more in 2005, 2006, 2007
7  and so on than you sold in 2002, 2003?
8      A.  Yes, sir.
9      Q.  How do you know that?
10      A.  Because everything was staged
11  and prepared for promotions and drives
12  to carry to the educational programs.
13  With Menards, programs were being put in
14  place with customers and other forms of
15  sale.
16      Q.  What relationship did you
17  individually have with Universal Forest
18  Products back in February of 2005?
19      A.  Personally?
20      Q.  Did you have any kind of
21  relationship with them?  Did you ever
22  work for them, did you ever have any
23  contract with them, did you ever sell

Page 155

1  stuff with them?
2      A.  No.
3      Q.  What about with Keystone
4  personally?
5      A.  Keystone was all Morris Forest
6  Products.
7      Q.  You had a relationship with
8  Morris but not directly with Keystone?
9      A.  Clear that statement as far as
10  relationship.
11      Q.  Any type of contractual
12  relationship?
13      A.  No contractual relationship as
14  far as --
15      Q.  I would assume you never did
16  any business on the side for Keystone
17  that was not through Morris Forest
18  Products?
19      A.  Everything that was done with
20  Keystone was through Morris Forest
21  Products.
22      Q.  You individually never did
23  anything for them, sold things for them,

Page 156

1  bought things for them, anything like
2  that?
3      A.  You mean like run to the store
4  and buy them a drink or buy wood and
5  lumber?
6      Q.  I am talking about a business
7  relationship.
8      A.  I was in contract sales with
9  Morris Forest Products.
10      Q.  You never competed with Morris
11  over the Keystone business individually,
12  did you?
13      A.  No.
14      Q.  Did you ever get paid anything
15  directly by Keystone?
16      A.  It may have been a
17  reimbursement -- no.  I was going to say
18  maybe a reimbursement for a pack of
19  crackers or a drink.
20      Q.  They never paid you directly
21  for selling lumber for them?
22      A.  No.
23      Q.  The same is true for Universal?

39  (Pages 153 to 156)

## 367 VALLEY AVENUE
**(877) 373-3660     BIRMINGHAM, ALABAMA     (205) 397-2397**

# FREEDOM COURT REPORTING

Page 157

1    A.  Yes.
2    Q.  After late February, early
3  March of 2005, you were still under
4  contract with Morris Forest Products?
5    A.  Yes.
6    Q.  Even though they weren't doing
7  the Keystone work at least for part of
8  the time, I understand there was a run
9  off period where they continued to do
10 some work with Keystone afterwards, but
11 there were time periods that you
12 continued to work for Morris where you
13 were not doing Keystone work?
14   A.  Yes.
15   Q.  How did you spend your time
16 during that time period?
17   A.  After that time I sort of sit
18 around.
19   Q.  Did you go back to selling
20 mobile home stuff that you had been
21 doing prior to the Keystone work?
22   A.  I was selling that while I was
23 doing all the Keystone work.  That is

Page 158

1  something that takes me a short time to
2  do.
3    Q.  What were you doing for the
4  first two years of your contract with
5  Morris Forest Products before the
6  Keystone work came in?
7    A.  Putting together my board and
8  wedge line, getting that prepared.  My
9  father invented that line.  So I put
10 that back together again.
11   Q.  Did you go back into that board
12 and wedge sales and spend most of your
13 time doing that after the Keystone sales
14 stopped?
15   A.  It didn't take much time to
16 handle that.
17   Q.  Is that what you did?
18   A.  Yes.
19   Q.  I understand you chose to leave
20 Morris Forest Products voluntarily?
21   A.  Yes.
22   Q.  That is something you sat down
23 with Mr. Morris and worked out?

Page 159

1    A.  Yes.
2    Q.  Was there any compensation that
3  either party had to pay to the other in
4  order to end that contract?
5    A.  No.  We agreed to end it.
6    Q.  That is something you could
7  have agreed to continue under or
8  something you could have agreed to stop,
9  either way?
10   A.  At that time.
11   Q.  That was sometime here in late
12 2005?
13   A.  Yes.  Five weeks ago.
14   Q.  We are in late October, so
15 sometime during September, 2005?
16   A.  Yes.
17   Q.  As of September 2005, you could
18 have chosen to continue your
19 relationship with Morris or chosen to
20 end it, because you still had a contract
21 in place?
22       MR. CLEVELAND:  Object to form.
23   A.  Yes.

Page 160

1    Q.  Something you had to work out
2  with Mr. Morris?  It is something you
3  had to work out with Mr. Morris as to
4  whether or not to end the contract?
5    A.  Yes.
6    Q.  Did the contract give you the
7  right to unilaterally just decide to
8  quit?
9       MR. CLEVELAND:  Objection.
10   A.  Clear that up.
11   Q.  You told me earlier that the
12 contract you had with Morris Forest
13 Products was for a set amount of time.
14 Was there any provision in that contract
15 that said if you wanted to leave before
16 the end of that time period, you could?
17   A.  No.
18   Q.  It is something you needed the
19 okay from Mr. Morris to do without
20 worrying --
21   A.  Gentleman's agreement.
22   Q.  Other than what you told me
23 earlier about the fact that you turned

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 161

1  down a job that was discussed between
2  you and Mr. Turner, is there anything
3  else that you can think of that would
4  lead any of the employees of Universal
5  or Mr. Turner to want to harm you in any
6  way?
7      A.  Ask that again.
8      Q.  Other than the fact that you
9  turned down the job you told me about,
10 is there anything else that you can
11 think of that would lead you to believe
12 that Mr. Turner or any of the employees
13 of Universal would want to harm you in
14 any way?
15     A.  The pursued harm was in the
16 point that the Keystone deck was taken
17 away from Morris Forest Products and the
18 harm was financially from the deck being
19 taken from Morris Forest Products.  As
20 far as Stan Pittman is concerned because
21 of the time and everything that was
22 devoted to that thing hurt him
23 financially.

Page 162

1      MR. DAVIDSON:  Who is him?
2      A.  Stan Pittman.
3      Q.  Let me ask the question in a
4  little bit different way.  Other than
5  the fact that on the evening of February
6  7th, 2005, following the meeting that we
7  talked about previously, Mr. Turner
8  offered you a job and you turned it
9  down, is there anything else that leads
10 you to the conclusion that the Keystone
11 business was taken way from Morris as a
12 way to get at Stan Pittman instead of
13 for any other reason?
14     A.  It was taken away and it hurt
15 Stan Pittman.
16     Q.  I understand that was the end
17 result.  I want to know is if you have
18 any reason to believe that it was done
19 simply as a way to get at you, to get at
20 Stan Pittman, that somebody went to the
21 trouble of --
22     A.  They had already started to
23 take the product away at the point that

Page 163

1  it hurt Stan Pittman.
2      Q.  I understand that.  I am
3  talking about the reasons for it.  I
4  want to know if there is any reason that
5  you can think of that somebody would go
6  to all the trouble of removing the
7  manufacturing of Keystone deck parts
8  from Morris Forest Products just to hurt
9  you, just to hurt Stan Pittman?
10     A.  They took the deck away and the
11 sales that I had pushed to do.  That was
12 enough to hurt Stan Pittman.
13     Q.  I understand that you
14 eventually got hurt.  I am talking about
15 the reasons.  I am not asking if that is
16 what happened.  I am asking if you know
17 of any facts that would lead you to
18 believe --
19     A.  At this moment, no.
20     Q.  Do you understand what my
21 question is?
22     A.  I understood what your
23 statement was.  My answer was at this

Page 164

1  moment, no.
2      Q.  I want to make sure you
3  understood the question.  Because you
4  answered at a time that I was trying to
5  ask a different thing.  I don't want the
6  record to be confused.  So I am going to
7  ask it again and make sure we are on the
8  same page.  Is there any fact
9  whatsoever, anything you can think of
10 that leads you to believe that somebody
11 went to all the trouble of taking the
12 business of Keystone decks away from
13 Morris Forest Products just to get at
14 you, Stan Pittman?
15     A.  At this moment, I don't know.
16     Q.  Nothing you can think of?
17     A.  At this moment, no.
18     Q.  Prior to February 7th, prior to
19 the evening of February 7th, 2005, had
20 you and Mr. Turner ever had cross words?
21     A.  Clear up cross words.
22     Q.  Had you ever gotten into any
23 heated arguments?

