# Exhibit 1

# FREEDOM COURT REPORTING

## Page 1

```
 1   IN THE UNITED STATES DISTRICT COURT
 2      OF THE MIDDLE DISTRICT COURT
 3          EASTERN DIVISION
 4
 5   CIVIL ACTION NO: CV 05-00564
 6
 7   MORRIS FOREST PRODUCTS, LLC,
 8       Plaintiff,
 9   vs.
10   KEYSTONE EXTERIOR DESIGN,
11       Defendant.
12
13           DEPOSITION
14              OF
15           STAN PITTMAN
16
17   REPORTED BY: Kelly Jackson
18           Registered Professional
19           Reporter
20           and Notary Public
21
22
23
```

## Page 2

```
 1       STIPULATIONS
 2
 3       IT IS STIPULATED AND AGREED by
 4   and between the parties through their
 5   respective counsel that said deposition
 6   may be taken before Kelly Jackson,
 7   Certified Shorthand Reporter, Registered
 8   Professional Reporter and Notary Public;
 9       That the signature to and the
10   reading of the deposition by the witness
11   is waived, the deposition to have the
12   same force and effect as if full
13   compliance had been had with all laws
14   and rules of Court relating to the
15   taking of depositions:
16       That it shall not be necessary
17   for any objections to be made by counsel
18   to any questions, except as to form or
19   leading questions, and that counsel for
20   the parties may make objections and
21   assign grounds at the time of trial, or
22   at the time said deposition is offered
23   in evidence or prior thereto.
```

## Page 3

```
 1           APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4       MR. TRES CLEVELAND
 5       Maynard, Cooper & Gale
 6       2400 AmSouth/Harbert Plaza
 7       Birmingham, Alabama  35203
 8
 9   FOR THE DEFENDANT:
10       MR. PATRICK DAVIDSON
11       Adams, Umbach, Davidson & White
12       205 South 9th Street
13       Opelika, Alabama  36801
14
15       MR. JOE STOTT
16       Scott, Sullivan, Streetman & Fox
17       2450 Valleydale Road
18       Birmingham, Alabama
19
20
21
22
23
```

## Page 4

```
 1           INDEX
 2
 3   EXAMINATION BY MR. STOTT      5
 4   EXAMINATION BY MR. DAVIDSON  209
 5   RE-EXAMINATION BY MR. STOTT  236
 6   DEFENDANT'S EXHIBIT 1         49
 7   DEFENDANT'S EXHIBIT 2         71
 8
```

1 (Pages 1 to 4)

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

Page 9

1  Q. How long have you worked for
2  Robbins Manufacturing in Tampa?
3  A. Five weeks today.
4  Q. I understand that you had some
5  connection with Morris Forest Products
6  prior to working for Robbins
7  Manufacturing; is that correct?
8  A. Yes.
9  Q. When did your relationship with
10 Morris Forest Products begin?
11 A. The relationship with Morris
12 Forest, approximately five years ago.
13 Q. Describe that relationship to
14 me.
15 A. I was a contract sales agent
16 with Morris Forest Products.
17 Q. What does a contract sales
18 agent do?
19 A. My expertise was in the mobile
20 home industry selling boards and wedges.
21 Q. We are in October, 2005 now, so
22 five years ago would have been sometime
23 during the year 2000, is that roughly

Page 10

1  when you started working with Morris
2  Forest Products?
3  A. Yes. Roughly in that area.
4  Q. During the time that you did
5  work with Morris Forest Products, did
6  your position with them change?
7  A. Could you repeat that?
8  Q. Let me ask it a different way.
9  Were you ever an employee of Morris
10 Forest Products?
11 A. No, sir.
12 Q. When you began selling boards
13 and wedges in the mobile home industry
14 in connection with Morris Forest
15 Products, how were you compensated?
16 A. Commission.
17 Q. Tell me what the basis of the
18 commission was, how did that work?
19 A. The basis on the commission was
20 a percentage of -- based on a percentage
21 of the load minus treatment, minus
22 freight.
23 Q. Have you ever had a different

Page 11

1  compensation arrangement with Morris
2  Forest Products?
3  A. The only other compensation
4  difference for just lumber material
5  would be a thirty percent of profit on
6  another item sold to a different
7  customer.
8  Q. What do you mean by that?
9  A. You split the profit in lumber
10 sales. Like the profit will be pulled
11 and then you have a 70/30 percent
12 split. So a commissioned salesman gets
13 the thirty percent and the manufacturer,
14 whoever they may be, will get seventy
15 percent.
16 Q. When you say on another item
17 sold to a different customer, what do
18 you mean by that, any item other than
19 this mobile home truck load stuff?
20 A. No. The other items -- that
21 was one item, which is a crating packing
22 material. Then any other item would be
23 based on that -- a percentage that would

Page 12

1  be set ahead of time based on profits,
2  based on volume.
3  Q. Did you have a written
4  contract?
5  A. Yes.
6  Q. Was there a specific term on
7  that written contract?
8  A. Yes.
9  Q. When did that term expire?
10 A. That expired the day that I
11 left Morris Forest Products to go to
12 Robbins.
13 Q. Did you wait until it expired
14 to leave or was that an agreement
15 between you and Morris that the contract
16 was over as of that time?
17 A. That was an agreement with us
18 that it was over at that time.
19 Q. Was there a specific term
20 written into the contract that you had,
21 a term of years?
22 A. Time?
23 Q. Term of time.

# FREEDOM COURT REPORTING

Page 41

1  Universal and that Morris Forest
2  Products would be involved and we would
3  be manufacturing and things would be
4  carrying on and everything would be good
5  for everybody.
6      Q.  When did this conversation take
7  place between you and Mr. Turner?
8      A.  This was sometime prior to
9  February 7. I would have to go back and
10 look and see an exact time. I couldn't
11 recall an exact time right now. Can I
12 go to the bathroom?
13         (Short recess.)
14     Q.  When we went off the record, I
15 was asking you about when the
16 conversation you had with Jerry Turner
17 took place and you said it was prior to
18 February 7. About how long prior, are
19 we talking about a few days, a month?
20     A.  Sometime within a few weeks
21 prior.
22     Q.  And you said Mr. Turner told
23 you he had talked to Universal and

Page 42

1  Morris would be involved, tell me
2  what -- is that exactly what he said?
3      A.  I can't recall it exactly to
4  the detail. But that was what he said.
5      Q.  Did he say what he meant by he
6  had talked to Universal?
7      A.  Could you clear that up?
8      Q.  That is what I am asking you to
9  do. Did Mr. Turner tell you what he
10 meant by the fact that he had talked to
11 Universal?
12     A.  As I took it, that things would
13 be just like they were.
14     Q.  What does that have to do with
15 Mr. Turner talking to Universal? Did he
16 say what he talked to them about?
17     A.  He was in conversation with
18 Universal and they were coming to meet
19 and everything would stay just like it
20 was. We would keep -- business would
21 stay just like it was.
22     Q.  He didn't tell you what it was
23 that he had talked to Universal about?