41 (Pages 161 to 164)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

## FREEDOM COURT REPORTING

Page 165

1    A.   Clear up heated arguments.
2    Q.   I don't think I can clear that
3  up anymore.  Had you ever gotten in a
4  fight with him?
5    A.   No.  We never had a fist
6  fight.  We have had discussions.
7    Q.   Have you ever had arguments so
8  bad that you left really mad?
9    A.   I don't argue.
10    Q.   Had Mr. Turner ever made any
11  threats to you?
12    A.   Not that I can recall.
13    Q.   I understand that you had never
14  met any of the Universal employees
15  before that day; is that right?
16    A.   Correct.
17    Q.   When you met with the Universal
18  employees, it was a few hours before you
19  and Mr. Turner had the discussion about
20  your employment opportunities?
21    A.   Redo that again.
22    Q.   The only time you met with
23  anyone from Universal was before you and

Page 166

1  Mr. Turner had the discussion about your
2  employment opportunities?
3    A.   The only time I met with any of
4  the Universal employees to discuss
5  Keystone, Universal, Morris was in that
6  meeting that we had on February the 7th.
7    Q.   Which was before you talked to
8  Mr. Turner about job opportunities, a
9  few hours before?
10    A.   Roughly, somewhere in that
11  area.
12        (Short recess.)
13    A.   I --
14    Q.   I want the record clear that I
15  haven't asked a question and if I ask
16  the right question, and you have a
17  statement you want to make, feel free.
18  Other than that, wait until the end.  If
19  your lawyer wants to ask you something,
20  he can ask you something.  If there is a
21  question that you misunderstood or
22  something you think you may have
23  misstated, let me know that.  As far as

Page 167

1  making a statement, I am not going to
2  agree to that.
3    A.   That is acceptable that I do
4  this at the end?
5        MR. CLEVELAND:  You can go
6  ahead.  As he just said --
7    Q.   Let me finish up my questions,
8  and if it is not covered by something
9  else I ask --
10        MR. CLEVELAND:  I think he has
11  a right if he believes he has misstated
12  an answer to your question, to clear
13  that up now.
14    Q.   Let the record show that we had
15  taken a fairly lengthy break and that
16  after conferring with your attorney, you
17  want to make a statement.
18    A.   I think that I did not
19  understand the question.  I think there
20  was an intent to do harm after turning
21  the job down twice.  As far as having
22  proof, solid proof right there in my
23  hand, I don't.  That's my statement.

Page 168

1    Q.   After turning the job down
2  twice, when did you turn the job down
3  before?
4        MR. CLEVELAND:  Object to the
5  form.
6    Q.   Are you saying twice that
7  evening on the evening of February 7th?
8    A.   And the evening after that in a
9  meeting that was turned down.
10    Q.   The first time you were offered
11  a job was February 7th?
12    A.   The second time was around the
13  11th.
14    Q.   So you believe after a February
15  11th, 2005 discussion with Jerry Turner,
16  that is when he had the intent to harm
17  you?
18        MR. CLEVELAND:  Object to the
19  mischaracterization of his testimony.
20    Q.   Is that not what you said?
21    A.   I feel like after turning the
22  job down twice, that the animosity was
23  built by the Universal/Keystone group,

42 (Pages 165 to 168)

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

## Page 169

1 ever how they are joined or united,
2 against me and the intent was to harm
3 after that.
4    Q.   And the sole intent you believe
5 of taking the business from Morris
6 Forest Products and placing it
7 elsewhere, having someone else do it,
8 was to get -- was to harm you, you Stan
9 Pittman instead of for any other
10 possible reason?
11    MR. CLEVELAND:  Objection.
12 Mischaracterization.  He did not use the
13 word sole.
14    Q.   You can answer.
15    A.   I stated that the intent was to
16 harm Stan Pittman after the second
17 rejection of the job.
18    Q.   Do you believe that was the
19 only reason that the decision was made
20 that Morris Forest Products would no
21 longer do Keystone work?
22    MR. CLEVELAND:  Objection.  It
23 calls for speculation.

## Page 170

1    Q.   He has already started.
2    MR. CLEVELAND:  If he knows the
3 exact intent of defendants, he can sure
4 answer that.  Anything else is
5 speculation.
6    A.   I know that the intent to harm
7 was after the rejection of the two job
8 offers.  I have not got the details in
9 my hand right now to prove it.
10    Q.   What I am asking is do you
11 believe that the reason behind the
12 decision that the Morris Forest Products
13 would no longer do Keystone work was
14 simply to harm you, just an opportunity
15 to get at Stan Pittman?
16    A.   I feel like the intent to harm
17 was to harm Stan Pittman after the
18 rejection of two jobs.
19    Q.   I understand you have told me
20 that a couple of times.  I want to know
21 if you believe --
22    A.   That's my answer.
23    Q.   -- that after you rejected a

## Page 171

1 job offer on two occasions, that someone
2 would go to all the trouble of removing
3 all of the equipment, all of the lumber,
4 all of the jobs, all of that stuff from
5 Morris Forest Products just to get at
6 you?
7    A.   I have not got that evidence in
8 my hand at this moment.
9    Q.   I didn't ask about the
10 evidence.  I am asking if that is what
11 your opinion is.  Was it just to get at
12 you?
13    MR. CLEVELAND:  Object.  Asked
14 and answered.
15    A.   I feel like the damage was done
16 because of the rejection of the two
17 jobs, that the intent to harm Stan
18 Pittman was from that.
19    Q.   You think Jerry Turner was so
20 mad at you turning the job down, that he
21 would decide never to do business again
22 with your employer just so he could hurt
23 you?

## Page 172

1    A.   I have not got that evidence in
2 my hand.
3    Q.   I didn't ask if that is
4 evidence that you have.  I asked if that
5 is what you believe.
6    A.   Yes.
7    Q.   So he didn't care if he lost
8 money, he didn't care if Morris Forest
9 Products lost money, he just cared about
10 getting Stan Pittman?
11    MR. CLEVELAND:  Objection.
12 Calls for speculation of defendant's
13 intent.
14    A.   I can't answer.
15    Q.   If that is the case, can you
16 explain to me why Morris Forest Products
17 and Jerry Turner are -- I am sorry,
18 Morris Forest Products and Keystone were
19 already in negotiations for ending the
20 relationship before those discussions
21 ever took place?
22    A.   That is between Morris Forest
23 Products and Keystone.

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 173

1    Q.   You have now expressed your
2  opinion that the only reason the
3  relationship ended between Morris and
4  Keystone was so somebody could get at
5  you?
6        MR. CLEVELAND:  I don't believe
7  he has ever testified the only reason.
8    Q.   That was my question.  He said
9  that is what he believed.  The record
10  will speak for itself on that.  If the
11  only reason that the relationship
12  between Morris and Keystone ended was
13  just so somebody could harm Stan
14  Pittman, then can you explain to me why
15  there were already negotiations before
16  those conversations ever took place
17  about the ending of the relationship
18  between the two parties?
19        MR. CLEVELAND:  Objection.  It
20  calls for speculation.  If you have
21  personal knowledge, you can answer that.
22    A.   I can't answer it.
23    Q.   You don't deny that was going

Page 174

1  on, do you, that there was already
2  discussions in the works about ending
3  the relationship?
4        MR. CLEVELAND:  Objection.  It
5  calls for speculation.
6    A.   I don't know what their
7  conversations were.
8    Q.   I showed you a letter, Exhibit
9  1, earlier about conversations about
10  ending the relationship between Morris
11  and Keystone, didn't you see that
12  earlier in your deposition today?
13    A.   I don't know what their
14  conversations were between the two of
15  them.
16    Q.   I am asking you right now, if
17  you saw a letter earlier today during
18  your deposition where there were
19  discussions about ending the
20  relationship between Morris Forest
21  Products and Keystone that occurred
22  before you ever turned down a job?
23        MR. CLEVELAND:  It calls for

Page 175

1  speculation.
2    Q.   It is not speculation to say
3  did you ever see a letter today in your
4  deposition.
5        MR. CLEVELAND:  He may not have
6  knowledge of the facts surrounding that
7  letter.
8    Q.   Did you see the letter today
9  that I showed you?
10    A.   I have seen the letter today.
11    Q.   Isn't it a fact that letter
12  discusses ending the relationship
13  between Morris Forest Products and
14  Keystone?
15        MR. CLEVELAND:  Objection.  It
16  calls for reliance on facts which are
17  not in the record.  The letter speaks
18  for itself.
19    Q.   Can you read and write?
20    A.   Yes, sir, I can.
21    Q.   Did you read the letter when I
22  showed it to you?
23    A.   No, sir.

Page 176

1    Q.   Why don't you read it right
2  now?
3        MR. CLEVELAND:  So the record
4  will be clear, Mr. Pittman did not write
5  this letter.
6    A.   I read the letter.
7    Q.   Isn't it a fact that the letter
8  discusses ending the relationship
9  between Morris Forest Products and
10  Keystone?
11    A.   Yes.
12    Q.   Can you explain to me why those
13  discussions were taking place before
14  February 11, 2005 if you believe that
15  the sole reason the relationship ended
16  was because you turned down a job
17  offer?
18        MR. CLEVELAND:  Objection.
19  Mischaracterization of plaintiff's
20  testimony and also assuming facts which
21  are not in the record.  And also
22  speculation.  If you have personal
23  knowledge.