Page 43

1      A.  Not specifically to the detail.
2      Q.  Did you understand there had
3  been some discussions between Keystone
4  and Universal that there was going to be
5  some sort of business arrangement
6  between those two entities?
7      A.  I knew there had been
8  conversation, but I didn't know the
9  details.
10     Q.  What did you understand that
11 conversation was about?
12     A.  That there would be --
13 something would happen with Keystone and
14 Universal.
15     Q.  Did you have any other source
16 of information about the relationship
17 between Keystone and Universal other
18 than Jerry Turner?
19     A.  That, I can't recall specifics.
20     Q.  Did you have other
21 conversations besides the one you just
22 told me about with Jerry Turner where he
23 discussed some relationship between

Page 44

1  Universal and Keystone?
2      A.  Repeat that question, again.
3      Q.  You told me about one
4  conversation you had with Jerry Turner
5  that took place sometime in the couple
6  of weeks before the February 7th meeting
7  where he told you that he had talked to
8  Universal and Morris would be involved
9  and everybody was going to be happy.
10 Other than that conversation, did you
11 have any other conversations with Jerry
12 Turner that involved the relationship
13 between Keystone and Universal?
14         MR. CLEVELAND: Are you talking
15 about before or after?
16     Q.  Right now I am talking about
17 before the February 7th, 2005 meeting.
18     A.  There was a conversation prior
19 to the February 7th meeting.
20     Q.  A different one than the one
21 you have already told me about?
22     A.  There was a conversation where
23 he mentioned it prior to the February

11 (Pages 41 to 44)

**Page 69**

1  Mr. Morris know about this or anything
2  to that effect?
3      A. I am sure that I -- I reckon
4  I was speculating then that him and
5  Mr. Morris had talked seeing how it was
6  the two of them's business.
7      Q. What, if anything, did
8  Mr. Turner say that needed to be done to
9  be prepared for that meeting on February
10 7?
11     A. Whatever he talked to
12 Mr. Morris --
13     Q. Did he mention anyone else by
14 name during that conversation that you
15 had with him?
16     A. The director of manufacturing,
17 Mr. Dana Rector, that he was going to
18 meet with him at the Universal plant
19 over in Georgia and they were going to
20 get some things coordinated and they
21 were going to come look at the plant at
22 Morris Forest Products.
23     Q. I take it Dana Rector was not

**Page 70**

1  involved in that telephone conversation
2  that you had with Mr. Turner, he wasn't
3  on the phone with y'all?
4      A. I don't know if he was there
5  with Mr. Turner.
6      Q. You didn't hear him talk or
7  hear anybody say anything to him during
8  that conversation?
9      A. Not that I recall.
10     Q. Did he call him the director of
11 manufacturing or did he call him by name
12 Dana Rector?
13     A. Both.
14     Q. Do you know if that meeting
15 ever took place?
16     A. As far as --
17     Q. You said that Mr. Turner said
18 that he was going to meet --
19     A. Dana Rector came to the meeting
20 when Universal came to Morris Forest
21 Products.
22     Q. Just a minute ago you told me
23 they were going to meet ahead of time.

**Page 71**

1      A. I don't know. With Mr. Turner
2  and then --
3      Q. Let me finish my question. You
4  told me a minute ago that according to
5  the conversation, Mr. Turner was going
6  to meet with Dana Rector, the head of
7  manufacturing sometime prior to the
8  February 7th meeting. Do you know if
9  that meeting between Mr. Turner and
10 Mr. Rector ever took place?
11     A. I wasn't there.
12     Q. Do you know if it ever took
13 place? I am not asking if you
14 attended. I want to know if you know
15 whether the meeting ever took place.
16     A. Not for certain.
17     Q. Have you ever heard from any
18 source that it did take place?
19     A. Not that I can recall.
20
21        (Whereupon, Defendant's Exhibit
22        2 was marked for
23        identification.)

**Page 72**

1
2      Q. I am going to show you what I
3  am going to mark as Defendant's Exhibit
4  Number 2. Can you identify that for me,
5  please?
6      A. That was my notes from a
7  conversation with Mr. Turner.
8      Q. That is dated February 1st,
9  2004?
10     A. Yes.
11     Q. I understand this meeting took
12 place on February 7, 2005. Are those
13 notes from 2004 or 2005?
14     A. 2005.
15     Q. When did you make that note?
16     A. That February 1st, 2005.
17     Q. That was something you made at
18 the time that the conversation took
19 place?
20     A. Right.
21     Q. You have mentioned Matt Missad
22 in that note by name?
23     A. Uh-huh (nodding head

Page 73

1  affirmatively).
2  Q.  Is there a particular reason
3  you mentioned him by name?
4  A.  No.  It was just whatever the
5  conversation was at the time.
6  Q.  Did you know Mr. Missad prior
7  to February 1st, 2005?
8  A.  No.
9  Q.  Can you explain to me why you
10 didn't mention Dana Rector's name in
11 that note?
12 A.  No, I couldn't.
13 Q.  Is it possible that it is
14 because his name was not mentioned and
15 Mr. Turner simply referred to the
16 director of manufacturing is why you
17 wrote that name?
18     MR. CLEVELAND:  Object to the
19 form.  Asked and answered.  He has
20 already testified to that.
21 A.  No.  It is the way Stan Pittman
22 does things.
23 Q.  Can you say for absolute

Page 74

1  certainty whether Mr. Turner mentioned
2  Dana Rector by name in that February 1st
3  conversation?
4     MR. CLEVELAND:  Object to the
5  form.  Asked and answered twice.
6  Q.  I have never asked the
7  question.
8     MR. CLEVELAND:  I am going to
9  object to it anyway.  You have asked it
10 twice and he has answered it twice.
11    MR. STOTT:  Object to the form
12 then instead of trying to tell him what
13 to say.
14 A.  That is -- the head of
15 manufacturing, Dana Rector was mentioned
16 in that conversation.
17 Q.  You have told me a couple of
18 times about a conversation that you had
19 with Mr. Turner that occurred before the
20 February 7th meeting.  Is that
21 conversation what is reflected in
22 Defendant's Exhibit 2?
23 A.  As best I can recall.

Page 75

1  Q.  Where on your notes does it
2  describe the fact that everything was
3  going to -- that Morris Forest Products
4  was going to be involved and everything
5  was going to go forward as before and
6  everybody was going to be happy?
7  A.  I didn't write them statements
8  down.
9  Q.  Your notes mention something
10 about a buyout, don't they?
11 A.  Yes.
12 Q.  Tell me what buyout you were
13 referring to in those notes, who was
14 buying who or what.
15 A.  That was Mr. Turner and
16 Mr. Morris.  That was something they had
17 between them.
18 Q.  Does that mean you don't know?
19 A.  Specific details, no.
20 Universal -- you would -- I am not going
21 to speculate.  You would take it that
22 Universal with Mr. Turner, Keystone,
23 there was to be something between

Page 76

1  Keystone and Universal.  Because
2  Universal hadn't approached Morris that
3  I had any recollection of of buying that
4  company out that I was aware of.
5  Q.  You thought Universal was going
6  to buy Keystone, is that how you
7  understood that, the term buyout?
8  A.  That is the way I would take
9  it.
10 Q.  Who owned the finished parts,
11 who owned the finished parts that were
12 at the Morris Forest Products facility?
13 A.  Morris Forest Products.
14 Q.  Who owned the goods in progress
15 that were at the Morris Forest Products
16 facility?
17 A.  Morris Forest Products.
18 Q.  Who owned the jigs that were at
19 Morris Forest Products?
20 A.  Morris Forest Products.
21 Q.  My understanding from reading
22 this is that Mr. Turner indicated to you
23 that people were going to meet with you