44  (Pages 173 to 176)

# FREEDOM COURT REPORTING

Page 177

1    A.  I didn't know.  I didn't know.
2  As far as reading the letter, I just
3  read the letter.
4    Q.  You didn't know then.  You know
5  now that there were discussions ongoing?
6    MR. CLEVELAND:  Objection. I
7  don't believe we have determined there
8  were discussions on this date.
9    Q.  After reading the letter, do
10  you know now that there were discussions
11  between Morris and Keystone before you
12  ever turned down a job offer from Jerry
13  Turner about ending the relationship
14  between Morris and Keystone?
15    MR. CLEVELAND:  Objection. If
16  you know that for a fact, you may
17  answer.
18    A.  I don't know that to be a fact.
19    Q.  Are you saying you don't know
20  if this letter is real?  Assume for me
21  it is a real letter, a real live
22  letter --
23    MR. CLEVELAND:  We both

Page 178

1  understand that it is possible that
2  letter could have been given on a
3  different date than is indicated.  Also
4  we haven't taken the defendant's
5  deposition.
6    MR. STOTT:  You can object to
7  whatever form you want to.
8    MR. CLEVELAND:  You are not
9  going to sit here and badger him saying
10  this is fact.
11    MR. STOTT:  I asked him to
12  assume for me that it is a real live
13  honest to goodness true letter.
14    MR. CLEVELAND:  Objection to
15  any assumptions.  He does not have to
16  assume facts which are not here.
17    MR. STOTT:  I can ask
18  hypotheticals all I want to.
19    MR. CLEVELAND:  He doesn't have
20  to answer them if he doesn't have
21  personal knowledge of them.
22    MR. STOTT:  I don't know what
23  rule book you are reading from.  If I

Page 179

1  ask the question, he has to answer it
2  unless you instruct him not to.
3    MR. CLEVELAND:  We will call
4  the judge.  You are not going to sit
5  here and throw him hypotheticals all day
6  about evidence that is not here.
7    MR. STOTT:  It is in evidence.
8  It was attached with affidavits to
9  things that have been filed in court
10  already.  It has already been
11  authenticated.  So your arguments are
12  completely without merit.
13    MR. CLEVELAND:  By your people.
14    MR. STOTT:  I didn't see any
15  objection to it.
16    MR. CLEVELAND:  He didn't write
17  the letter.
18    MR. STOTT:  That's why I am
19  asking him to assume that it is
20  authentic.  That is how we do things.
21    Q.  Mr. Pittman, assume for me this
22  is a correct letter that Mr. Morris
23  actually wrote and sent on or about

Page 180

1  February 3rd, 2005, you can agree with
2  me under that set of hypotheticals, that
3  there were already discussions ongoing
4  before you ever turned down a job from
5  Jerry Turner about ending the
6  relationship between Morris and
7  Keystone?
8    A.  I don't have personal knowledge
9  of that.
10    Q.  I understand you don't have
11  personal knowledge.  That's why I asked
12  you to assume that that is a true
13  letter.
14    MR. CLEVELAND:  If you have an
15  opinion, you may answer.
16    A.  I do not have personal
17  knowledge.
18    MR. CLEVELAND:  He is asking
19  you to assume.  If you can come up with
20  his set of facts and come to some kind
21  of realization that you are comfortable
22  with, you can say that.
23    A.  Repeat the question.

45 (Pages 177 to 180)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 181

1    Q.   How about this, assume for me
2  that Rod Morris wrote to Keystone and
3  said we would like to exit the Keystone
4  program in a clean and orderly manner,
5  assume for me that he wrote those words
6  before you and Mr. Turner ever had a
7  discussion about a job with Keystone,
8  assuming those facts to be true,
9  wouldn't you agree that there was
10 already discussion about ending the
11 relationship between Morris and Keystone
12 before you ever turned down a job with
13 Jerry Turner?
14      MR. CLEVELAND:  Objection to
15 the characterization of your facts.  You
16 didn't say anything about him receiving
17 the letter.  Communication can't be one
18 way.  If you are going to give some
19 hypotheticals, let's get them right.
20      Q.   You can answer the question.
21 Your objection is duly noted.
22      A.   I don't know the time element
23 of this letter being received.  I don't

Page 182

1  know that was the exact date.
2       Q.   Do you understand this
3  sentence, we would like to exit the
4  Keystone program in a clean and orderly
5  manner, does that make sense to you?
6       A.   Yes.
7       Q.   It is in words that you
8  understand?
9       A.   Yes.
10      Q.   Assume for me that those words
11 were communicated by Mr. Morris to
12 Keystone before you ever turned down a
13 job with Jerry Turner.  Assuming those
14 facts to be true, can you explain to me
15 how it could be that Jerry Turner
16 decided to or someone decided to end the
17 relationship between Keystone and Morris
18 solely because of something that
19 happened at a later date than this
20 letter?
21      MR. CLEVELAND:  Under those set
22 of facts, exactly as he stated, you can
23 give your opinion to that if you have

Page 183

1  one.
2       A.   Restate it one more time,
3  please.
4       Q.   Will you read it back?
5           (Record read.)
6       A.   It is still my personal
7  opinion, Stan Pittman's opinion that
8  there was an intent to harm.  Whether it
9  was at the time of the letter or what
10 the date -- assuming the date of the
11 letter is correct, I still feel there
12 was an intent to harm Stan Pittman due
13 to turning down the job.  Financial.
14      Q.   Even in the face of that
15 letter, and assuming that that letter is
16 accurate, it is still your opinion that
17 the sole reason for the decision that
18 Morris Forest Products would no longer
19 do Keystone work was simply to get at
20 you and to harm you?
21      MR. CLEVELAND:  Same objection
22 to the word sole.
23      A.   A reason to harm.  Is that an

Page 184

1  answer?
2       Q.   Let me ask it in a different
3  way.  What do you believe was the
4  driving force behind the decision that
5  Morris Forest Products would no longer
6  do business -- that Keystone would no
7  longer do business with Morris Forest
8  Products?
9       MR. CLEVELAND:  It calls for
10 speculation.  But you can certainly give
11 your opinion.
12      A.   It is my opinion that a reason
13 for the termination --
14      Q.   That is not my question.  Let
15 me interrupt you.  That's not my
16 question.  My question is what do you
17 believe was the driving force behind the
18 decision that Morris Forest Products and
19 Keystone would no longer do business
20 together?
21      MR. CLEVELAND:  Again, it calls
22 for speculation.  Answer if you know.
23      A.   My speculation is the driving

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 185

1  force was to harm Stan Pittman after
2  turning down the jobs.
3      Q.  Even in the face of the
4  February 3rd letter, which I am asking
5  you to assume was actually typed and
6  actually sent, you still believe that
7  after you turned down the job offer from
8  Jerry Turner on two occasions, that was
9  the driving force -- to get back at you,
10  to hurt you for turning down the job,
11  that was the driving force behind the
12  decision to no longer do business with
13  Morris Forest Products?
14      A.  I believe there was an intent
15  to harm Stan Pittman after turning down
16  the job two times.
17      Q.  Please answer me yes or no.  I
18  am trying to use your words, trying to
19  get rid of all the words that your
20  lawyer said were objectionable.  In the
21  face of that February 3rd letter where
22  it is discussed that Morris would like
23  to exit the Keystone program in an

Page 186

1  orderly manner, despite seeing that
2  letter and assuming that it is true, you
3  still believe that the reason Morris and
4  Keystone no longer did business after
5  mid February, 2005, the driving force
6  behind that decision was to harm Stan
7  Pittman?
8      MR. CLEVELAND:  Object to the
9  form.  Asked and answered.
10      A.  Could you read his last
11  statement?
12      (Short recess.)
13      A.  Yes.
14      Q.  So if you would not have turned
15  down the job offer on the night of
16  February 7th and on or about February
17  11th, 2005, you believe that Morris and
18  Keystone would have continued to do
19  business?
20      MR. CLEVELAND:  Objection.
21  Calls for speculation.  If you know, you
22  can answer.
23      A.  That and speculation that I

Page 187

1  believe stuff would have carried on.
2      Q.  All the statements that were
3  made on February 7th during the meetings
4  that we have talked about, everyone
5  intended on following through with those
6  statements and continuing the
7  relationship between Keystone and Morris
8  until you turned down the job offer on
9  the night of February 7th or on February
10  11th, 2005?
11      MR. CLEVELAND:  Calls for
12  speculation and the defendant's intent.
13  If you know, you can answer.
14      MR. DAVIDSON:  Do you know the
15  difference between a trial objection and
16  a deposition objection?
17      MR. CLEVELAND:  I do.
18      MR. DAVIDSON:  Can you reframe
19  from making trial objections?  It is
20  kind of an important question.
21      MR. CLEVELAND:  Well --
22      MR. DAVIDSON:  I haven't said a
23  word all day except thank you.  It is

Page 188

1  important for me that we play by the
2  rules here on an important question like
3  that.  I would respectively ask you to
4  make a trial objection at trial and let
5  your client answer without --
6      MR. CLEVELAND:  I am not going
7  to let him sit here and ask him
8  questions that call for him to
9  speculate.
10      MR. STOTT:  Object to the
11  form.  If it is speculative, the judge
12  will kick it out.
13      MR. CLEVELAND:  I can state my
14  reason to form.  I can state
15  speculation.  I can state asked and
16  answered.
17      MR. STOTT:  We entered the
18  usual stipulations for a reason.  The
19  objections to form are to be stated
20  objection to form.  You argue reasons in
21  front of the judge.
22      Q.  I have got to have you answer
23  that question.