Page 85

1  meeting, who was the next person outside
2  of the folks that were already there
3  that morning because they worked there,
4  who was the next person to arrive?
5      A.  As far as from Universal?
6      Q.  Any attendees at the meeting
7  other than yourself, Rod Morris and
8  Brandon Morris.
9      A.  I don't recall what the
10 progression of Matthew -- Mr. Missad,
11 Mr. Honholt were the ones that flew in.
12 Mr. Dana Rector, and the other gentleman
13 that I would have to go back and look
14 for his name to recall it right now, I
15 have a blank there, all drove in from
16 Atlanta and Mr. Turner drove in.
17     Q.  Did those three different
18 groups of people arrive at three
19 different times?
20     A.  They come in three different
21 ways, yes.  Exactly how they walked in
22 the door, I couldn't tell you.
23     Q.  You know they were there at

Page 86

1  different times, you just don't remember
2  which order?
3      A.  Right.
4      Q.  You couldn't tell me whether
5  Mr. Turner got there first or whether
6  Mr. Rector --
7      A.  I couldn't tell you the
8  progression they walked through the
9  door.
10     Q.  You do know they got in at
11 different times?
12     A.  Yes.
13     Q.  Were there any discussions that
14 occurred during that meeting that
15 related to the relationship among
16 Universal, Keystone and Morris that took
17 place before everyone arrived?
18     A.  That, I can't recall.
19     Q.  Tell me what happened after
20 everybody got there and the meeting
21 started.  I want you to take me through
22 it in as much detail as possible,
23 telling me what statements were made and

Page 87

1  who they were made by.
2      A.  The meeting progressed with
3  everybody more or less introduced
4  themselves, blah, blah, blah.  The
5  meeting went with Keystone and Universal
6  were having the -- whatever business
7  they were having together.  Morris
8  Forest Products was involved as far as a
9  manufacturing side.
10         As I said before, it was --
11 this meeting was a meeting that Morris
12 Forest Products would continue on doing
13 just like they were doing.  In the
14 prior -- in the beginning of this
15 meeting, it was my opinion that I would
16 not let Universal go through the plant.
17 This is my personal opinion.  To go and
18 see.  By the end of the morning
19 conversations that we had with
20 Universal, we were to believe -- led to
21 believe that we would be involved, that
22 we would be a manufacturing facility for
23 whatever this Universal/Keystone, ever

Page 88

1  how this was going, and we would carry
2  on just like we were.  So at the end of
3  that meeting, we felt that everything
4  was okay, and Mr. Morris said that it is
5  okay to go ahead and take Universal
6  through the plant so they can see how
7  the operation is going so they can
8  better understand so we could better
9  function together.
10     Q.  You told me generally what the
11 discussion was.  What I want to do is
12 break that down into specific statements
13 made by specific people.  I think you
14 told me everybody that attended the
15 meeting.  Jerry Turner was there?
16     A.  Yes.
17     Q.  Tell me everything that Jerry
18 Turner stated at that meeting that you
19 can recall.
20     A.  I can't repeat what Mr. Turner
21 said verbatim.  I could say that the
22 gist of all the conversations that were
23 in that meeting that Morris Forest

Page 89

1  Products was involved and everything
2  would progress just like it was.
3     Q.  Did anybody participate in the
4  discussions at the same level or were
5  there more people who were more
6  talkative than others?
7     A.  It was just like at any
8  meeting.  There would be people that
9  talked more than others.
10    Q.  Were there people who didn't
11 talk at all other than shooting the
12 breeze?
13    A.  No.  Everybody had a part of
14 the conversation.
15    Q.  Tell me everything that Matt
16 Missad said to you that was untrue.
17    A.  The conversation that was had
18 there was that everything would progress
19 normally, that Morris Forest Products
20 would be involved, we would progress on,
21 and that is the reason they got the tour
22 of the plant.  Is that -- in
23 manufacturing, you just don't take

Page 90

1  anybody through your plant unless you
2  are sure they are going to be involved
3  with you and you have that warm fuzzy
4  feeling.
5     Q.  Do you know for a fact that
6  Mr. Missad made any statements to that
7  effect?
8        MR. CLEVELAND:  Object to the
9  form.  Asked and answered.
10    A.  I told you everything -- the
11 statements that were in that
12 conversation was that everything would
13 move on.
14    Q.  I understand.  You also told me
15 that some people talked more than
16 others.  I know that everybody doesn't
17 repeat the exact same phrases at a
18 meeting.  What I want to know is do you
19 know for sure that Matt Missad made
20 those statements?
21       MR. CLEVELAND:  Object to the
22 form.
23    A.  The same as I stated before.

Page 91

1  The gist of the conversation was
2  everything was going to move on.
3     Q.  I understand that's the gist of
4  the conversation.  What I want to know
5  is was Matt Missad one of the people who
6  said that?
7     A.  The gist of the conversation by
8  everybody in there was that everything
9  would progress on just like it was.
10    Q.  I take it you don't know
11 whether Matt Missad made those
12 statements or not?
13    A.  I am telling you the gist of
14 the conversation, that everything would
15 progress on just like it was.
16    Q.  Yes or no, you do or do not
17 remember Mr. Missad making those
18 statements?
19    A.  Making what statements?
20    Q.  The statements that you
21 described as the gist of the
22 conversation.
23    A.  I do remember with the gist of

Page 92

1  the conversation through Mr. Missad that
2  the things would progress just like they
3  were.
4     Q.  Tell me everything you heard
5  Dana Rector say at the meeting that
6  specifically came out of his mouth, not
7  the gist of the conversation.
8     A.  Dana Rector made the statement
9  that everything would be wonderful if it
10 stayed at Morris Forest Products, not
11 verbatim as far as -- the gist of what
12 he said that everything would be
13 wonderful if it stayed manufactured at
14 Morris Forest Products.
15    Q.  Is there anything else that you
16 can recall that he said?
17    A.  The conversations I had with
18 Dana Rector as we left that --
19    Q.  Let's leave it in the meeting
20 first.  If there is conversations that
21 were outside of the meeting
22 afterwards -- I think that is where you
23 are going, isn't it?