47 (Pages 185 to 188)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 189

1    MR. CLEVELAND: If I don't
2  state my reason, I don't want to get
3  there and then say they didn't tell us
4  what it was.
5    MR. STOTT: I will say right
6  now for the record, if I don't ask the
7  reason, it is my problem if I don't
8  correct it. If I think I want to
9  correct the question, then I will ask
10  you for the reason so I can restate it
11  in a proper form manner. If I don't
12  ask, I will do it at my own risk.
13    MR. CLEVELAND: I will keep
14  objecting how I have been doing.
15    Q.  Mr. Pittman, I need you to
16  answer this question. Given that you
17  have already told me that you believe
18  that you're turning down a job offer on
19  February 7th and February 11, 2005 after
20  all the meetings took place during the
21  day of February 7th was the driving
22  force behind the reason that Keystone
23  and Morris no longer do business, is it

Page 190

1  your opinion and belief that all the
2  statements that you have told me about
3  that were made during the day by the
4  employees of Universal Forest Products
5  and by Mr. Turner prior to the time that
6  you had dinner with him at Burger King,
7  that when all of those statements were
8  made, everyone intended on continuing
9  the relationship between Keystone and
10  Morris Forest Products, and it wasn't
11  until after you turned down the job that
12  night and again on February 11th, that
13  the decision was made that those
14  entities would no longer do business
15  together?
16    MR. CLEVELAND: Same objection.
17    A.  I have to believe that the harm
18  was done to Stan Pittman for turning
19  down the two jobs. Having proof in hand
20  right now, I do not have.
21    Q.  I appreciate that. But that
22  was not the question. My question is
23  given that it is your belief and you

Page 191

1  have expressed your opinion on this and
2  you did not call it speculation, you
3  called it your opinion, that it is your
4  opinion that the reason Morris and
5  Keystone no longer do business was
6  because somebody wanted to get back at
7  you for turning down a job on the night
8  of February 7th and on February 11th,
9  2005?
10    A.  Yes.
11    Q.  Given that statement, do you
12  agree then that when all of the
13  statements were made to you and made to
14  other employees of Morris Forest
15  Products during the day, during the
16  meetings on February 7, 2005, that the
17  relationship was to continue that
18  everyone intended, everyone involved,
19  all the Universal employees and
20  Mr. Turner, everyone intended that the
21  relationship would continue, at that
22  time, it wasn't until after you turned
23  down the job, that they changed their

Page 192

1  mind and decided not to continue the
2  relationship?
3    MR. CLEVELAND: Same objection.
4    A.  You are going to have to go
5  back, let her read it. It is getting
6  where it is rolling. It was a long
7  statement.
8    Q.  I will break it down. You have
9  already told me that it was your act of
10  turning down a job on the night of
11  February 7th and during the conversation
12  on February 11th, 2005 that you believe
13  was the driving force behind the
14  decision that Keystone and Morris would
15  no longer do business, do you agree with
16  that statement?
17    A.  Yes.
18    Q.  Prior to that time, everyone
19  intended that the business would
20  continue including the Universal and
21  Keystone employees, correct?
22    A.  Do that again.
23    Q.  Let me ask this way. Do you

48 (Pages 189 to 192)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 193

1  know of any other reasons whatsoever
2  that there is no longer a relationship
3  between Keystone and Morris Forest
4  Products?
5      MR. CLEVELAND: Objection to
6  the form.
7      A. Do I have any personal
8  knowledge of any other reasons apart
9  from -- I don't know how to answer that.
10     Q. Let me ask it this way. It is
11 your opinion that Keystone quit doing
12 business with Morris to get back at you
13 for turning down a job?
14     MR. CLEVELAND: Objection.
15 Asked and answered.
16     Q. Correct?
17     A. It is my belief that Stan
18 Pittman was harmed for turning down the
19 job.
20     Q. So before you turned down the
21 job, there was no reason for the
22 relationship to not be continued?
23     A. I have no personal knowledge.

Page 194

1      Q. So it is your belief that when
2  the Universal employees and Mr. Turner
3  attended the meeting of February 7th,
4  2005, that all of the statements that
5  were made at that time about the
6  relationship continuing were truthful
7  when said but after you turned down the
8  job, Mr. Turner changed his mind and
9  decided to no longer do business with
10 Morris Forest Products?
11     MR. CLEVELAND: Objection. It
12 calls for speculation.
13     A. I feel like I was harmed
14 because of turning down the two jobs.
15     Q. You have said that as your
16 answer to just about every question that
17 I have asked whether that is the
18 question or not. What I want to know is
19 before you turned down the job, was
20 there any reason that the relationship
21 would not continue?
22     MR. CLEVELAND: Same objection.
23     Q. In other words --

Page 195

1      A. Was there a reason for it to
2  end, I don't know.
3      Q. Do you have any evidence
4  whatsoever that on February 7th, 2005,
5  that the employees from Universal did
6  not intend for the relationship between
7  Morris and Keystone to move forward?
8      A. What was the time frame of
9  that?
10     Q. On the day of February 7, 2005
11 before you turned down the job offer.
12     A. We thought everything was
13 moving on, that we were moving on for
14 production.
15     Q. Do you understand or do you
16 believe that the Universal employees as
17 of that date before you turned down the
18 job felt the same way?
19     MR. CLEVELAND: Objection. It
20 calls for speculation.
21     A. I think Universal and Keystone
22 had made some type of agreement. What
23 that was, I don't know.

Page 196

1      Q. The cause of that agreement was
2  your decision to turn down the job?
3      A. Explain that.
4      Q. The reason that Keystone and
5  Universal came to whatever agreement
6  they came to about not doing business
7  with Morris Forest Products was because
8  you turned down a job offer?
9      A. I think there was an intent to
10 harm for turning down the job.
11     Q. Let's get away from this intent
12 to harm. That's not what I am asking
13 you. I am asking solely if there is any
14 other -- let me strike that. I am going
15 to try to think of a way that I can ask
16 this so that we can understand each
17 other. Although I think I have done it
18 just about every way possible. If the
19 reason that Keystone quit doing business
20 with Morris was to get back at you for
21 turning down a job offer on the night of
22 February 7th and on February 11th, 2005,
23 would you agree with me that the

49 (Pages 193 to 196)

## 367 VALLEY AVENUE
## (877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397

## FREEDOM COURT REPORTING

Page 197

1  decision that Morris would no longer --
2  that Keystone would no longer do
3  business with Morris was not made until
4  after you turned down that job offer?
5      MR. CLEVELAND:  Objection.
6  Same objection as stated before.
7      A.  I don't have personal knowledge
8  of their time frame that they made their
9  decision.
10     Q.  It had to be after you turned
11  down the job offer if you believe the
12  job offer was the reason for it?
13     MR. CLEVELAND:  Same objection.
14     A.  State it again.
15     Q.  The decision to quit doing
16  business with Morris had to be made
17  after you turned down the job offer if
18  your decision to turn down the job offer
19  was the reason for it; correct?
20     MR. CLEVELAND:  Same objection.
21     A.  One more time.
22     Q.  Read it back.
23        (Record read.)

Page 198

1      A.  There was an intent to harm
2  Stan Pittman.
3      Q.  That would be a great answer if
4  that was the question.  When was the
5  intent to harm Stan Pittman created?
6      A.  After the turning down of the
7  two jobs, the two job offers.
8      Q.  Would you agree then that the
9  decision -- how was the intent to harm
10  Stan Pittman carried out?
11     A.  The intent was by taking the
12  deck program away from Morris Forest
13  Products.
14     Q.  Here is where we are now.  The
15  intent wasn't formed after until you
16  turned down the job, and you said that
17  just a second ago, correct?  The record
18  speaks for itself.  The intent was
19  formed as a result of you turning down
20  the job and it was then carried out by
21  removing the program, the Keystone
22  program from Morris Forest Products, so
23  you would agree that the decision to

Page 199

1  remove the program, the Keystone program
2  from Morris Forest Products was not made
3  until after you turned down the job,
4  correct?
5      MR. CLEVELAND:  Object.  Calls
6  for speculation.
7      A.  I believe that the intent to
8  harm Stan Pittman was done from
9  rejecting the two job offers.  They made
10  a decision after those two rejections.
11  I don't know.
12     Q.  It was at some point after, it
13  had to be after?
14     MR. CLEVELAND:  Objection.
15  Calls for speculation.
16     A.  It had to be at a point of
17  rejection.
18     Q.  At the moment you rejected the
19  job the second time or after?
20     MR. CLEVELAND:  Objection.  It
21  calls for speculation.
22     A.  Somewhere in -- that, I don't
23  know an exact minute.