23 (Pages 89 to 92)

Page 93

1   A.  Yes.
2   Q.  Stick with the conference room
3   right now.  Is there anything else he
4   said in the conference room?
5   A.  Specifically that I can
6   remember right now, no.
7   Q.  Was he one of the people that
8   talked a lot less in the conference room
9   than others?
10  A.  I didn't count his words.
11  Q.  You know who dominates a
12  meeting when there is a group of people,
13  it is pretty quick to see who is going
14  to talk a lot and who is not.  I am
15  always one of the ones that talks a lot
16  and you probably have figured that out
17  by now.  You can see there is people
18  that kind of sit back and listen.  How
19  would you describe Mr. Rector in that
20  conversation in the conference room?
21  A.  He wasn't the top speaker in
22  the room.
23  Q.  When you indicated that he said

Page 94

1   everything would be wonderful if the
2   manufacturing stayed at Morris, was that
3   in the conference room?
4   A.  That was right there at the
5   conference room.
6   Q.  That's the only statement you
7   specifically remember him saying in the
8   conference room?
9       MR. CLEVELAND:  Object to the
10  form.
11  A.  That statement that was made --
12  I know that statement was made.
13  Q.  Is there anything else
14  specifically that you can recall him
15  saying still in the conference room?
16  A.  In the conference room or out?
17  Q.  In the conference room.
18  A.  Not at this moment.
19  Q.  What about Mr. Honholt, tell me
20  everything that Mr. Honholt said during
21  the meeting in the conference room.
22  A.  A lot of questions about
23  product, a lot of questions about how

Page 95

1   things were done.
2   Q.  Did he make any statements or
3   just ask questions?
4   A.  He asked questions and made
5   statements.  The whole gist of that
6   conversation was headed in the direction
7   of Morris Forest Products doing the
8   manufacturing, keeping things there.
9   Q.  Tell me the best you can recall
10  anything that Mr. Honholt said during
11  that meeting in the conference room that
12  was not true.
13      MR. CLEVELAND:  Object to the
14  term not true.  If you know any
15  statements that he said for sure that
16  weren't true, answer.
17  A.  The things that I know today
18  that are not true in that, that that
19  meeting was carried to lead us to
20  believe that everything would progress,
21  that I would continue doing just what I
22  was doing, promoting and pushing the
23  Keystone deck, sales, and that

Page 96

1   everything would go according to normal
2   was what we were led to believe.
3   Q.  Right now I want to know what
4   Mr. Honholt said that was untrue.
5   A.  We were not carried on in the
6   production of the Keystone deck or the
7   sales of the Keystone deck.
8   Q.  What did Mr. Honholt say that
9   was contrary to that?
10  A.  The gist of that conversation
11  that we would carry on, everybody in
12  there.  The conversation was led to
13  believe by the questions and the
14  statements that were made through that
15  conversation.  I can't recall specific
16  words right this minute of what was
17  said, but their gist was to lead on to
18  we would be involved.
19  Q.  But you can't remember any
20  specific words Mr. Honholt used?
21  A.  Not right at this moment.
22  Q.  What about Mr. Rector, anything
23  that he said that was untrue, specific

Case 3:05-cv-00564-WHA-DRB   Document 38-3   Filed 11/08/2005   Page 10 of 20

**FREEDOM COURT REPORTING**

Page 97

1  words that he used?
2  A. The gist of that conversation
3  that we would be continuing
4  manufacturing.
5  Q. Can you remember specific
6  statements that Mr. Rector made that
7  were untrue, specific words that he
8  used?
9  A. The specifics that was untrue
10 that we would stay involved and we would
11 be manufacturing after that date, which
12 we didn't.
13 Q. Is that something you
14 specifically remember Dana Rector saying
15 or was that the gist of the conversation
16 among everybody?
17 A. That was the gist of the
18 conversation of everybody there.
19 Q. I am trying to separate those
20 two things. I want to know if you
21 recall specific statements. At this
22 time I am asking about very specific
23 statements. Let me go back to

Page 98

1  Mr. Honholt. I think you said you can't
2  remember the specific words he said.
3  What about Mr. Missad, can you remember
4  specific words that he said?
5  A. Matthew stated that he did not
6  want a confrontational relationship with
7  Morris Forest Products and thought that
8  we could work it out where we could
9  progress on and everything would be okay
10 as far as manufacturing.
11 Q. What about Mr. Rector, do you
12 remember any specific words that he
13 said?
14 A. The statement that I made
15 before, that he stated at the end that
16 it would be wonderful if it stayed
17 there. The rest of the conversations
18 would lead us to believe that he was --
19 as far as right now this second, I
20 cannot quote him in specific detail on
21 his statements.
22 Q. What about Craig Jansen; is
23 there anything you can think of with

Page 99

1  detail something you remember him
2  saying?
3  A. The details; right now I
4  can't. Right now I can't recall.
5  Q. Do you know if Craig Jansen
6  even spoke at all during that meeting?
7  A. It is to the best of my
8  recollection that everybody talked in
9  that meeting.
10 Q. But you can't remember any
11 specific words that Craig Jansen used?
12 A. Not at this moment.
13 Q. What about Jerry Turner?
14 A. Not right at this moment.
15 Q. Do you recall Mr. Morris, Rod
16 Morris at one time saying something
17 about a potential lawsuit during that
18 meeting?
19 A. A lawsuit?
20 Q. That there may be litigation
21 over the relationship between Keystone
22 and Morris Forest Products?
23 A. That, I don't recall.

Page 100

1  Q. When Mr. Missad said he didn't
2  want a confrontational relationship, was
3  that in response to something that was
4  said by someone else?
5  A. The best I can recall in that
6  statement that he was making was he
7  wanted us to have that warm fuzzy
8  feeling so we would know that we would
9  be progressing on with the manufacturing
10 and everything would stay like it was.
11 Q. Didn't Mr. Morris actually say
12 this was probably going to end up in
13 litigation and Matt Missad responded
14 that he wasn't going to buy a lawsuit,
15 that is when he said he thought that
16 everybody could work everything out?
17 A. That, I don't recall.
18 Q. Can you say for certain one way
19 or the other whether that statement was
20 made?
21 A. Not right at this moment.
22 Q. At some point the group in the
23 conference room breaks up and you leave

25 (Pages 97 to 100)

**367 VALLEY AVENUE**
(877) 373-3660     BIRMINGHAM, ALABAMA     (205) 397-2397

Page 113

1 Keystone/Universal or both?
2    A. It was my interpretation from
3 the conversation with Mr. Missad that we
4 would carry on just like we were.
5    Q. Tell me specifically what
6 Mr. Missad said in the car after the
7 meeting that led you to that
8 interpretation.
9    A. The gist of that conversation
10 was that the manufacturing would stay in
11 Davidston, Alabama, we would continue to
12 manufacture.
13    Q. Are those words that he
14 specifically used?
15    A. I don't know if I am quoting
16 him verbatim. The gist of what I took
17 from what he said that we would move on
18 in that direction.
19    Q. After you dropped him off at
20 the airport, have you ever again spoken
21 to him?
22    A. Yes. We have had conversations
23 after.

Page 114

1    Q. When?
2    A. In the weeks after.
3    Q. Tell me about -- we will get
4 back to that in just a minute. After
5 Doug Honholt left that meeting around
6 lunchtime, have you ever since spoken to
7 him?
8    A. Not that I recall.
9    Q. After Dana Rector left that
10 meeting around lunchtime, have you ever
11 since spoken to him?
12    A. Not since that time.
13    Q. How about Craig Jansen?
14    A. No.
15    Q. The only person who you
16 understand to be employed with Universal
17 that you have spoken to since that
18 meeting is Matt Missad?
19    A. Yes, the only person I have
20 spoken to since that meeting.
21    Q. Tell me about any conversations
22 you have had with him after that time.
23    A. After that time, after the