Page 200

1      Q.  I understand it.  But we know
2  it wasn't before you turned down the job
3  if that was the reason?
4      A.  They had an intent to harm.
5      Q.  Once you turned down the job?
6      MR. CLEVELAND:  Objection.
7  Calls for speculation.
8      Q.  Mr. Pittman, this isn't that
9  hard.  I can't understand what the
10  problem here is.
11     MR. CLEVELAND:  The problem is
12  he doesn't know the answer to the
13  question.
14     A.  I can't come up with an answer
15  to that question.  I am sorry.  I don't
16  know where you are driving to or what
17  you are trying to get to.  Because you
18  and me ain't connecting.  I reckon it is
19  Alabama and Georgia, we have this
20  communication gap.
21        (Short recess.)
22     Q.  Mr. Pittman, I know we have
23  been over this several times.  You are

50 (Pages 197 to 200)

## 367 VALLEY AVENUE
### (877) 373-3660     BIRMINGHAM, ALABAMA     (205) 397-2397

# FREEDOM COURT REPORTING

Page 201

1  having some difficulty with the way I am
2  wording the question. So I am going to
3  see if I can do it in a way that we can
4  reach an agreement here. The
5  decision -- it is your belief that the
6  decision that Keystone would no longer
7  do business with Morris was a direct
8  result of your decision to turn down a
9  job offer; is that correct?
10     A.  Yes.
11     Q.  Prior to that time it is your
12  belief that everyone involved, the
13  Universal employees and Keystone
14  employees, intended to go forward with
15  the relationship but that soured when
16  they got upset with you for turning down
17  a job?
18     A.  I do not know why.
19     Q.  Didn't you already tell me the
20  reason why is because you turned down a
21  job?
22     A.  I don't know each one of them
23  soured.

Page 202

1     Q.  I said the relationship soured.
2     A.  That sounds like we are getting
3  married or something.
4     Q.  They got upset with you. In
5  your opinion everyone involved, the
6  Keystone folks, the Morris folks and the
7  Universal folks, all intended for the
8  relationship to continue to go forward
9  until people got upset with you for
10  turning down a job offer?
11        MR. CLEVELAND:  Same objection
12  as previously stated.
13     A.  I reckon you haven't came up
14  with the right question for me to come
15  up with the right answer. I know it is
16  mighty simple. I can't come up with --
17  I can't tie all that together in my
18  brain, just the right answer to answer
19  all the questions that you put to me. I
20  am sorry.
21     Q.  Maybe I can break it up some.
22  I think we have established that you
23  believe that the decision to end the

Page 203

1  relationship was a result of your
2  turning down a job offer; is that
3  correct?
4     A.  I feel there was an intent to
5  harm because I have turned down the job,
6  I will agree with that.
7     Q.  The intent to harm was carried
8  out by ending the relationship?
9     A.  And the removal of deck system
10  from Morris Forest Products.
11     Q.  Is there a difference in your
12  mind between ending the relationship and
13  the removal of the deck system from
14  Morris Forest Products?
15     A.  The removal -- I see it as a
16  removal of the deck system.
17     Q.  I am going to write that down.
18  Removal of the deck system. And tell me
19  what removal of the deck system means to
20  you.
21     A.  They took the deck system away
22  from Morris Forest Products.
23     Q.  They took the deck system from

Page 204

1  Morris Forest Products?
2     A.  Yes.
3     Q.  That means they didn't give
4  Morris Forest Products the right to sell
5  the deck system anymore?
6     A.  Correct.
7     Q.  Maybe that is where we are
8  getting stuck. You believe the decision
9  to remove the deck system from Morris
10  Forest Products was a way to get back at
11  you for turning down a job?
12     A.  Was an intent to harm.
13     Q.  That's how they carried it
14  out. The reason that they removed the
15  deck system from Morris Forest Products
16  was to hurt you, Stan Pittman?
17        MR. CLEVELAND:  Objection.
18  Asked and answered.
19     Q.  I will agree it has been
20  asked. But it hasn't been answered yet.
21     A.  State that again.
22     Q.  It is your opinion that the
23  removal of the deck system from Morris

51 (Pages 201 to 204)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 205

1  Forest Products was done as a way of
2  getting back at you for turning down a
3  job?
4      MR. CLEVELAND:  Same objection.
5      A.  The removal of the deck work
6  system caused harm to Stan Pittman
7  financially is what it did.  How you
8  want to come to that answer, I don't
9  know.  But I am telling you --
10     Q.  You have told me a thousand
11  times --
12     A.  A thousand times that it was
13  taken away and it caused intentional
14  harm to Stan Pittman.  I don't know what
15  you want for the rest of the question
16  you have got.  I will do my best and we
17  may sit here all night until we can come
18  up with that answer.
19     Q.  If a car runs a red light and
20  hits me and somebody says why did they
21  run the red light, and I say it hurt,
22  that's not the reason, that's the
23  result.  I understand you are telling me

Page 206

1  that harm was caused to you as a
2  result.  And you have already told me
3  that the intent came from the fact in
4  your mind that they were upset with you
5  for turning down a job; is that correct?
6      A.  Yes.
7      Q.  Would you agree with me then
8  that the reason that the decision was
9  made that Morris Forest Products would
10  no longer have the Keystone deck
11  business was because you turned down a
12  job with them?
13     MR. CLEVELAND:  Objection.
14  Asked and answered.
15     A.  The reason was that to harm
16  Stan Pittman financially for turning
17  down the job.
18     Q.  So before you turned down the
19  job, there was no reason to remove the
20  deck system from Morris Forest Products
21  as far as you know?
22     MR. CLEVELAND:  Objection.
23  That calls for speculation.

Page 207

1      A.  I don't know.
2      Q.  Would you agree that it would
3  have been up a wonderful thing if Morris
4  could have just kept doing the Keystone
5  work?
6      A.  Could I agree that it was a
7  wonderful thing for them to carry on,
8  why would I object to that?
9      Q.  I don't know.  I am asking
10  you.  Would you agree that would have
11  been a good thing, a wonderful thing if
12  they could -- if Morris could have just
13  kept that work?
14     A.  Yes.
15     Q.  Do you believe that the
16  manufacturing processes at Morris Forest
17  Products were good?
18     A.  Yes, they were real good.
19     Q.  In fact, the whole setup that
20  y'all had out there for doing this
21  Keystone work in your opinion was good?
22     A.  Yes.
23     Q.  Do you have any reason to

Page 208

1  believe that the decision to end the
2  relationship, to remove the deck system
3  from Morris Forest Products was made
4  before you turned down the job offer?
5      MR. CLEVELAND:  Objection as
6  previously stated.
7      A.  I thought we had done answered
8  that.
9      MR. CLEVELAND:  You can answer
10  again if you know.
11     A.  Make that statement again.
12     Q.  Do you have any evidence
13  whatsoever that the decision to remove
14  the deck system from Morris Forest
15  Products was made before you turned down
16  the job offer?
17     A.  I believe that the removal from
18  the product -- of Morris Forest Products
19  was done for intentional harm for Stan
20  Pittman financially for turning down the
21  job.
22     Q.  Did you ever turn down a job
23  with Keystone before the conversations

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 209

1 that you had with Universal on February
2 7, 2005 took place?
3     A.  I turned down the job on the
4 night of the 7th and night of the 11th.
5     Q.  Did you ever turn down a job
6 with Keystone before those times?
7     A.  Not that I can recollect at
8 this moment.
9     Q.  Did you ever have any
10 discussions with Mr. Turner or anyone
11 else with Keystone about jobs with
12 Keystone prior to the night of February
13 7th, 2005?
14     A.  Not that I can recollect at
15 this moment.
16         MR. STOTT:  I am going to go
17 through my notes.
18 EXAMINATION BY MR. DAVIDSON:
19     Q.  I am Rick Davidson and I
20 represent Mr. Ludwig and Mr. Turner and
21 their business.  You know you have sued
22 them; is that right?
23     A.  Yes.

Page 210

1     Q.  I am going to try to be brief.
2 The same ground rules apply to my
3 questions.  In the meeting of February
4 7th, do you recall any specific
5 statement that my client made, Mr. Jerry
6 Turner?
7     A.  The gist of the conversation --
8     Q.  Listen, we are going to get out
9 of here.  I don't want to know gist.  I
10 don't want to know your conclusion.  I
11 don't want to know what you think.  If
12 you can't swear to it under oath to this
13 judge and this jury that a word or a
14 sentence came out of this man's mouth,
15 don't waste our time telling us.  My
16 question is can you give me one
17 statement under oath that this man
18 Mr. Turner said during that meeting?
19         MR. CLEVELAND:  Objection.  He
20 can answer yes or no and then he can
21 obviously say to the best of his
22 recollection anything he thinks was
23 said.

Page 211

1     A.  Restate the question.
2     Q.  Tell me every word that you
3 heard come out of Mr. Turner's mouth
4 during the February 7, 2005
5 conversation.
6     A.  The best of my recollection
7 that everything would -- the best of my
8 recollection is the statements of
9 Mr. Turner that everything would move on
10 like it was at that moment.
11     Q.  You are telling the ladies and
12 gentlemen of the jury he said everything
13 would move on like it was?
14     A.  That is not verbatim.  But
15 that's the gist of what he said.
16 Everything would move on in that
17 direction.
18     Q.  Did he say anything else?
19     A.  There was other conversations,
20 but as far as telling you specific words
21 right now, I can't.
22     Q.  Why did you leave Morris Forest
23 Products?