Page 115

1 initial meeting in the weeks prior, we
2 had conversations when it started coming
3 to light that Morris Forest Products
4 would not be manufacturing.
5    Q. Tell me -- tell me how it came
6 to light that Morris Forest Products
7 would not be manufacturing.
8    A. The -- I would have to go back
9 to my notes on that as far as specific
10 details how that time progressed.
11    Q. Let me ask it this way. Is
12 that something you learned through
13 Mr. Morris?
14    A. No. Part of this conversation
15 was with Matt Missad and I.
16    Q. I need you to tell me the best
17 you can anything that Matt Missad told
18 you about that issue.
19    A. I would have to go back to my
20 notes on that and see what specific
21 statements were made.
22       MR. CLEVELAND: I will object
23 for the record that I believe this line

Page 116

1 of questioning is teetering on the edge
2 of jurisdictional issues since it is
3 passed February 7th. I don't believe
4 any of --
5    Q. Can we stipulate that the
6 February 7th that -- there were no
7 statements that comprise the fraud
8 allegation that occurred after the
9 February 7th meeting?
10       MR. CLEVELAND: Ask some more
11 questions and --
12    Q. Did Matt Missad say anything to
13 you that you believe was untrue after
14 that February 7th meeting?
15    A. Any statement that he made?
16    Q. Yes.
17    A. There was -- led to believe
18 that there would be some compensation
19 for Morris Forest Products in that days
20 after that meeting.
21    Q. Do you know if there were in
22 fact offers made to Mr. Morris?
23    A. I don't know exact details on

29 (Pages 113 to 116)

FREEDOM COURT REPORTING

Page 129

1    A.  Yes.
2    Q.  Do you know whether the folks
3  at Keystone knew that you would be
4  involved as a sales rep in the process
5  of selling?
6    A.  I am sure they did.
7    Q.  How did they know that?
8    A.  Because I was there.
9    Q.  What do you mean?
10    A.  There in the meetings, there
11  out driving building that business.
12    Q.  At what point did you alert
13  Mr. Turner or anyone else at Keystone
14  that you were an independent contractor
15  instead of an employee?
16    A.  It was pretty well stated from
17  the time Mr. Turner was around and
18  Mr. Ludwig both.
19    Q.  And --
20    A.  Mr. Don Ludwig.
21    Q.  Do you know if that was
22  before --
23    A.  I have never stated that I was

Page 130

1  an employee of Morris Forest Products.
2    Q.  Did you tell Mr. Ludwig and
3  Mr. Turner that before or after the
4  contract was signed?
5    A.  I couldn't tie it down to an
6  exact date.
7    Q.  You know at some point they
8  became aware that you were an
9  independent contractor?
10    A.  Right.  I was pretty verbal
11  about it.
12    Q.  You don't know if it was before
13  or after they signed a contract with
14  Mr. Morris?
15    A.  I couldn't tell you a specific
16  date.  I have never worked for anybody
17  but the contract sales is all I have
18  ever done.
19    Q.  Did you have any sort of deal
20  where you would get paid a minimum
21  amount even if you didn't do any sales
22  for a particular time period with
23  Morris?

Page 131

1    A.  Ask that again.
2    Q.  If you had a bad week and you
3  didn't sell anything, would you get
4  paid?
5    A.  My payment schedule was
6  stretched all out over the month, yes.
7  Some months it would be a lot greater
8  than one month, but I would keep it in
9  reserves so I would have it to fill in
10  those voids.  That's the common practice
11  in commission sales.
12    Q.  You drew a particular amount
13  each week or each two weeks regardless
14  of how much you had sold and at some
15  point later on you would decide to take
16  bigger draws if there was money in
17  reserve?
18    A.  You more or less monitor your
19  sales to see if you are staying within
20  that perimeter of your draw.
21    Q.  You indicated that you had some
22  recollection of some discussions that
23  occurred several months before this

Page 132

1  February, 2005 meeting, maybe back
2  October, November time period, maybe
3  even into December, January, 2004, 2005
4  where there were some renewal
5  discussions of renewing the contract.
6  And what I want to know about that is do
7  you recall during those conversations if
8  there were any discussions about making
9  any changes to the existing contract?
10    A.  Specific details, I do not
11  recall.
12    Q.  Do you remember having
13  conversations with Mr. Morris where you
14  and he discussed some changes that y'all
15  would like to see to the contract for
16  renewal?
17    A.  Specific details, I don't
18  recall.
19    Q.  I am not asking for the
20  specific details.  Do you remember
21  generally speaking with Mr. Morris that
22  there were some changes that y'all would
23  like to see?

33 (Pages 129 to 132)

367 VALLEY AVENUE
(877) 373-3660     BIRMINGHAM, ALABAMA     (205) 397-2397

Page 133

1   A. I am sure we had conversations,
2   you're always wanting to make things
3   better. As far as a specific time,
4   whether it was in that period of time, I
5   don't have any idea.
6   Q. Is there anything that you can
7   think of in the contract that you wanted
8   to see changed?
9   A. Nothing that I can -- nothing
10  that I can recall.
11  Q. What, if anything, did you do
12  differently as a result of conversations
13  that you had with the Universal
14  employees and Jerry Turner on February
15  7th, 2005?
16  A. What -- clear that up.
17  Q. Did you change the way you were
18  going about doing things because of
19  those conversations?
20  A. After that -- after that period
21  of time -- specific date I couldn't tell
22  you, specific minute, I couldn't tell
23  you. After the fact that it came to

Page 134

1   light that we would not be
2   manufacturing, yes, I had to change
3   everything I was doing because Keystone
4   for twenty-four months had been my
5   life. That is what drove me, that
6   sales. I don't know if you have ever
7   been in sales, but when you take on a
8   project like that, that is your life,
9   that's your focus. Just like a receiver
10  running for the goal line, you take it.
11  Anticipating the rewards when you reach
12  that goal.
13  Q. I assume you don't know all the
14  specific terms of the contract between
15  Keystone and Morris that was in place
16  back in late 2004?
17  A. I could not. I do not.
18  Q. So if that contract did just
19  simply expire, that is not something you
20  would know?
21      MR. CLEVELAND: Objection. It
22  calls for speculation.
23  Q. Is that correct?

Page 135

1   A. I think that -- is that a yes
2   or a no?
3   Q. I want to know --
4   A. Or can I say something else?
5   Q. Let me ask the question a
6   little bit better. I have sort of
7   forgotten exactly what I said. If the
8   contract did simply expire because the
9   time of the contract, the term of the
10  contract ran out, that's not something
11  you would be able to speak to, you don't
12  know that one way or the other, do you?
13  A. Let me make this statement. I
14  don't think Rod Morris would have led
15  Robbins Manufacturing to spend eight
16  thousand dollars on a display site, that
17  would be sort of detrimental to anybody
18  in the wood business to lead them to
19  think that they were fixing to get a
20  chance to sell this thing, to spend
21  eight thousand dollars for nothing. I
22  think if the contract had came to an end
23  at whatever time you are talking about,

Page 136

1   I don't think as a productive business,
2   we would have carried on manufacturing
3   through for the hurricane, we would not
4   have approached Home Depot, we would not
5   have been setting meetings for Robbins,
6   we would not have spent all that money
7   preparing for the two week show at
8   Menards. I don't think we would have
9   done that.
10  Q. I will ask you to answer it in
11  the yes or no. As far as whether there
12  is a term that called for an expiration
13  and it just plain expired, that's not
14  something you know, you don't know that
15  one way or the other?
16  A. I don't know that specific date
17  and time for an expiration.
18  Q. Hypothetically, just assuming
19  for --
20  A. I don't do no assuming.
21  Q. I am going to ask you to do it
22  for the purpose of this question.
23  Assuming for me that that contract was