Page 212

1     A.  Why did I leave Morris Forest
2 Products?
3     Q.  Yes.
4     A.  Well, Morris Forest Products
5 had been damaged by this Keystone/
6 Universal, whatever you want to call it,
7 and Morris Forest Products is under
8 great financial stress.  Stan Pittman
9 had to leave to try to survive.
10     Q.  Did you miss any paychecks
11 between February 7th of 2005 and the end
12 of September when you left?
13     A.  As far as commission checks?
14     Q.  You told me you got --
15     A.  I got commission checks.  I
16 didn't get paid -- clear it up,
17 paychecks like when you go to work for
18 somebody and you work on their time
19 clock.
20     Q.  You got paid how often?
21     A.  Weekly.  I got a weekly
22 commission check, a draw.
23     Q.  Did you get a weekly commission

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 213

1  draw after February 7, 2005?
2      A.  I got the weekly commission
3  draw up until the week prior to I left.
4      Q.  Are you telling the Court that
5  it was different in amount than the
6  checks you got prior to February 7th of
7  2005?
8          MR. CLEVELAND:  Objection.
9      A.  I stated what?
10     Q.  Are you saying that your checks
11  after February 7th, 2005 were less than
12  your checks before February 7, 2005?
13         MR. CLEVELAND:  Same objection.
14     A.  My checks that I received was
15  based on my commission for the lumber
16  and the board and wedges that I had
17  sold.
18     Q.  Was that less after February
19  7th, 2005 than the period before
20  February 7th, 2005?
21     A.  No.
22     Q.  Have you ever seen -- let me
23  take that back.  Prior to the filing of

Page 214

1  this lawsuit, had you ever told anyone
2  that you received a thousand dollars a
3  week as your draw?
4      A.  State that again.
5      Q.  Prior to filing this lawsuit,
6  in 2005, had you ever told anyone that
7  you received and were paid a thousand
8  dollars per week?
9      A.  As far as a commission or as
10  far as a draw?
11     Q.  Period.
12     A.  That, I don't remember.
13     Q.  Were you paid a thousand
14  dollars per week?
15     A.  I can't answer that question as
16  it is stated.
17     Q.  Were you ever paid a thousand a
18  week as either a commission or as a
19  guaranteed draw?
20     A.  Is that a yes or a no or I can
21  give an answer?
22     Q.  Give your best answer.
23     A.  I received a draw of a thousand

Page 215

1  dollars a week.  At times there would be
2  adjustments to that draw.
3      Q.  Up and down?
4      A.  I am a pretty good sales
5  manager.  Every now and then it would be
6  up.
7      Q.  Were there any draws after
8  February 7th, 2005 that were in excess
9  of a thousand dollars a week?
10     A.  No.
11     Q.  When you met with Mr. Turner on
12  the night of February 7th and you told
13  us that there was an employment offer
14  extended, who were you going to work
15  for?
16     A.  The offer was from Keystone/
17  Universal.
18     Q.  From who?
19     A.  Keystone/Universal.
20     Q.  Who is that?
21     A.  That's Keystone and Universal
22  or Universal/Keystone.
23     Q.  Are you saying there was an

Page 216

1  entity named Keystone/Universal that
2  existed on February 7?
3          MR. CLEVELAND:  Objection to
4  the mischaracterization.
5      A.  I don't have those details to
6  make the proof of that.  That was my --
7  that is what I assumed.
8      Q.  Have you ever talked to any
9  employees of Keystone Manufacturing or
10  Keystone itself?
11     A.  Any employees?
12     Q.  Yes.
13     A.  There is just Turner and Ludwig
14  in Keystone.
15     Q.  There aren't any employees?
16     A.  There is no other employees
17  that I have talked to with Keystone.
18     Q.  In the discussions with
19  Mr. Turner the evening of February 7th,
20  did he talk about how much you would be
21  paid?
22     A.  No.
23     Q.  Did he talk about where you

54  (Pages 213 to 216)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 217

1 would work out of?
2      A.  As far as a specific place, no.
3      Q.  Did he talk about whether you
4 would get a company car or mileage
5 reimbursement or anything like that?
6      A.  No.
7      Q.  What was the offer?
8      A.  To follow the product.
9      Q.  Could you have accepted an
10 offer to follow the product without
11 knowing those other things, what you
12 were accepting?
13      A.  My statement was that I would
14 not have carrots waved in front of me to
15 pursue me in that direction until this
16 Morris Forest Products, whatever
17 happened, was settled.
18      Q.  Is that the only discussion you
19 ever had with Mr. Turner about being
20 paid to sell Keystone products?
21      A.  The night of the 7th and the
22 11th.
23      Q.  Nothing prior to that; is that

Page 218

1 right?
2      A.  Not that I remember.
3      Q.  Nothing you can swear to under
4 oath?
5      A.  Nothing that I can remember
6 right now at this moment.
7      Q.  I want you to look at
8 Defendant's Exhibit Number 2, I believe
9 it was in the stack in front of you at
10 some point.  Is that your handwriting?
11      A.  Yes, sir.
12      Q.  And you testified that exhibit
13 was made on February 1st of 2005?
14      A.  That is the best of my
15 recollection.
16      Q.  What kind of -- was it made in
17 a notebook somewhere?
18      A.  It was probably -- well, it was
19 on a legal pad on my desk.
20      Q.  Do you keep a specific legal
21 pad for just your dealings in this
22 matter, or do you keep a running legal
23 pad of everything that is going on?

Page 219

1      A.  When you're selling wood, you
2 keep it running, either a spiral
3 notebook or a binder.
4      Q.  Have you ever maintained a
5 binder for just Keystone?
6      A.  No, not just -- let me back
7 up.  Specify what you are talking about
8 for Keystone.  Let me clear up where I
9 am coming from because from the time
10 that Keystone came in, I made many notes
11 on Keystone as far as conversations
12 between customers that bought the
13 Keystone decks with conversations with
14 Turner and Ludwig.  It is just -- when
15 you are in sales, you just sit there and
16 write notes as you are making
17 conversation.
18      Q.  Did you keep all those in the
19 same place, your notes?
20      A.  They are in multiple pads on my
21 desk, on the desk that I was at.
22      Q.  Where are they today?
23      A.  I couldn't tell you right now

Page 220

1 this minute.
2      Q.  Do you have any other notes of
3 any conversations with Mr. Turner that
4 you reviewed?
5      A.  I would have to go back to
6 the -- I would have to go back to the
7 pads.  The pads would have to be looked
8 at.
9      Q.  Did you review any
10 conversations with Mr. Turner prior to
11 coming to prepare for the deposition
12 today?
13      A.  No.
14      Q.  How about with Mr. Ludwig?
15      A.  No.
16      Q.  Isn't it true, Mr. Pittman,
17 that the Menards account was already in
18 existence prior to Morris Forest
19 Products taking over the manufacturing,
20 Keystone was already selling to them?
21      A.  No.
22      Q.  Sir?
23      A.  No.

## 367 VALLEY AVENUE
### (877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397

# FREEDOM COURT REPORTING

Page 221

1    Q.  You made the original sales
2  plan to Menards, is that what you are
3  telling us?
4    A.  What I am saying is the big box
5  sales was our sales, Morris Forest
6  Products had the big box sales.  That
7  big box sales, which is your depot
8  loads, that sort of thing, was given to
9  Morris Forest Products to make those
10  sales.
11    Q.  Did Menards already buy from
12  Keystone before Morris Forest Products
13  took over that part of the business?
14    MR. CLEVELAND:  Objection.  It
15  calls for speculation.  If you know.
16    A.  That -- that is one of them
17  trick questions there.
18    Q.  What is tricky about it?
19  Either you made the initial contact and
20  sold to Menards or they were already
21  selling to Menards.
22    A.  The recollection I had was we
23  carried the first Keystone deck to

Page 222

1  Menards and did the dog and pony.  Rod
2  and I hauled the deck up there, the
3  first deck --
4    Q.  Who did you make the dog and
5  pony to?
6    A.  Menards' buyers.
7    Q.  What was their names?
8    A.  I can't recall all their names.
9    Q.  The big box agreement that you
10  just told us about that allowed Morris
11  to sell to Lowe's, Home Depot, Menards,
12  that agreement was negotiated between
13  Mr. Morris and Mr. Turner; is that
14  right?
15    A.  Morris and Keystone, yes.
16    Q.  You didn't negotiate that
17  agreement?
18    A.  No.  That would be Morris and
19  Keystone.
20    Q.  Was that agreement as far as
21  you know limited to just big box?
22    A.  It had -- I would have to go
23  back to notes to see what it was.  But