34 (Pages 133 to 136)

Page 141

1  of that occurred in February of 2005
2  that you would have done any differently
3  had the statements you told me about not
4  been made, the statements at the
5  February 7th meeting?
6       MR. CLEVELAND: Objection.
7  Calls for speculation.
8       A.  I don't know how to answer that
9  question, what I would have done. I am
10 not going to play the lottery here. I
11 don't play the lottery. It is
12 speculation. You're assuming.
13      Q.  You can't think of anything as
14 you sit here that you would have done
15 differently had those statements that
16 you told me about not taken place during
17 the month of February, 2005?
18      MR. CLEVELAND: Same objection.
19      A.  I am not going to assume
20 anything.
21      Q.  I am not asking you to assume
22 or speculate. Mr. Pittman, what I am
23 asking you is there anything you know of

Page 142

1  that you would have done differently?
2  If the answer is I don't know, that's
3  fine.
4       A.  I don't know.
5       Q.  Is there anything that you gave
6  up doing that you could have done during
7  that period immediately following
8  February 7, 2005 that you decided not to
9  do because of the conversations that
10 went on at that meeting?
11      MR. CLEVELAND: Can you repeat
12 that?
13      Q.  Is there anything that you
14 could have done in February of 2005 or
15 in that few week period after February
16 7, 2005, anything you decided not to do
17 but you could have done and you decided
18 not to do it because of the statements
19 made at that February 7th, 2005
20 meeting? Again, I don't want you to
21 speculate.
22      MR. CLEVELAND: This is in the
23 context of could have done, this is with

Page 143

1  the contract and this whole situation?
2       Q.  I want to know if there is
3  anything in your life that you reframed
4  from doing that you decided not to do
5  because of the statements made at that
6  February 7th, 2005 meeting in that three
7  or four week period before you found
8  out --
9       A.  The statements being?
10      Q.  The ones you told me about at
11 the meeting that you said were untrue.
12      A.  The statements that we would
13 continue on the -- the gist of the
14 conversation was that we would continue
15 on.
16      Q.  I am going to make it as
17 crystal clear as I can. Is there
18 anything that you could have done
19 between -- strike that. Is there
20 anything you could have done in the few
21 weeks after February 7th, 2005 before
22 you learned that Keystone in fact was
23 not going to continue to use Morris,

Page 144

1  whatever that time period is up to the
2  point you found out that Keystone was
3  not going to continue to use Morris to
4  manufacture their supplies, is there
5  anything you had an opportunity to do
6  that you decided not to do because of an
7  untrue statement made to you at the
8  February 7th, 2005 meeting?
9       MR. CLEVELAND: Object to the
10 form.
11      A.  Could you clear that up? I
12 know I might seem like I am a little
13 dense.
14      Q.  I don't know how else to ask
15 it. There is a time period between
16 February 7th, 2005 and a few weeks later
17 where you thought that Morris was going
18 to continue to do the Keystone business
19 and at some point you found out they
20 weren't.
21      A.  Up until that point?
22      Q.  Up until that point is there
23 something in your life that you decided

Page 145

1  not to do that you would have done
2  except for the untrue statements made to
3  you at that meeting?
4      A.  Up until that point my life and
5  soul was Keystone decks and selling and
6  maintaining the customers and keeping
7  the product alive and doing well.  Until
8  that point where it was plain that it
9  was over, that was what I was doing.
10 That was my heart and soul.
11     Q.  Is there some opportunity that
12 you passed up or something that you
13 would have done differently, something
14 you would have decided to do if it
15 wasn't for the feeling that you were
16 going to continue to do the Morris work?
17     A.  I ain't got a clue.
18     Q.  How are you paid currently?
19     A.  Currently?
20     Q.  With your job right now, how
21 are you paid?
22         MR. CLEVELAND:  Object.  That
23 has nothing to do with the

Page 146

1  jurisdictional issues that we are here.
2      Q.  I disagree strongly.  I think
3  it very clearly goes to one of the
4  elements of your claims, that being
5  damages.
6          MR. CLEVELAND:  If he is paid a
7  lot or not, I don't think that is
8  relevant.
9      Q.  You need to answer.
10     A.  It is none of your business.
11     Q.  Unfortunately you brought a
12 lawsuit and in your lawsuit you are
13 claiming that you lost wages.  You are
14 going to have to tell me.
15     A.  I don't have to tell you.  What
16 happened -- what is happening now after
17 I left Morris Forest Products, the judge
18 would have to tell me I have to.
19         MR. STOTT:  I am going to give
20 you an opportunity to instruct him to
21 answer.
22         MR. CLEVELAND:  I want you to
23 convince me of why you think that is

Page 147

1  relevant to jurisdictional issues.  We
2  are not here to talk about damages.
3          MR. STOTT:  I hate to tell you
4  that damages is an element of your
5  claims.
6          MR. CLEVELAND:  We have pled
7  that he has damages.
8          MR. STOTT:  I have a right to
9  find out if he did or not.
10         MR. CLEVELAND:  You are saying
11 that if he makes more money now, that he
12 didn't have any damages?  Is that what
13 you're -- is that what you are trying to
14 say?  If that's the case, then that is
15 definitely not true because maybe if he
16 won the lottery or got a better job,
17 circumstance has nothing to do with the
18 fact --
19         MR. STOTT:  We certainly have
20 the right to make that argument.
21         MR. CLEVELAND:  That's the
22 status of law.  It is not an argument.
23         MR. STOTT:  It is your decision

Page 148

1  if he answers or doesn't answer.  You
2  can either instruct --
3          MR. CLEVELAND:  I didn't
4  instruct him to answer or not to
5  answer.
6          MR. STOTT:  I am asking you to
7  do that.
8          MR. CLEVELAND:  I don't know if
9  I can make him answer if he doesn't want
10 to.  I don't think it has anything to do
11 with jurisdictional issues.
12     Q.  I am going to give you one more
13 chance to answer that question.  I need
14 to know if you are going to refuse to
15 answer a direct question under oath in a
16 deposition that is ordered by the court.
17     A.  Restate the question.
18     Q.  Tell me how you are currently
19 compensated in your current job and the
20 amount of that compensation.
21     A.  The statement -- I will make
22 one and only statement, and you can take
23 this as what you want or you can throw

37 (Pages 145 to 148)

Page 149

1  it away. I am a commissioned salesman
2  at where I am at with perks. Take it or
3  leave it.
4     Q. Are you making more money or
5  less money than you were making working
6  for Morris Forest Products? If you
7  refuse to answer, you need to tell me
8  you refuse to answer.
9        MR. CLEVELAND: If you know,
10 you can answer. It certainly doesn't
11 effect your claim either way. If you
12 know.
13    A. That, I don't know.
14    Q. You don't know if you are
15 making more money or less money today
16 than you were making when you worked for
17 Morris Forest Products?
18    A. If Universal hadn't came in and
19 snatched out the decks out from under
20 us, I would have been making a whole lot
21 more money than what I am making right
22 now.
23    Q. What do you mean by Universal