Page 223

1  there were items listed that made it
2  legal or whatever you want to call it to
3  sell those markets.
4    Q.  Were there any other markets
5  that Morris was allowed to sell to?
6    A.  They had on the contract marked
7  to what areas that Morris could sell.
8    Q.  Do you know where the original
9  for Defendant's Exhibit 2 is?
10    A.  No, sir, I have no idea where
11  the original is.
12    Q.  When was the first time you
13  think you saw the licensing agreement
14  between Morris Forest Products and
15  Keystone?
16    A.  I have no -- I could not tell
17  you.  Honestly I couldn't remember back
18  to that moment.
19    Q.  You think you were already
20  getting paid for sales before you saw
21  it?
22    A.  That, I don't know.  I don't
23  know when the time of that --

Page 224

1    Q.  When was it that you and
2  Mr. Morris came to an agreement about
3  how you would be paid for commission on
4  this account?
5    A.  On which account?
6    Q.  The one you sued us over, sir.
7    A.  When you say an account --
8    Q.  What do you call Keystone, what
9  is that to you?  You were selling wedges
10  and other things to other people.  I
11  think we are here about Keystone.
12    A.  We are really here about
13  Keystone, but when you call an account,
14  a Keystone -- I am not trying to be
15  difficult because I have ten hours of
16  driving to do when I leave here, I am
17  just like everybody else, I would like
18  to be out of here pretty quick.  The
19  Keystone account was to the mobile home
20  industry is what the Keystone account
21  was.  The Menards big box account, that
22  Menards account was an account, and
23  Keystone in the books was an account.

56 (Pages 221 to 224)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

## FREEDOM COURT REPORTING

Page 225

1    Q.  Did you sell to both the
2  manufactured home industry and Menards?
3    A.  Sold to Keystone.  I know this
4  is going to get difficult.
5    Q.  Let me simplify.  Did you get
6  paid for selling Keystone products?
7    A.  I was based on a commission for
8  Keystone products.
9    Q.  Is the answer yes?
10    A.  I reckon you could say yes.
11    Q.  When did you and Mr. Morris
12  come to the agreement of how you would
13  be paid for selling Keystone products?
14    A.  I could not give you an exact
15  date when we came to that agreement.
16    Q.  Was it before the contract was
17  signed with Keystone or was it after?
18    A.  I couldn't give you an exact
19  date.
20    Q.  How did you get paid, what was
21  your commission?
22    A.  Commission on a deck program is
23  one and a half percent of the invoice

Page 226

1  after freight is subtracted.
2    Q.  Was that ever memorialized on a
3  piece of paper that you signed and he
4  signed, that would be Mr. Morris?
5    A.  I would have to go back through
6  my notes and see.
7    Q.  What notes would you go look
8  at?
9    A.  The notes on all my Keystone
10  stuff.
11    Q.  Where are they kept?
12    A.  Probably at Morris Forest
13  Products.
14    Q.  Where at Morris Forest
15  Products?
16    A.  Where they keep all the
17  Keystone stuff.
18    Q.  Where is that?
19    A.  Probably in a box at Morris
20  Forest Products.  I don't know.  I have
21  been gone for five weeks.  I could not
22  honestly give you an answer where they
23  are at.

Page 227

1    Q.  Where did you keep it?
2    A.  In a box.  But there is
3  somebody else at my desk.  There ain't
4  nothing the same when I was there.  I am
5  sorry.
6    Q.  When did you file this lawsuit?
7    A.  I couldn't recollect the exact
8  date when we did the lawsuit.
9    Q.  Where did you spend the night
10  last night?
11    A.  Rod Morris' house.
12    Q.  We have got some point of
13  reference.  When was the last time you
14  were at Morris Forest Products' offices
15  where you saw your notes?
16    A.  The last time I was at Morris
17  Forest Products was five weeks ago.
18    Q.  When is the last time you
19  recall knowing where your notes were
20  about Keystone?
21    A.  The -- some of the weeks
22  prior -- past February 7, I took all
23  that stuff and boxed it up and put it in

Page 228

1  a box.  Now, as far as giving you an
2  exact date, I don't know.
3    Q.  What did you do with the box
4  when you boxed it all up?
5    A.  I boxed it up and put it in the
6  corner of my cubicle.
7    Q.  Did you tell anybody what the
8  box was there for?
9    A.  The box was marked Keystone
10  papers to the best I remember.  I
11  couldn't attest to that to be a certain
12  fact.  It was some kind of mark -- I
13  usually put a mark on the boxes when I
14  do my board and wedge or any other
15  product.
16    Q.  Did you keep any other Keystone
17  records in any place other than your
18  office at Morris Forest Products?
19    A.  All the Keystone stuff was kept
20  at the office unless it was in the seat
21  of my pickup truck when I was riding
22  around.
23    Q.  How is it that Defendant's

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 229

1 Exhibit 2 -- how was it that one is the
2 only notes we have got? Do you have any
3 explanation for that?
4     A. No, sir, I have no explanation.
5     Q. On what day was your last day
6 at Morris Forest Products?
7     A. It was five weeks ago. This
8 would have been my sixth week. Whatever
9 the date that was when I left. The
10 Friday prior to that five weeks.
11     Q. Do you recall being in a
12 meeting in November of 2004 concerning
13 the renegotiation of this license
14 agreement?
15     A. I do not remember details.
16     Q. I am not asking about a detail
17 yet. I am asking a very big question.
18 Did you participate in a meeting with
19 Mr. Morris, Mr. Ludwig and Mr. Turner
20 concerning a renegotiation of this
21 licensing agreement?
22     A. We had many meetings. Details
23 right now -- without going back to my

Page 230

1 pads and pulling notes, I could not tell
2 you what the details of those meetings
3 were.
4     Q. How many meetings did you have
5 with Turner and Ludwig and Morris and
6 yourself in 2004, the four of you?
7     A. Without going back and pulling
8 up dates and calendars and all, I
9 couldn't tell you.
10     Q. On this conversation that
11 formed the basis of Defendant's Exhibit
12 2 -- do you see it there?
13     A. Yes, sir.
14     Q. Where were you when that took
15 place?
16     A. If it was written on my legal
17 pad, I was sitting at my desk at Morris
18 Forest Products.
19     Q. Was anybody else present during
20 that conversation?
21     A. No. Everybody was in their
22 cubicles or out in the plant.
23     Q. How long a conversation was it?

Page 231

1     A. Normally our conversations were
2 not extremely long.
3     Q. Do you have a specific
4 recollection about how long this one
5 was?
6     A. Not to the minute I couldn't.
7     Q. Did you always take notes of
8 the conversations with Mr. Turner?
9     A. If I was on my cell phone, if
10 he talked to me on my cell phone, I
11 probably didn't take notes because I
12 could have been out driving or something
13 like that.
14     Q. What was your cell phone
15 number?
16     A. (256) 846-0593, I believe.
17     Q. What service was that with?
18     MR. CLEVELAND: I don't see how
19 that question relates to the
20 jurisdictional issues.
21     MR. STOTT: You offered this
22 exhibit in opposition to a
23 jurisdictional issue. I am entitled to

Page 232

1 find out when it was made.
2     MR. CLEVELAND: He didn't say
3 he made it while he was on his cell
4 phone. He said he made it while he was
5 at his desk.
6     A. I was at the office. If it was
7 made -- the only time that I would have
8 received a cell phone call was when I
9 was on the road. If these notes were
10 written, I was sitting at my desk.
11     Q. If you would preface the answer
12 with I was sitting at my desk instead of
13 if, we can get on with it.
14     A. That's what I said. If I wrote
15 the note, I was sitting at my desk.
16 I don't write too good and drive at the
17 same time.
18     Q. Could you explain to me why you
19 were talking to Mr. Turner about a
20 buyout by Universal?
21     A. I have no idea. That's notes I
22 wrote down while we were doing the
23 conversation.

## 367 VALLEY AVENUE
### (877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397

# FREEDOM COURT REPORTING

Page 233

1    Q.   Did you have any other
2    conversations with Mr. Turner about the
3    buyout?
4    A.   Not that I can recall.
5    Q.   The buyout was the buyout of
6    Morris Forest Products, wasn't it?
7        MR. CLEVELAND:  Objection.
8    Asked and answered.
9    A.   That is an assumption.  I have
10   not got that knowledge right now.
11   Q.   Are you telling us it was or
12   wasn't?
13       MR. CLEVELAND:  Objection.
14   A.   I couldn't tell you right now.
15   Q.   You wrote the note.  You can
16   explain to us who the buyout was about.
17       MR. CLEVELAND:  Object.  He has
18   been asked and answered these questions
19   previously.
20   A.   That is the notes I wrote when
21   I was talking to Mr. Turner.
22   Q.   You don't know who that buyout
23   was about?