Page 150

1  snatched the decks out from under you?
2     A. When they came in, we had an
3  agreement and a sales agreement and
4  customers, and the deck left, so there
5  was nothing for me to sell.
6     Q. What do you mean the deck left?
7     A. It wasn't manufactured by
8  Morris Forest Products.
9     Q. Do you know if Universal was a
10 competitor of Morris?
11       MR. CLEVELAND: Object to the
12 question. It calls for a legal
13 conclusion.
14    A. To my knowledge, I don't know.
15    Q. What did you know about
16 Universal Forest Products back in late
17 2004, early 2005?
18    A. A big company.
19    Q. Did you know what kind of work
20 they did?
21    A. Yes.
22    Q. What did you know, what kind of
23 things --

Page 151

1     A. I knew they were in the wood
2  business.
3     Q. Were they doing some of the
4  same things that Morris Forest Products
5  did?
6     A. I had never been in their
7  plant.
8     Q. Was it your understanding that
9  they were in that same line of work?
10    A. That would put me to
11 speculation.
12    Q. Had you heard --
13    A. The thing that I knew that they
14 built was mobile home trusses.
15    Q. Did Morris Forest Products
16 build mobile home trusses?
17    A. No.
18    Q. Was there anything else that
19 Universal did that you are aware of?
20    A. I ain't got an idea.
21    Q. Did you think they were a
22 competitor of Morris Forest Products?
23    A. I personally had no run-in as

Page 152

1  far as a competition with Universal.
2     Q. I am not asking if you ever
3  personally competed. I am asking if you
4  knew if they did some of the similar
5  work and maybe were competing for some
6  of the same customers as Morris Forest
7  Products?
8        MR. CLEVELAND: Objection.
9  Asked and answered.
10    A. I was not stated to that to be
11 a fact that I recall.
12    Q. How do you think you've been
13 affected by the fact that Morris Forest
14 Products no longer does the work with
15 Keystone?
16    A. It was detrimental to the
17 company.
18    Q. Detrimental to Morris Forest
19 Products?
20    A. To me and Morris Forest
21 Products. There was a great deal of
22 money invested on the Morris Forest
23 Products putting that product up to the

Page 165

1  A. Clear up heated arguments.
2  Q. I don't think I can clear that
3  up anymore. Had you ever gotten in a
4  fight with him?
5  A. No. We never had a fist
6  fight. We have had discussions.
7  Q. Have you ever had arguments so
8  bad that you left really mad?
9  A. I don't argue.
10  Q. Had Mr. Turner ever made any
11  threats to you?
12  A. Not that I can recall.
13  Q. I understand that you had never
14  met any of the Universal employees
15  before that day; is that right?
16  A. Correct.
17  Q. When you met with the Universal
18  employees, it was a few hours before you
19  and Mr. Turner had the discussion about
20  your employment opportunities?
21  A. Redo that again.
22  Q. The only time you met with
23  anyone from Universal was before you and

Page 166

1  Mr. Turner had the discussion about your
2  employment opportunities?
3  A. The only time I met with any of
4  the Universal employees to discuss
5  Keystone, Universal, Morris was in that
6  meeting that we had on February the 7th.
7  Q. Which was before you talked to
8  Mr. Turner about job opportunities, a
9  few hours before?
10  A. Roughly, somewhere in that
11  area.
12      (Short recess.)
13  A. I --
14  Q. I want the record clear that I
15  haven't asked a question and if I ask
16  the right question, and you have a
17  statement you want to make, feel free.
18  Other than that, wait until the end. If
19  your lawyer wants to ask you something,
20  he can ask you something. If there is a
21  question that you misunderstood or
22  something you think you may have
23  misstated, let me know that. As far as

Page 167

1  making a statement, I am not going to
2  agree to that.
3  A. That is acceptable that I do
4  this at the end?
5      MR. CLEVELAND: You can go
6  ahead. As he just said --
7  Q. Let me finish up my questions,
8  and if it is not covered by something
9  else I ask --
10      MR. CLEVELAND: I think he has
11  a right if he believes he has misstated
12  an answer to your question, to clear
13  that up now.
14  Q. Let the record show that we had
15  taken a fairly lengthy break and that
16  after conferring with your attorney, you
17  want to make a statement.
18  A. I think that I did not
19  understand the question. I think there
20  was an intent to do harm after turning
21  the job down twice. As far as having
22  proof, solid proof right there in my
23  hand, I don't. That's my statement.

Page 168

1  Q. After turning the job down
2  twice, when did you turn the job down
3  before?
4      MR. CLEVELAND: Object to the
5  form.
6  Q. Are you saying twice that
7  evening on the evening of February 7th?
8  A. And the evening after that in a
9  meeting that was turned down.
10  Q. The first time you were offered
11  a job was February 7th?
12  A. The second time was around the
13  11th.
14  Q. So you believe after a February
15  11th, 2005 discussion with Jerry Turner,
16  that is when he had the intent to harm
17  you?
18      MR. CLEVELAND: Object to the
19  mischaracterization of his testimony.
20  Q. Is that not what you said?
21  A. I feel like after turning the
22  job down twice, that the animosity was
23  built by the Universal/Keystone group,

**FREEDOM COURT REPORTING**

Page 169

1   ever how they are joined or united,
2   against me and the intent was to harm
3   after that.
4       Q. And the sole intent you believe
5   of taking the business from Morris
6   Forest Products and placing it
7   elsewhere, having someone else do it,
8   was to get -- was to harm you, you Stan
9   Pittman instead of for any other
10  possible reason?
11      MR. CLEVELAND: Objection.
12  Mischaracterization. He did not use the
13  word sole.
14      Q. You can answer.
15      A. I stated that the intent was to
16  harm Stan Pittman after the second
17  rejection of the job.
18      Q. Do you believe that was the
19  only reason that the decision was made
20  that Morris Forest Products would no
21  longer do Keystone work?
22      MR. CLEVELAND: Objection. It
23  calls for speculation.

Page 170

1       Q. He has already started.
2       MR. CLEVELAND: If he knows the
3   exact intent of defendants, he can sure
4   answer that. Anything else is
5   speculation.
6       A. I know that the intent to harm
7   was after the rejection of the two job
8   offers. I have not got the details in
9   my hand right now to prove it.
10      Q. What I am asking is do you
11  believe that the reason behind the
12  decision that the Morris Forest Products
13  would no longer do Keystone work was
14  simply to harm you, just an opportunity
15  to get at Stan Pittman?
16      A. I feel like the intent to harm
17  was to harm Stan Pittman after the
18  rejection of two jobs.
19      Q. I understand you have told me
20  that a couple of times. I want to know
21  if you believe --
22      A. That's my answer.
23      Q. -- that after you rejected a

Page 171

1   job offer on two occasions, that someone
2   would go to all the trouble of removing
3   all of the equipment, all of the lumber,
4   all of the jobs, all of that stuff from
5   Morris Forest Products just to get at
6   you?
7       A. I have not got that evidence in
8   my hand at this moment.
9       Q. I didn't ask about the
10  evidence. I am asking if that is what
11  your opinion is. Was it just to get at
12  you?
13      MR. CLEVELAND: Object. Asked
14  and answered.
15      A. I feel like the damage was done
16  because of the rejection of the two
17  jobs, that the intent to harm Stan
18  Pittman was from that.
19      Q. You think Jerry Turner was so
20  mad at you turning the job down, that he
21  would decide never to do business again
22  with your employer just so he could hurt
23  you?