Page 234

1        MR. CLEVELAND:  Objection.  He
2    has already answered that.
3        MR. DAVIDSON:  No, he hasn't.
4        MR. CLEVELAND:  He answered it
5    when he asked him.  I don't want to sit
6    here all day and have the same
7    question --
8        MR. DAVIDSON:  I have been
9    talking for twenty-five minutes.
10       MR. CLEVELAND:  I understand.
11       MR. DAVIDSON:  Then be quiet,
12   please, and let me ask my questions.
13       MR. CLEVELAND:  Don't ask the
14   same ones that he has answered.
15       MR. DAVIDSON:  I am entitled to
16   ask every question I want to.
17       MR. CLEVELAND:  We will sit
18   here all day and I will keep objecting
19   to it.
20   A.   That's the notes that I took in
21   the conversation with Mr. Turner.
22   Q.   We have established that and
23   you wrote it; right?

Page 235

1    A.   Yes.
2    Q.   And that's your handwriting;
3    right?
4    A.   Yes.
5    Q.   It was your brain that was
6    making the translation of what was being
7    said and put on that paper?
8    A.   That was it.
9    Q.   Nobody else was telling you
10   what to write?
11   A.   Right.
12   Q.   What did you mean when you
13   wrote the sentence about the buyout?
14       MR. CLEVELAND:  Same
15   objection.  Go ahead and answer this.
16   A.   The notes were from the
17   conversation that we had there.  To
18   recall further details from that right
19   there, I couldn't tell you.
20   Q.   Can you tell me under oath that
21   it was either, A, the buyout of Morris
22   Forest Products by Universal, or, B, the
23   buyout of Keystone by Universal?

Page 236

1        MR. CLEVELAND:  Same
2    objection.  If you know, you can
3    answer.
4    A.   That would have to be a
5    conversation between Mr. Turner and
6    Mr. Morris and Universal.
7    Q.   I am not asking about a
8    conversation among other people.  I am
9    asking about this conversation that you
10   wrote a note about.  All I am asking
11   you -- listen, this is simple.  This is
12   so simple.  Either you remember what it
13   was about or you don't.  Either you
14   remember it was about a buyout of
15   Universal or you remember it was a
16   buyout of Morris Forest Products?
17       MR. CLEVELAND:  Object.  The
18   record will speak for itself.  He's
19   already answered these questions from
20   Mr. Stott.
21   A.   It was a conversation with me
22   and Mr. Turner as far as him and his
23   conversation with Universal and the

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 237

1  buyout. I wrote the note. You just
2  have to take it as it is. That's the
3  note that I wrote.
4      Q.  Who was being bought out?
5      A.  That is just a note that I
6  wrote.
7      Q.  Who was being bought out?
8      MR. CLEVELAND:  Answer if you
9  know.
10     A.  The Universal/Keystone was
11  coming together in some type of an
12  agreement. The details, I don't know.
13  That is the best I can tell you.
14     Q.  Does it say that Universal and
15  Keystone are coming to an agreement?
16     MR. CLEVELAND:  Objection. The
17  letter speaks for itself -- the note,
18  not letter.
19     Q.  Is that referenced --
20     A.  In taking it, that somebody
21  from Universal was coming with
22  Mr. Turner to Morris Forest Products,
23  that there was a Keystone/Universal

Page 238

1  coming together of some type. I wrote
2  buyout. That's the best I can do for
3  you.
4      Q.  Based on that note, could they
5  have been buying out Morris?
6      MR. CLEVELAND:  Objection.
7  Asked and answered.
8      A.  I wasn't privileged to a buyout
9  knowledge of Morris.
10     MR. DAVIDSON:  That's all I
11  have.
12  RE-EXAMINATION BY MR. STOTT:
13     Q.  I have one quick follow-up.
14  Mr. Pittman, you in responding to the
15  questions about the conversation you had
16  with Jerry Turner about your job offer,
17  you said that you told him that you were
18  not going to have a carrot waved in
19  front of your face about a job offer
20  until all this stuff with Morris Forest
21  Products was worked out. What stuff
22  with Morris Products was being worked
23  out?

Page 239

1      A.  You have got -- all of a sudden
2  we have this Universal bunch coming in
3  and we have Universal, Keystone and
4  Morris, and I was in the dark. I didn't
5  know what details had to be -- what was
6  happening.
7      Q.  You had no clue as to the
8  negotiations that were ongoing with
9  Morris Forest Products at that point?
10     A.  Ongoing with who?
11     Q.  With Universal and/or Keystone
12  and Morris Forest Products.
13     A.  I didn't know what details were
14  happening at that moment.
15     Q.  Did you know that there was
16  some sort of negotiations ongoing?
17     A.  Ongoing?
18     Q.  Correct.
19     A.  I knew there had been
20  conversation that day of the 7th about
21  the Keystone, Universal, Morris Forest
22  Products.
23     Q.  What kind of conversations?

Page 240

1  Something different than what you told
2  me before?
3      A.  No, just like we have talked
4  about all day long. Same conversation.
5  But -- let's not go --
6      Q.  Here is the issue. If you were
7  led to believe that everything was just
8  going to go on as it was before, what
9  did you think had to be worked out?
10     MR. CLEVELAND:  Objection.
11  Asked and answered.
12     A.  I don't know.
13     Q.  Why would you think that
14  anything had to be worked out?
15     A.  I don't know. I didn't have
16  enough details to make a rational
17  decision. I don't know --
18     Q.  Had anyone, anyone whatsoever,
19  whether it be an employee of Morris
20  Forest Products, an employee of Keystone
21  or an employee of Universal, told you
22  there were details that still had to be
23  worked out before it was decided if

60 (Pages 237 to 240)

## 367 VALLEY AVENUE
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 241

1  Morris Forest Products would continue to
2  handle the Keystone line?
3      A.  That's something I can't recall
4  right now.
5      Q.  Then why did you tell
6  Mr. Turner that you couldn't make a
7  decision on a job until those details
8  were worked out?
9          MR. CLEVELAND:  Objection.
10  Asked and answered.
11      A.  Because there wasn't a detail
12  -- I didn't have enough information.  I
13  didn't know.  I didn't want to be
14  offered something to take me away from
15  Morris Forest Products.
16      Q.  Until the deal was worked out
17  with Morris?
18      A.  I didn't know what was
19  happening.
20      Q.  That's what you said.  That's
21  your testimony, not mine.
22      A.  What I said was I didn't know
23  what was happening.  I didn't know the

Page 242

1  details of what was fixing to take
2  place.
3      Q.  Were you aware there was some
4  sort of negotiations going on at that
5  point?
6          MR. CLEVELAND:  Objection.
7  Asked and answered.
8      A.  I knew there was a meeting on
9  the 7th.
10      Q.  Did you know there was some
11  negotiation over the issue of whether or
12  not Morris was going to keep that work?
13          MR. CLEVELAND:  Same objection.
14      Q.  The Keystone work.  Did you
15  know that issue was up in the air still
16  as of that date?
17      A.  I knew that the gist of the
18  conversations that we had in that
19  meeting that Morris Forest Products
20  would carry on just like we had been
21  doing.
22      Q.  What was it that you told
23  Mr. Turner had to be worked out before

Page 243

1  you could respond to that job offer?
2          MR. CLEVELAND:  Same objection.
3      A.  I don't know.
4      Q.  What did you think was undone,
5  what did you think had not been
6  completed, what part of the
7  negotiations?
8          MR. CLEVELAND:  That has been
9  asked and answered.
10      Q.  He hasn't answered it yet.
11          MR. CLEVELAND:  He said he
12  didn't know.
13      A.  I don't know.  I did not know
14  what the information was that was --
15  what was going to take place with that
16  program.
17      Q.  Did you think there was some
18  issues that still had to be worked out?
19      A.  I don't know.  I told you -- I
20  will tell you I don't know.  I don't
21  know what other detail.
22      Q.  Let me ask it this way.  Did
23  you think that everything was already

Page 244

1  accomplished as far as working out
2  details between Morris and Keystone, or
3  did you think there was more work to be
4  done?
5      A.  I didn't know what the details
6  of what was happening.  I knew there had
7  been a meeting and it looked like
8  everything was going to move on and that
9  was it.  I didn't know what was
10  happening past that point.
11      Q.  You told Mr. Turner you had to
12  have all the details, had to get the
13  deal worked out with Morris before you
14  could answer, even though you didn't
15  think there was anything left to be
16  worked out?
17          MR. CLEVELAND:
18  Mischaracterization of his testimony.
19      Q.  Kind of pulled that out of the
20  sky?
21          MR. CLEVELAND:  Same objection.
22      A.  I didn't know what was -- I
23  didn't know -- I think there may be some

61 (Pages 241 to 244)

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

Page 245

1  people out there that can make decisions
2  like that without having all the
3  details. I might be one of those
4  strange ones that just can't do it.
5      Q.  The only thing in the world you
6  know is what the intent to harm you was,
7  right, that's the only thing you have
8  been able to answer this entire
9  deposition, isn't it?
10     MR. CLEVELAND:  I object to
11 that.
12     MR. STOTT:  Go ahead.  I am not
13 going to ask it again.  He doesn't know
14 anything.  We have taken a deposition
15 for five hours and we have gotten the
16 words I don't know four thousand times.
17 I am surprised he answered his name.
18 That is all.
19
20
21
22
23

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**