Page 172

1       A. I have not got that evidence in
2   my hand.
3       Q. I didn't ask if that is
4   evidence that you have. I asked if that
5   is what you believe.
6       A. Yes.
7       Q. So he didn't care if he lost
8   money, he didn't care if Morris Forest
9   Products lost money, he just cared about
10  getting Stan Pittman?
11      MR. CLEVELAND: Objection.
12  Calls for speculation of defendant's
13  intent.
14      A. I can't answer.
15      Q. If that is the case, can you
16  explain to me why Morris Forest Products
17  and Jerry Turner are -- I am sorry,
18  Morris Forest Products and Keystone were
19  already in negotiations for ending the
20  relationship before those discussions
21  ever took place?
22      A. That is between Morris Forest
23  Products and Keystone.

**FREEDOM COURT REPORTING**

Page 205

1  Forest Products was done as a way of
2  getting back at you for turning down a
3  job?
4        MR. CLEVELAND: Same objection.
5        A. The removal of the deck work
6  system caused harm to Stan Pittman
7  financially is what it did. How you
8  want to come to that answer, I don't
9  know. But I am telling you --
10       Q. You have told me a thousand
11 times --
12       A. A thousand times that it was
13 taken away and it caused intentional
14 harm to Stan Pittman. I don't know what
15 you want for the rest of the question
16 you have got. I will do my best and we
17 may sit here all night until we can come
18 up with that answer.
19       Q. If a car runs a red light and
20 hits me and somebody says why did they
21 run the red light, and I say it hurt,
22 that's not the reason, that's the
23 result. I understand you are telling me

Page 206

1  that harm was caused to you as a
2  result. And you have already told me
3  that the intent came from the fact in
4  your mind that they were upset with you
5  for turning down a job; is that correct?
6        A. Yes.
7        Q. Would you agree with me then
8  that the reason that the decision was
9  made that Morris Forest Products would
10 no longer have the Keystone deck
11 business was because you turned down a
12 job with them?
13       MR. CLEVELAND: Objection.
14 Asked and answered.
15       A. The reason was that to harm
16 Stan Pittman financially for turning
17 down the job.
18       Q. So before you turned down the
19 job, there was no reason to remove the
20 deck system from Morris Forest Products
21 as far as you know?
22       MR. CLEVELAND: Objection.
23 That calls for speculation.

Page 207

1        A. I don't know.
2        Q. Would you agree that it would
3  have been up a wonderful thing if Morris
4  could have just kept doing the Keystone
5  work?
6        A. Could I agree that it was a
7  wonderful thing for them to carry on,
8  why would I object to that?
9        Q. I don't know. I am asking
10 you. Would you agree that would have
11 been a good thing, a wonderful thing if
12 they could -- if Morris could have just
13 kept that work?
14       A. Yes.
15       Q. Do you believe that the
16 manufacturing processes at Morris Forest
17 Products were good?
18       A. Yes, they were real good.
19       Q. In fact, the whole setup that
20 y'all had out there for doing this
21 Keystone work in your opinion was good?
22       A. Yes.
23       Q. Do you have any reason to

Page 208

1  believe that the decision to end the
2  relationship, to remove the deck system
3  from Morris Forest Products was made
4  before you turned down the job offer?
5        MR. CLEVELAND: Objection as
6  previously stated.
7        A. I thought we had done answered
8  that.
9        MR. CLEVELAND: You can answer
10 again if you know.
11       A. Make that statement again.
12       Q. Do you have any evidence
13 whatsoever that the decision to remove
14 the deck system from Morris Forest
15 Products was made before you turned down
16 the job offer?
17       A. I believe that the removal from
18 the product -- of Morris Forest Products
19 was done for intentional harm for Stan
20 Pittman financially for turning down the
21 job.
22       Q. Did you ever turn down a job
23 with Keystone before the conversations

52 (Pages 205 to 208)

**367 VALLEY AVENUE**
**(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397**

**FREEDOM COURT REPORTING**

Page 209

1  that you had with Universal on February
2  7, 2005 took place?
3      A.  I turned down the job on the
4  night of the 7th and night of the 11th.
5      Q.  Did you ever turn down a job
6  with Keystone before those times?
7      A.  Not that I can recollect at
8  this moment.
9      Q.  Did you ever have any
10 discussions with Mr. Turner or anyone
11 else with Keystone about jobs with
12 Keystone prior to the night of February
13 7th, 2005?
14     A.  Not that I can recollect at
15 this moment.
16         MR. STOTT:  I am going to go
17 through my notes.
18 EXAMINATION BY MR. DAVIDSON:
19     Q.  I am Rick Davidson and I
20 represent Mr. Ludwig and Mr. Turner and
21 their business.  You know you have sued
22 them; is that right?
23     A.  Yes.

Page 210

1      Q.  I am going to try to be brief.
2  The same ground rules apply to my
3  questions.  In the meeting of February
4  7th, do you recall any specific
5  statement that my client made, Mr. Jerry
6  Turner?
7      A.  The gist of the conversation --
8      Q.  Listen, we are going to get out
9  of here.  I don't want to know gist.  I
10 don't want to know your conclusion.  I
11 don't want to know what you think.  If
12 you can't swear to it under oath to this
13 judge and this jury that a word or a
14 sentence came out of this man's mouth,
15 don't waste our time telling us.  My
16 question is can you give me one
17 statement under oath that this man
18 Mr. Turner said during that meeting?
19         MR. CLEVELAND:  Objection.  He
20 can answer yes or no and then he can
21 obviously say to the best of his
22 recollection anything he thinks was
23 said.

Page 211

1      A.  Restate the question.
2      Q.  Tell me every word that you
3  heard come out of Mr. Turner's mouth
4  during the February 7, 2005
5  conversation.
6      A.  The best of my recollection
7  that everything would -- the best of my
8  recollection is the statements of
9  Mr. Turner that everything would move on
10 like it was at that moment.
11     Q.  You are telling the ladies and
12 gentlemen of the jury he said everything
13 would move on like it was?
14     A.  That is not verbatim.  But
15 that's the gist of what he said.
16 Everything would move on in that
17 direction.
18     Q.  Did he say anything else?
19     A.  There was other conversations,
20 but as far as telling you specific words
21 right now, I can't.
22     Q.  Why did you leave Morris Forest
23 Products?

Page 212

1      A.  Why did I leave Morris Forest
2  Products?
3      Q.  Yes.
4      A.  Well, Morris Forest Products
5  had been damaged by this Keystone/
6  Universal, whatever you want to call it,
7  and Morris Forest Products is under
8  great financial stress.  Stan Pittman
9  had to leave to try to survive.
10     Q.  Did you miss any paychecks
11 between February 7th of 2005 and the end
12 of September when you left?
13     A.  As far as commission checks?
14     Q.  You told me you got --
15     A.  I got commission checks.  I
16 didn't get paid -- clear it up,
17 paychecks like when you go to work for
18 somebody and you work on their time
19 clock.
20     Q.  You got paid how often?
21     A.  Weekly.  I got a weekly
22 commission check, a draw.
23     Q.  Did you get a weekly commission

53 (Pages 209 to 212)

**367 VALLEY AVENUE**
(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397